A. Barry Cappello (CSB No. 037835)
abc@cappellonoel.com
Lawrence J. Conlan (CSB No. 221350)
lconlan@cappellonoel.com
Wendy D. Welkom (CSB No. 156345)
wwelkom@cappellonoel.com
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805)564-2444
Facsimile:   (805)965-5950
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| KEVIN MICHAEL BROPHY, JR., an individual,<br><br>Plaintiffs,<br><br>v.<br><br>BELCALIS ALMANZAR aka CARDI B, an individual; KSR GROUP, LLC, a New York limited liability company; WASHPOPPIN, INC., a New York corporation; and DOES 1-20, inclusive,<br><br>Defendants. | **Case No. 8:17-cv-01885-CJC(JPRx)**<br><br>Hon. Cormac J. Carney,<br>U.S. District Judge<br><br>**SUPPLEMENTAL DECLARATION OF LAWRENCE J. CONLAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [F.R.C.P. RULE 12(B)]**<br><br>Hearing Date:  August 26, 2019<br>Time:            1:30 pm<br>Location:       7C<br><br>Complaint filed:  10/26/17<br>Pre-Trial Conf.:  Not Yet Set<br>Trial Date:  Not yet Set |

## SUPPLEMENTAL DECLARATION OF LAWRENCE J. CONLAN

I, Lawrence J. Conlan, declare as follows:

I am a partner in the law firm of Cappello & Noël LLP, and I am counsel of record for Plaintiff in this matter. I make this Declaration of my own personal knowledge, and if called to do so, I could testify competently to the matters stated herein.

### Deposition Transcripts

1.      Attached hereto as Exhibit A is a true and correct copy of excerpts of the transcript of the January 8, 2019 deposition of Klenord Raphael, aka "Shaft", the designated Person Most Knowledgeable for Defendant KSR Group, LLC.

2.      Attached hereto as Exhibit B is [REDACTED – FILED UNDER SEAL]

### Documents Produced During Jurisdictional Discovery

3.      Attached hereto as Exhibit C is [REDACTED – FILED UNDER SEAL]

4.      Attached hereto as Exhibit D is [REDACTED – FILED UNDER SEAL]

5.      Attached hereto as Exhibit E is [REDACTED – FILED UNDER SEAL]

6.      Attached hereto as Exhibit F is [REDACTED – FILED UNDER SEAL]

7.      Attached hereto as Exhibit G is a true and correct copy of an Excel spreadsheet, produced in native format by Defendants during jurisdictional discovery titled "Copy of Cardi B 2016-2017 performances.xlsx".

8.      Attached hereto as Exhibit H is a true and correct copy of a set of images produced by Defendants during jurisdictional discovery and bates-stamped KSR00001-00006. [PARTIALLY REDACTED – UNREDACTED VERSION FILED UNDER SEAL]

9.     Attached hereto as Exhibit I is [REDACTED – FILED UNDER SEAL]

10.     Attached hereto as Exhibit J is a true and correct copy of a recording contract dated October 17, 2016, between Defendant KSR Group LLC and Defendant Belcalis Almanzar, noticed as Deposition Exhibit 13 at the January 8, 2019 deposition of Raphael Klenord, the designated Person Most Knowledgeable for Defendant KSR Group, LLC.

11.     Attached hereto as Exhibit K is a true and correct copy of a series of social media posts, noticed as Deposition Exhibits 14, 15, 16, 17, 18, 20, 21, 22 and 23 at the January 8, 2019 deposition of Raphael Klenord, the designated Person Most Knowledgeable for Defendant KSR Group, LLC.

12.     Attached hereto as Exhibit L is a true and correct copy of a series of social media posts, noticed as Deposition Exhibits 24, 25, 26, 27, 32 and 33 at the January 8, 2019 deposition of Raphael Klenord, the designated Person Most Knowledgeable for Defendant KSR Group, LLC.

13.     Attached hereto as Exhibit M is a true and correct copy of a series of social media posts, noticed as Deposition Exhibits 28, 29, 30, 31, 34, 35 at the January 8, 2019 deposition of Raphael Klenord, the designated Person Most Knowledgeable for Defendant KSR Group, LLC and Deposition Exhibits 44 and 49 at the April 19, 2019 deposition of Belcalis Almanzar.

14.     Attached hereto as Exhibit N is a true and correct copy of a series of social media posts, noticed as Deposition Exhibits 37 and 38.

15.     Attached hereto as Exhibit O is a true and correct copy of a social media post, noticed as Deposition Exhibits 47 and 51 at the April 19, 2019 deposition of Belcalis Almanzar.

16.     Attached hereto as Exhibit P is a true and correct copy of a social media post, noticed as Deposition Exhibit 50 at the April 19, 2019 deposition of Belcalis Almanzar.

DECLARATION OF LAWRENCE J. CONLAN

1

2                        **Discovery Responses and Correspondence**

3          17.     Attached hereto as Exhibit Q are true and correct copies of

4  Defendants' responses to Plaintiff's special interrogatories propounded in response

5  to the Court's order granting leave to conduct jurisdictional discovery.

6          18.     Attached hereto as Exhibit R is a true and correct copy of a May 8

7  email exchange between Plaintiff and Defendants' counsel.

8          19.     Attached hereto as Exhibit S is a true and correct copy of a February

9  14, 2019 email sent to Defendants' counsel regarding Defendant Cardi B's removal

10  of her Instagram page.

11

12  I declare under penalty of perjury that the foregoing is true and correct.

13          Executed the 5th day of August, 2019, at Santa Barbara, California.

14

15                                    */s/Lawrence J. Conlan*
                                      Lawrence J. Conlan
16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
 2    CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION
 3
 4    KEVIN MICHAEL BROPHY, JR.,      )
      AN INDIVIDUAL,                  )
 5                                    )
                        PLAINTIFF,    )
 6                                    )
      vs.                             )CASE NO. 8:17-CV-
 7                                    )  01885-CJC(JPRx)
      BELCALIS ALMANZAR AKA CARDI B,)
 8    AN INDIVIDUAL; KSR GROUP, LLC,)
      A NEW YORK LIMITED LIABILITY    )
 9    COMPANY; WASHPOPPIN, INC.,      )
      A NEW YORK CORPORATION; AND     )
10    DOES 1-20, INCLUSIVE,           )
                                      )
11                                    )
                        DEFENDANTS.   )
12    _____)
13
14      DEPOSITION OF PERSON MOST KNOWLEDGEABLE OF KSR
15           GROUP, LLC, KLENORD SHAFT RAPHAEL
16                TUESDAY, JANUARY 8, 2019
17
18
19
20
21
22
23
24    JOB NO:  3188607
25    REPORTER: JESSICA N. NAVARRO, C.S.R. NO. 13512
```

                                              Page 1

```
 1    DEPOSITION OF KLENORD SHAFT RAPHAEL, PMK, TAKEN ON

 2    BEHALF OF PLAINTIFF AT 11:04 A.M., ON TUESDAY, JANUARY

 3    8, 2019, AT 1755 WEST HIGHLAND AVENUE, 19TH FLOOR,

 4    HOLLYWOOD, CALIFORNIA, BEFORE JESSICA N. NAVARRO, C.S.R.

 5    NO. 13512, PURSUANT TO NOTICE.

 6

 7    APPEARANCES OF COUNSEL

 8

 9    FOR PLAINTIFF:

10            CAPELLO & NOEL, LLP

              BY:  LAWRENCE J. CONLAN, ATTORNEY AT LAW

11            831 STATE STREET

              SANTA BARBARA, CALIFORNIA 93101

12            805.564.2444

              LCONLAN@CAPPELLONOEL.COM

13

14    FOR DEFENDANTS:

15            ALAN G. DOWLING, APC

              BY:  ALAN G. DOWLING, ATTORNEY AT LAW

16            1043 PACIFIC STREET

              SANTA MONICA, CALIFORNIA 90405

17            818.679.6395

              AGDOWLING@AOL.COM

18

19

20

21

22

23

24

25

                                              Page  2
```

```
 1                    HOLLYWOOD, CALIFORNIA

 2             TUESDAY, JANUARY 8, 2019, 11:04 A.M.

 3                            -O-

 4

 5                  (Prior to the deposition commencing,

 6                  all counsel stipulated to waive the

 7                  reporter read on and read off

 8                  pursuant to Federal Rule 30.)

 9

10                  KLENORD SHAFT RAPHAEL,

11       having been duly administered an oath by the

12        reporter, was examined and testified as follows:

13

14                        EXAMINATION

15   BY MR. CONLAN:

16       Q    So, I'm Larry Conlan.  I represent

17   plaintiff in this case.  We met briefly off the

18   record.  You understand you're having your

19   deposition taken today?

20       A    Yes.

21       Q    Have you had your deposition taken before?

22       A    For this case?

23       Q    In any other case.

24       A    I have.

25       Q    Okay.  How many times?
```

Page 6

| | | |
|---|---|---|
| 1 | A | Once. |
| 2 | Q | Okay.  How long ago was it? |
| 3 | A | Two months ago. |
| 4 | Q | Okay.  Was that in the case between you |

5   and Cardi B?

| | | |
|---|---|---|
| 6 | A | No. |
| 7 | Q | Okay.  Was that it in a case in which you |

8   were a litigant?

| | | |
|---|---|---|
| 9 | A | No. |
| 10 | Q | You were just a fact witness -- |
| 11 | A | Yes. |
| 12 | Q | -- in the case? |

13         Okay.  Well, the basic process today is

14   that I'm going to be asking you questions.  The

15   court reporter is going to be transcribing your

16   answers.  Give me a moment to make sure my question

17   is finished before you answer so we have a clean

18   record.  Do you understand that?

| | | |
|---|---|---|
| 19 | A | Yes. |
| 20 | Q | Seems like you're a pretty busy man.  So, |

21   if you need to take a break at some point, let me

22   know we can take a break.  I just ask that you don't

23   take any breaks while a question is pending.  Do you

24   understand that?

| | | |
|---|---|---|
| 25 | A | Gotcha. |

Page  7

```
 1          Q     You understand you're under oath today?

 2          A     Yes.

 3          Q     When the deposition is over you're going

 4     to have a chance to review the transcript that the

 5     court reporter prepares and you will have an

 6     opportunity to make some corrections of the

 7     transcript if necessary.  Do you understand that?

 8          A     Yes.

 9          Q     And do you understand that if you make

10     corrections or changes that are material, I will

11     have an opportunity to comment on that in front of a

12     judge or a jury.  Do you understand that?

13          A     Yes.

14          Q     And if I do that, it may affect your

15     credibility as a witness.  Do you understand that?

16          A     Yes, I do.

17          Q     Okay.  Do I have your full attention to

18     testify --

19          A     Yes, you do.

20          Q     -- at the moment?

21          A     Yes.

22          Q     Okay.  And as I ask you questions today,

23     may I address you as Shaft or do you want me to

24     address you --

25          A     Mr. Raphael is fine.
```

Page 8

```
 1        Q    Okay.  And when -- your recollection is
 2   that Cardi B was only out here for two events?
 3        A    She was out here at that time for two
 4   events.
 5        Q    When you say "that time," what time period
 6   are you referring to?
 7        A    I don't exactly remember the exact time
 8   period that was required.  But whatever was required
 9   is when.  She wasn't out here too much.
10        Q    When did you start representing Cardi B?
11        A    I managed Cardi maybe 2013.
12        Q    When you began managing her was that
13   through KSR?
14        A    No.
15        Q    Was that through World Star?
16        A    Yeah.
17        Q    And at what point did you enter into an
18   agreement between KSR and Cardi B?
19        A    That was late.  That was probably at least
20   2015 or '16.
21        Q    Okay.  So from 2013 when you began -- when
22   World Star began managing Cardi B until the time
23   that World Star/KSR and Cardi B no longer had a
24   contractible relationship, how many times did you
25   arrange for Cardi B to visit California?
```

Page 14

```
 1        A     That would be twice.
 2        Q     And when you did that, did you arrange her
 3   flights?
 4        A     Yes.
 5        Q     Did you arrange her travel within
 6   California?
 7        A     Yes.
 8        Q     Did you arrange --
 9        A     I didn't.
10        Q     Someone on your behalf?
11        A     The travel agency did.
12        Q     Okay.  And you or someone on your behalf
13   asked the travel agent to do that?
14        A     Yes.
15        Q     Okay.  And that was on behalf of World
16   Star or KSR or both?
17        A     No.  It was on behalf of really just --
18   just me as World Star.
19        Q     Okay.  And why don't you describe for the
20   record the relationship between KSR and Cardi B?
21        A     The relationship between KSR and Cardi B?
22        Q     Yeah.
23              MR. DOWLING:  You can talk about the
24   nature of the business relationship.
25
```

Page 15

```
 1    BY MR. CONLAN:

 2        Q    Correct.

 3        A    KSR is a record label.

 4        Q    Okay.  And what does a record label do for

 5    its clients like Cardi B?

 6        A    Market records.

 7        Q    Okay.

 8        A    That's it.

 9        Q    And does KSR have the right to records?

10    Does it own rights to records that it markets?

11        A    Does it own the rights to the records that

12    it markets?  Part of -- that's a good question.  I'm

13    not sure because I got -- technically, I don't know

14    if Atlantic owns it.  I'm not sure.

15        Q    Before Atlantic Recording came into the

16    picture, did KSR own any rights to Cardi B's music?

17        A    Before, yes.

18        Q    Okay.  And what rights did it own?

19        A    I'm not exactly sure of the question

20    because -- but because she signed a label, I own

21    rights to the music.

22        Q    Okay.  I'm going to ask you a couple

23    questions.  I'm just going to go back to documents.

24        A    That's fine.

25        Q    Did you or anyone on behalf of KSR make
```

Page 16

```
1    when you asked him to do the artwork for the mix

2    tape?

3         A    To put together -- I gave him the -- put

4    together the cover of the mix tape and forwarded him

5    pictures.

6         Q    Did you give him guidance on what you

7    wanted it to look like?

8         A    No.  Just gave him pictures.  Yeah, he got

9    pictures really.

10        Q    All right.

11        A    So there's really no guidance.

12        Q    Were you the one who set up the photo

13   shoot that was used in part for the cover of the mix

14   tape?

15        A    Yeah.

16        Q    Okay.  And that's the photo of Cardi B

17   sitting in the back of the limo?

18        A    Yeah, with the model.

19        Q    With the Corona with the model?

20        A    Uh-huh.

21        Q    And where did that photo shoot take place?

22        A    Canada.

23        Q    Where in Canada?

24        A    Toronto.

25        Q    And when you sent the photo to Timothy
```

Page 21

```
 1   Gooden, there was a -- the model had a tattoo of
 2   Calvin and Hobbs on his back; is that right?
 3         A    He had tattoos on his back.
 4         Q    Yeah.  Okay.  Did you tell Timothy Gooden
 5   you wanted some other kind of tattoos on the model's
 6   back instead?
 7         A    No.  Timothy added tattoos on his back.
 8         Q    And did you talk to him about where he got
 9   the images of the tattoos that he added --
10         A    No.
11         Q    -- on his back?
12         A    Huh-uh.
13         Q    Remember to wait until I'm finished asking
14   the question --
15         A    Sorry.
16         Q    -- before you answer.
17              Okay.  We'll come back to that.  Were you
18   responsible for marketing Gangsta Bitch Volume 1?
19   You -- and when I say "you," I'm talking about KSR.
20         A    No.
21         Q    Who is involved with or employed by or a
22   member of KSR?
23         A    At that time all the marketing was done on
24   Cardi's social.
25         Q    What does that mean?
```

Page 22

```
 1      A    That means all the marketing was done via
 2  Instagram.
 3      Q    Okay.  And the marketing that was done via
 4  Instagram was that done at your direction?
 5      A    Partly, yeah.
 6      Q    Does KSR have any employees?
 7      A    No.
 8      Q    How many members does it have?
 9      A    One, just me.
10      Q    Just you; right?
11      A    Uh-huh.
12      Q    Okay.  So if anything is done by KSR, it's
13  done at your direction; correct?
14      A    It's partly me and the artist.
15      Q    Okay.
16      A    It's not just me by myself.
17      Q    Right.  But if it's something that's a
18  direction that's coming from KSR, it's a direction
19  that comes from perhaps with consultation with
20  whatever artist --
21      A    And artist, correct.
22      Q    -- you're working with?
23           And how many artists do you work with?
24      A    Three.
25      Q    How many artists did KSR work with between
```

Page 23

```
 1        A    Currently three.

 2        Q    Who are they?

 3        A    The ones I mentioned.

 4        Q    Okay.  But you don't -- now, World Star

 5   nor KSR represents Cardi B; right?

 6        A    Actually, I take that back.  Only two.

 7        Q    Okay.  HoodCelebrityy and Josh X?

 8        A    Right.  Just Josh X.

 9        Q    And not HoodCelebrityy?

10        A    I don't manage HoodCelebrityy.

11        Q    So going back to KSR, currently KSR

12   markets for Josh X and HoodCelebrityy?

13        A    As the label.

14        Q    Okay.  Got it.

15        A    That's why.

16        Q    Okay.  And -- and so you said that when

17   you were marketing the Gangsta Bitch Volume 1 Mix

18   Tape for Cardi B in consultation with Cardi B, it

19   was done through social media?

20        A    Yes.

21        Q    Was that the only platform that was used?

22        A    Yes.

23        Q    Did KSR have merchandising rights to

24   Cardi B's merchandise?

25        A    Yes.
```

Page 25

```
1        A      Uh-huh.

2        Q      Okay.  You have worked in the past with a

3    lawyer named Rick Joseph in L.A?

4        A      Yes.

5        Q      For low long?

6        A      From when I began managing Cardi.

7        Q      So you didn't work with Mr. Joseph until

8    2015 or 2013?

9        A      Whenever I started working with --

10   whenever Cardi went on television is when Joseph

11   started working with Cardi.

12       Q      How did you meet Mr. Joseph?

13       A      Meek Mill introduced me.  Mill's manager

14   introduced me to him.

15       Q      Macmillian?

16       A      Meek Mill's manager.

17       Q      Meek Mill's?

18       A      Yes.

19       Q      And who is Meek Mill's manager?

20       A      I forget his name.  It's been a long time?

21       Q      When you've done work for other artists,

22   other than Cardi B, have you also worked through

23   Mr. Joseph in preparing contracts and negotiating

24   contracts on their behalf?

25       A      With Joseph did -- yes.
```

                                                Page 27

```
 1        Q     Do you still work with Mr. Joseph?

 2        A     Here and there, not as much.

 3        Q     How many times have you come to California

 4   to meet with Mr. Joseph?

 5        A     We spoke on the phone.

 6        Q     How many times?

 7        A     How many times we spoke on the phone?

 8        Q     Yeah.

 9        A     Often.

10        Q     Often?

11        A     I mean, when he's negotiating the deal for

12   Love and Hip Hop actually we spoke on the phone for

13   like a while.

14        Q     So starting around 2013?

15        A     When -- starting around when Cardi was on

16   TV, yes.

17        Q     Do you recall that being around 2013?

18        A     Whenever that was.  I -- '13 or '15,

19   whenever it was.

20        Q     Approximately, 2013/2014; is that fair?

21        A     Yeah.  Whenever she was on TV.

22        Q     When you began working with Mr. Joseph and

23   talking to him on the phone frequently, would you

24   say you spoke with him on the phone a couple times a

25   week?
```

Page 28

```
 1        A     No, not that often.

 2        Q     Couple times a month on average?

 3        A     Probably twice a month.

 4        Q     Okay.  From that period of time until

 5   when?

 6        A     Until --

 7        Q     Currently?

 8        A     Not currently.  Until maybe 2016.

 9        Q     So from 2013 or '14 until around 2016 you

10   spoke with Mr. Joseph on the phone a couple times a

11   month on average?

12        A     Yeah.

13        Q     Okay.  And Mr. Joseph is located in

14   Beverly Hills; correct?

15        A     Yeah.

16        Q     Okay.  And do you have a client retainer

17   agreement with Mr. Joseph?

18        A     Yes.

19        Q     On behalf of KSR?

20        A     Yes.

21        Q     Yes?

22              MR. DOWLING:  You're extremely patient

23   about all this.  As you know the court ordered this

24   discovery be conducted with respect to three

25   specific issues identified in the Court's order.
```

Page 29

1      Q      This is an image that Tim Gooden prepared?

2      A      No. 4?

3      Q      Yeah.

4      A      Okay.

5      Q      Is that right?

6      A      Yes.

7      Q      And the original photo that you sent to

8    him, is that on page six?

9              MR. DOWLING:   What do you mean that he

10   sent to him?   There's no testimony to that effect.

11             MR. CONLAN:   All right.   Let me ask him.

12   BY MR. CONLAN:

13     Q      Do you see the image on page six?

14     A      Yes.

15     Q      Is that an image that was created during

16   the photo shoot that you coordinated for Cardi B in

17   Toronto?

18     A      Yes.

19     Q      Did you take that image and send it to

20   Nojo?

21     A      Yes.

22     Q      Okay.   And what did you tell him?

23     A      Clean it up.

24     Q      Okay.   And so he cleaned it up by

25   basically finding a different tattoo and photo

                                        Page 41

```
 1    shopping onto the model?
 2         A    Yeah.
 3         Q    Is that your understanding?
 4         A    That's what he did, yeah.
 5         Q    Do you know where he got the image --
 6         A    No idea.
 7         Q    -- for the photo shop?  Did you ever ask
 8    him?
 9         A    No.
10         Q    During the course of this litigation have
11    you ever contacted Nojo and asked him where he got
12    the image?
13         A    Yes.
14         Q    And what did he say?
15         A    On the internet.
16         Q    Did he say where?
17         A    No.
18         Q    Did you ask him where?
19         A    He said on the internet.  I did.  He said
20    on the internet.  He Googled it.
21         Q    How did he Google it?
22         A    I have no idea.
23         Q    Did you tell him that a lawsuit had been
24    filed by the person whose tattoo it was that appears
25    on the model now?
```

Page 42

```
 1        A     Definitely.

 2        Q     Yeah.  What did he say?

 3        A     He said, wow.

 4        Q     Yeah.  Did you ask him if he made any

 5    efforts to contact the person who has the tattoo on

 6    his back?

 7        A     No.

 8        Q     You didn't ask him?

 9        A     No.

10        Q     How much did you pay Nojo to do this work?

11        A     He might have charged me $200.

12        Q     Does Nojo do all of your graphic design

13    work?

14        A     Not all, no.

15        Q     This will be Exhibit 3.

16              (Whereupon, Plaintiff's Exhibit 3 was

17               marked for identification by the court

18               reporter and attached hereto.)

19    BY MR. CONLAN:

20        Q     Do you recognize this document?  For the

21    record this is Bates-stamped KSR 7 through -- it's

22    two-sided, KSR7 through 13.

23        A     Yeah.

24        Q     What is it?

25        A     It's a recording agreement.
```

Page 43

```
 1        Q     Yes.

 2        A     Klenord Shaft Raphael.

 3        Q     Okay.  And Kollective Sound Recording

 4   Group is what?

 5        A     I have no idea.

 6        Q     Was that an error, do you know on this

 7   agreement?  Do you see where --

 8        A     Yeah, I see it.  Yeah.

 9        Q     You don't know where that came from?

10        A     No, I don't know where that came from.

11        Q     That's not an entity that you --

12        A     Uh-huh.

13        Q     -- control?

14        A     No.

15        Q     That's not an entity you ever formed?

16        A     No.

17        Q     But this was an agreement that was being

18   negotiated between KSR Group and Atlantic

19   Corporation?

20        A     Yes.

21        Q     On your behalf of KSR?

22        A     Yes.

23        Q     And for what artists or what artist was

24   this intended to include?

25        A     Cardi B.
```

Page 45

```
 1        Q     Just Cardi B?

 2        A     Uh-huh.

 3        Q     And did Mr. Joseph negotiate other similar

 4   agreements on behalf of KSR for other artists that

 5   KSR represents?

 6        A     Yes.

 7        Q     For whom?

 8        A     HoodCelebrityy.

 9        Q     Okay.  Set that aside.  So when I finish

10   with these, you can just kind of turn them over and

11   keep them in the same order so the court reporter

12   can take them at the end of the day.

13        A     Cool.

14        Q     This is going to be Exhibit 4.

15              (Whereupon, Plaintiff's Exhibit 4 was

16               marked for identification by the court

17               reporter and attached hereto.)

18   BY MR. CONLAN:

19        Q     Exhibit 4 is a document entitled Empire

20   Distribution -- Digital Distribution Agreement and

21   it's stamped KSR14 through 20 -- 24 and it's also

22   two sided.  Do you recognize this document?

23        A     Yeah.

24        Q     What is it?

25        A     Distribution agreement.
```

Page 46

```
 1          Q      Is this the final agreement?

 2          A      Yes.

 3          Q      Okay.  And this is a distribution

 4    agreement between KSR Group and Empire?

 5          A      Yeah.

 6          Q      And Empire is located in San Francisco?

 7          A      I'm not sure.

 8          Q      Do you see where it says licensee and it's

 9    got Empire's name?

10          A      Yep.

11          Q      Maiden Lane in San Francisco, California.

12          A      Yes.

13          Q      Who negotiated this agreement on behalf of

14    KSR?

15          A      I think I might have.

16          Q      Did Rick Joseph have any role in

17    negotiating this agreement?

18          A      I don't remember.  I don't think so.

19          Q      There are some initials on the bottom

20    right corner of each page, KR, are those your

21    initials?

22          A      My initials.

23          Q      And then if you turn to the last page

24    where it says or -- I'm sorry, 22 where it says

25    licensor.  It says signature and that's your
```

Page 47

```
 1   signature there?

 2        A    Yes.

 3        Q    Leonard Raphael?

 4        A    What page?

 5        Q    22.

 6        A    22, yeah, that's my signature.

 7        Q    And on 24 there's another signature there?

 8        A    Yeah.

 9        Q    And that's the direct deposit form?

10        A    Yeah.

11        Q    Okay.  And Ghazi Shami, am I pronouncing

12   that right?

13        A    It's the owner?

14        Q    Yeah.

15        A    Yeah.

16        Q    Is he the guy who you negotiated this

17   contract with?

18        A    No.  We negotiated with somebody else.

19        Q    Do you have a copy of this signed by

20   Mr. Shami?

21        A    I don't -- I'm not sure.

22        Q    Do you understand this to be the final

23   agreement between KSR and Empire?

24        A    No.  They -- he would have to sign it and

25   send it to me, so this may not be the final.
```

Page 48

```
 1        Q     Okay.  Did you search for any copies that

 2    he had signed and sent to you?

 3        A     I'm not sure.  I don't remember.

 4        Q     Okay.  What is the purpose of this

 5    agreement?

 6        A     It's a distribution agreement.

 7        Q     For what?

 8        A     Basically distribute music on all

 9    platforms.

10        Q     Okay.  For what artist?

11        A     Cardi, it's for Cardi.

12        Q     Just for Cardi?

13        A     At this time just for Cardi, yeah.

14        Q     And this time is?

15        A     2015.

16        Q     December 2015?

17        A     Yeah.

18        Q     And so it says there in No. 2 Content.  It

19    says "Licensor owns and/or controls 100 percent of

20    the sound recordings delivered to licensee."  See

21    that?

22        A     Uh-huh.

23        Q     Okay.  And licensor is KSR Group; correct?

24        A     Uh-huh.

25        Q     So any sound recordings of Cardi B you
```

Page 49

1   were representing that or KSR was representing here

2   that it owned and controlled them at this time?

3        A    At this time, yeah.

4        Q    And if you can turn to page seven of the

5   contract, it's the Bates-stamp 20.  There's a

6   paragraph No. 12.

7        A    Uh-huh.

8        Q    See that?

9        A    Yeah.

10       Q    Okay.  And it's a mediation arbitration

11  provision?

12       A    Yes, uh-huh.

13       Q    It says that "The controversy or claim

14  shall be settled by three arbitrators and all

15  hearings shall be held in San Francisco,

16  California."  Do you see that?

17       A    Uh-huh.

18       Q    And further down it says "In rendering the

19  award, the arbitrator shall interpret this agreement

20  it accordance with the substantive laws of

21  California."  Do you see that?

22       A    Uh-huh.

23       Q    And that's what you agreed to when you

24  signed this contract?

25       A    Yep.

Page 50

```
 1        Q     Have there been any disputes with Empire?

 2        A     No.

 3        Q     So how much has Empire paid you or paid

 4   KSR pursuant to this agreement?

 5        A     I have no clue.  No clue whatsoever.

 6        Q     Did you, and for the purposes of this

 7   case, collect information demonstrating how much KSR

 8   received from Empire?

 9        A     Yeah, my assistant gave it to Alan.

10        Q     You think so?

11        A     I think she did.

12              MR. DOWLING:  And we gave it to you.

13   BY MR. CONLAN:

14        Q     I'm going to hand you No. 5.

15        A     Okay.

16                  (Whereupon, Plaintiff's Exhibit 5 was

17                   marked for identification by the court

18                   reporter and attached hereto.)

19   BY MR. CONLAN:

20        Q     No. 5 for the record is a -- looks like a

21   letter agreement between WB Music Corp., and I don't

22   know if it's KSR or you individually.  But it's

23   Bates-stamped KSR 26 through 44 and it's two sided.

24   Do you recognize this document?

25        A     Yes.
```

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1        Q     Okay.  Why don't you tell me for the

 2   record what it is?

 3        A     This is a publishing agreement.

 4        Q     Between -- and who are the parties to it?

 5        A     Warner/Chappell and myself.

 6        Q     You individually, not KSR?

 7        A     Me individually, nothing to do with KSR.

 8        Q     And what artist is it intended to cover?

 9        A     All my -- any artist.  It's not artist

10   specific.

11        Q     So was this intended to cover -- or did

12   this, when it was signed, include Cardi B?

13        A     Yeah, any artists that I have worked with.

14        Q     Okay.  September of 2017 you were working

15   with Cardi B?

16        A     Yeah, I was working with Cardi B,

17   HoodCelebrityy.  Any artist, not just Cardi.

18        Q     And this was negotiated on your behalf by

19   Rick Joseph in Beverly Hills?

20        A     Uh-huh.

21        Q     And this is called an exclusive

22   administration agreement, you called it a publishing

23   agreement.  Do you --

24        A     It's the same thing.

25        Q     Okay.  If you turn to the page stamped 35.
```

                                              Page 52

```
 1        A     Uh-huh.
 2        Q     There's a paragraph 8.1.4.  And this has
 3   to do with claims made against Warner/Chappell
 4   Music; right?
 5        A     Uh-huh.
 6        Q     That paragraph?
 7        A     Okay.
 8        Q     And is that correct?
 9        A     Yes.
10        Q     And it's talking about if claims are made
11   then Warner/Chappell will withhold a certain amount
12   of money; is that correct?
13        A     Yep.
14        Q     Okay.  Now, Warner/Chappell is located in
15   san -- Los Angeles, California; correct?  You can go
16   ahead and turn to the first page again.
17        A     Yep.
18        Q     You understood at the time that this
19   contract was being negotiated at the time by your
20   attorney located in Beverly Hills with WB Music
21   corp. care of Warner/Chappell music also located in
22   Los Angeles, California; correct?
23        A     I didn't know where they were located to
24   tell you the truth.
25        Q     You understand now that this is where
```

Page 53

1    they're located, at least as of this time?

2         A    I see it now on the document.

3         Q    Okay.  So going back to the 8.1.4 it's

4    referring to the amount on legal hold.  It's talking

5    about refunds and it refers to interest on the

6    amount released at the regular savings and loan pass

7    book interest rate prevailing in Los Angeles from

8    time to time.  Do you see that?

9         A    Yep.

10        Q    Okay.  And if you turn to page 13 of the

11   agreement, Bates-stamp 38.

12        A    Yes.

13        Q    That's your signature there, agreed and

14   accepted?

15        A    Yes, it is.

16        Q    If you look to the top of that page 11.1

17   it says "This agreement has been entered into and to

18   be interpreted in accordance with the laws of the

19   State of California."  Do you see that?

20        A    Yes, I do.

21        Q    And that's what you agreed to?

22        A    Yep.

23        Q    Okay.  Turn to page 14 of the agreement if

24   you could, Bates-stamp 39.

25        A    Okay.

                                        Page 54

1    Q    There's "Schedule A, Existing

2    Compositions" and that refers to something else.  It

3    says "See Attached."  And question for you is

4    what -- what was supposed to be attached to that?

5    A    I don't know what was attached to it.

6    Q    Well, existing Compositions, what is your

7    understanding of what that means?

8    A    I'm not sure if it's a composition of all

9    the artists or for just Cardi.  So I'm not sure.

10   It's probably previous music, but I'm not sure if

11   it's all --

12   Q    Okay.

13   A    -- or some.  I'm not sure.

14   Q    So at a minimum it included Cardi; right?

15   A    Yes.

16   Q    Does that mean it included Gangsta Bitch

17   and songs appearing on Gangsta Bitch?

18   A    Is this included?  I'm not sure.  I'd

19   assume so.

20   Q    Okay.

21   A    I'd assume so.  This deal -- this deal

22   wasn't really centered around Gangsta Bitch music.

23   Q    Excuse me?

24   A    This deal wasn't really centered around

25   Gangsta Bitch Music.

Page 55

```
 1        A     And the VMAs, yes.  But the others, ESPN,
 2    Star, Queen Sugar, Dance Battle, no idea.
 3        Q     Could they be for other artists that you
 4    represent?
 5        A     I'm not -- none of my artist appeared on
 6    those shows.
 7        Q     Okay.
 8        A     None of my other artists.
 9        Q     All right.  I'm going to hand you Exhibit
10    6.
11              (Whereupon, Plaintiff's Exhibit 6 was
12               marked for identification by the court
13               reporter and attached hereto.)
14    BY MR. CONLAN:
15        Q     Exhibit 6 for the record is stamped KSR60
16    through 62.  And this is an email from a woman named
17    Heather Lowery at Live Nation to a gentleman by the
18    name of Mark Cheatham --
19        A     Uh-huh.
20        Q     -- at CAA, what is that?
21        A     Live Nation.
22        Q     What is CAA?  Creative Artists?
23        A     Creative Artists.  Yeah, it's a talent
24    agency.
25        Q     Right.  And what is your connection or
```

Page 57

1    KSR's connection to Live Nation or Creative Artists?

2         A    They just book talent.

3         Q    Okay.  And what is -- so do you have --

4    does KSR have a contract with Live Nation?

5         A    No.

6         Q    What -- does Live Nation make money

7    working with KSR?

8         A    They make money off whatever they book.

9         Q    Okay.  And is that through an agreement

10   with KSR?

11        A    No agreement, no.  They just -- they

12   just -- if they have a situation, then they bring it

13   to us.

14        Q    So when you say "no agreement," you mean

15   no written agreement?

16        A    Yeah, there's no agreement.

17        Q    How do you determine how much money Live

18   Nation makes if they book for KSR?

19        A    They ask for 10 percent.

20        Q    They ask for 10 percent?

21        A    Yeah.

22        Q    Does KSR pay 10 percent?

23        A    If we agree to what they say, yeah.

24        Q    Has KSR paid Live Nation 10 percent for

25   any artist at any time?

Page 58

```
 1        A     Yeah, all -- any artists.  All the
 2   artists.
 3        Q     Okay.  Heather Lowery from KSR is located
 4   in Beverly Hills?
 5        A     She's not from KSR.
 6        Q     I mean, Live Nation.
 7        A     I guess, I take it, yes.
 8        Q     And where is Mark Cheatham located?
 9        A     Mark I -- Mark?  From -- I guess he's from
10   L.A. as well.
11        Q     Okay.  So this is an email from Heather
12   Lowery to Mark Cheatham and she's describing two
13   scenarios for Cardi B appearances; correct?
14        A     Yeah, we never did this.
15        Q     Okay.
16        A     We never did this.
17              MR. DOWLING:  Counsel, I have a question
18   about this exhibit when you're done.
19              MR. CONLAN:  Yeah.
20   BY MR. CONLAN:
21        Q     Okay.  So there's two attachments to this.
22              MR. DOWLING:  No, there are not.
23              MR. CONLAN:  Okay.
24              MR. DOWLING:  Those are the two pages that
25   came from Empire --
```

Page 59

```
 1    two Live Nation situations that Cardi might have

 2    been.

 3    BY MR. CONLAN:

 4         Q    Where?

 5         A    I don't remember the state.  Could have

 6    been Ohio.

 7         Q    All right.

 8         A    It was Spotify event, so I'm not sure.

 9         Q    Wherever it was, did KSR pay Live Nation a

10    fee for it's work on that event?

11         A    No.  We didn't pay, Live Nation paid us.

12    We don't pay Live Nation a fee.

13         Q    So Live Nation collected the proceeds and

14    then KSR got a cut, is that how it works?

15         A    Yeah.  Live Nation would have promoted us,

16    correct.

17         Q    Okay.  So then KSR gets a cut of

18    whatever --

19         A    No, not a cut.  Live Nation goes to you

20    25 -- whatever -- they pay the artist to perform for

21    the show.

22         Q    Okay.

23         A    That's it.

24         Q    And what does KSR get out of it?

25         A    What does KSR get?
```

Page 64

```
 1        Q    Yeah.

 2        A    KSR --

 3        Q    Does it get a piece?

 4        A    KSR at the time 20 percent.

 5        Q    Of what the artist --

 6        A    Of what the artist makes.

 7        Q    -- gets?  All right.  Let's set that one

 8   aside.

 9             Now, let's look at Exhibit 7 which are the

10   two sales graphs that were produced on behalf of KSR

11   Group.

12        A    Okay.

13                  (Whereupon, Plaintiff's Exhibit 7 was

14                   marked for identification by the court

15                   reporter and attached hereto.)

16   BY MR. CONLAN:

17        Q    What do these two pages show?  Well, first

18   of all, what are they?

19        A    They're records sales.

20        Q    Of what?

21        A    Of whatever -- whatever song Cardi had on

22   Empire.

23             MR. DOWLING:  Why don't we establish first

24   whether he had any part in preparing these

25   documents?
```

```
 1    BY MR. CONLAN:
 2        Q    Mr. Raphael, did you have any part in
 3    preparing these documents?
 4        A    No.
 5        Q    Did you -- where did you get them?
 6        A    When did I get what?
 7        Q    When did you get these documents?
 8        A    I don't know if I got these documents.
 9        Q    Have you seen them before?
10        A    Not this specific document, but I've seen
11    the charts.  I seen the -- I seen these on the
12    computer.
13        Q    Okay.  So you've seen --
14        A    But not this specific.  But I've seen
15    charts like this on the computer.
16        Q    Okay.  Have you seen this --
17        A    Specific?
18        Q    -- specific chart --
19        A    No.
20        Q    -- either digitally or electronically or
21    in paper form?
22        A    No.
23        Q    So you didn't look at this before it was
24    produced in this case?
25        A    No, my assistant put it together.
```

Page 66

| | | |
|---|---|---|
| 1 | Q | She put it together? |
| 2 | A | Yeah.  She's the one -- yeah. |
| 3 | Q | And you're talking about Denise Dixon? |
| 4 | A | Uh-huh. |
| 5 | Q | Did she prepare it or did she get it from |
| 6 | | Empire? |
| 7 | A | She got it from Empire. |
| 8 | Q | Okay.  And do you know what it shows? |
| 9 | A | It shows record sales. |
| 10 | Q | Of what? |
| 11 | A | I'm not exactly sure. |
| 12 | Q | How would you find out? |
| 13 | A | I'm looking at the time frame of 2016.  It |
| 14 | | shows record sales probably of Cardi of the mix |
| 15 | | tape. |
| 16 | Q | Okay.  So your understanding is that these |
| 17 | | are the 2016 and '17 sales of Gangsta Bitch? |
| 18 | A | Uh-huh. |
| 19 | Q | At least according to Empire's records? |
| 20 | A | Yes. |
| 21 | Q | Okay.  And was there any 2015 sales? |
| 22 | A | I don't think so.  It says right here zero |
| 23 | | in January, so I'd assume no. |
| 24 | Q | Okay.  And these charts were generated by |
| 25 | | Empire which is the company located in San |

Page 67

1    Francisco?

2        A    These charts were produced on the computer

3    by Denise.

4        Q    Well, Denise didn't prepare these charts;

5    right?

6        A    She had to -- she queried them.  They

7    don't come like this.  She had to query the data.

8        Q    Okay.  So why don't you walk me through

9    your understanding of the process of Denise

10   preparing these charts?

11       A    She had to log on and she'd have to put

12   the time that she was looking for and then it gets

13   produced online.

14       Q    So she inputs a filter which is KSR Group

15   there?

16       A    Uh-huh.

17       Q    And then the time period?

18       A    Time period.

19       Q    Right.

20       A    And then it creates a chart.

21       Q    And this is a portal that she accesses

22   that's operated by Empire Distribution; right?

23       A    That's their portal.

24       Q    And Empire Distribution is located in

25   San Francisco, California?

Page 68

```
 1        A      Yes.
 2        Q      And she -- the reason she is able to
 3   access this portal is pursuant the distribution
 4   agreement that KSR has with Empire Distribution;
 5   correct?
 6        A      Correct, yes.
 7        Q      And so how can you tell by looking at that
 8   these are the sales for Gangsta Bitch?
 9        A      Says KSR group.
10        Q      Well, 2016 and 2017, didn't Cardi B have
11   other albums out?
12        A      Yeah, but not on with Atlantic.
13        Q      Well, this is from Empire; right?
14        A      Not on Empire, yeah.
15        Q      Okay.  Did KSR have other artist that were
16   part of the -- or that fell under the agreement
17   between KSR and Empire at this time?
18        A      Yes.
19        Q      Okay.  So how do you know that this is for
20   Gangsta Bitch and not some other artist or album?
21        A      Because it says KSR Group.
22        Q      But KSR represented other artists at the
23   time; right?
24        A      Yeah, uh-huh.
25        Q      So do you know or do you not know if this
```

Page 69

1    is for Gangsta Bitch?

2         A    Yeah, for Gangsta Bitch.

3              MR. DOWLING:   Is the question whether it's

4    only for Gangsta Bitch?

5              THE WITNESS:   Yeah.

6    BY MR. CONLAN:

7         Q    No.   The question is how do you know it's

8    for Gangsta Bitch and not some other artist or

9    album?

10        A    Because --

11             MR. DOWLING:   That's where I'm confused.

12             THE WITNESS:   But it says KSR.

13   BY MR. CONLAN:

14        Q    Right.   And KSR represents other artists;

15   right?

16        A    Right.   But it would have said something

17   else for another artist.

18        Q    What would it have said?

19        A    HoodCelebrityy.

20        Q    Why didn't it say Cardi B?

21        A    That's how they set it up.

22        Q    How do you know that?

23        A    Say that again.

24        Q    How do you know that?

25        A    How do I know what?

                                          Page 70

```
 1        Q     That that's how they set it up.

 2        A     Because I know if I go I'll see a filter

 3   for HoodCelebrityy.

 4        Q     Who set it up that way, Empire?

 5        A     Uh-huh.

 6        Q     And that's the company that's based in San

 7   Francisco?

 8        A     That's correct.

 9        Q     Mr. Raphael, did you produce any other

10   documents in the course of this litigation that

11   related to sells of Gangsta Bitch Music, Volume 1,

12   other than these two pages?

13        A     That's it.

14        Q     Did you produce any other documents

15   related to any other sales of Cardi B music?

16        A     That's the only way she gets sales.

17        Q     Did you look for any other documents?

18        A     There's no others that I know.

19        Q     Does KSR have financial statements?

20        A     I don't know of anything else.

21        Q     KSR doesn't prepare financial statements?

22        A     This is -- this is -- everything that's

23   for Gangsta Bitch Music would be right here?

24        Q     Does KSR prepare financial statements?

25        A     Yearly.
```

Page 71

```
 1        Q     Okay.  And did you make any effort to look
 2   at those financial statements as part of this
 3   litigation?
 4        A     No, because anything that Cardi has would
 5   be here as far as record sales.
 6        Q     Did you make my effort to search for
 7   records related to merchandising revenues related to
 8   Gangsta Bitch?
 9        A     No.
10        Q     Did you make any effort to search for
11   records related to appearance revenues generated by
12   appearances that Cardi B made?
13        A     No.
14             MR. DOWLING:  I'm interpreting "you" as
15   being him individually.
16             MR. CONLAN:  I'm meaning KSR.
17   BY MR. CONLAN:
18        Q     Did you or anyone on behalf of KSR make
19   any effort to search for and produce records related
20   to revenues generated by merchandising appearances
21   or any other possible revenue source?
22        A     No, she had.
23        Q     From Cardi B?
24        A     No, she had no merchandise for this.  No
25   merchandising for Gangsta Bitch.
```

Page 72

1        Q     Did you or anyone on behalf of KSR do

2    anything in this case to search for and produce

3    documents showing revenues generated by Cardi B's

4    appearances anywhere?

5        A     No, I don't think so.  Cardi she always

6    hosted before the music, so it wasn't attributable.

7        Q     Exhibit 8 is an email from Matt Martinez

8    at Atlantic Bates-stamped KSR63.  It's actually a

9    chain between looks like you and Matt Martinez and

10   some other people.

11       A     Uh-huh.

12             (Whereupon, Plaintiff's Exhibit 8 was

13              marked for identification by the court

14              reporter and attached hereto.)

15   BY MR. CONLAN:

16       Q     Who is Matt Martinez?

17       A     I don't know.

18       Q     Okay.  The subject to the email chain is

19   Cardi B L.A. session?

20       A     Uh-huh.

21       Q     Do you recall this exchange of emails?

22       A     I don't recall it, but I'm looking at it

23   now.

24       Q     You don't have any reason to believe that

25   these weren't emails that you sent or received in

Page 74

```
 1    November of 2017?

 2         A    What's the question?

 3         Q    You see the first email at the bottom is

 4    from you; right?

 5         A    Uh-huh.

 6         Q    And you're asking him to book a flight and

 7    a room for someone in L.A. that day?

 8         A    Uh-huh.

 9         Q    And the subject is Cardi B L.A. session?

10         A    Okay.

11         Q    What was that, the Cardi B L.A. session?

12         A    That must have been a time when she

13    recorded in L.A.

14         Q    Okay.  So she's making an appearance or

15    recording in L.A?

16         A    No, not appearance, just recording.

17         Q    Where was she recording in L.A.?

18         A    It says --

19         Q    At SLS?

20         A    No.  SLS is a hotel.

21         Q    And that's where she stayed?

22         A    That's where probably the engineer stayed.

23         Q    Who is the engineer, somebody from

24    New York?

25         A    Uh-huh.
```

Page 75

1        A     Yep, this is Jay White, Dallas, Texas.
2     Yep, yep.  Okay.
3        Q     When you finish, I'm going to ask you some
4     specific questions about each of them.
5        A     Okay.  Cool.
6        Q     Finished?
7        A     Yeah.
8        Q     All right.  So if you look at the first
9     page this is an itinerary for you dated November 8,
10    2017; right?
11       A     Okay.
12       Q     Is that right?
13       A     That's for me, yes.
14       Q     Okay.  And this is for a flight from LAX
15    to JFK; correct?
16       A     Yep.
17       Q     Okay.  So you had already been in L.A. at
18    this point in time when you took this flight
19    obviously?
20       A     Correct.
21       Q     For how long?
22       A     I have no clue.
23       Q     Where did you stay?
24       A     I have no clue.  I don't remember this
25    time.

Page 78

1      Q     Where do you normally stay when you come

2   to L.A.?

3      A     I stay different places.  Different -- I

4   stay anywhere.  I stay at SLS.  I stay at Loews.  I

5   stay at different places.

6      Q     How many times a year do you come to

7   California for any reason?

8            MR. DOWLING:  You might want to break down

9   time periods.

10           THE WITNESS:  When?

11  BY MR. CONLAN:

12     Q     2017, how many times did you come to

13  California?

14     A     She had award shows.  I might have came

15  maybe five times for the year.  I'm not sure.

16     Q     Okay.  How many times in 2018 did you come

17  to California?

18     A     I don't know.  I'm not sure.

19     Q     And when you come to California are you

20  coming as a -- as a -- as the member of KSR in part

21  at least?

22     A     No.  I have girlfriends out here, so, no.

23     Q     When you come to California do you do

24  business in California?

25     A     Not -- no.  When I do -- I have business

                                          Page 79

```
 1   in California?  No.  All my business is mostly done
 2   in New York.
 3        Q    Okay.  This trip in November 2017, was
 4   this for the Cardi B L.A. session that we saw in the
 5   previous exhibit?
 6        A    It might have -- it might not have been
 7   for the session.  It might have been for something
 8   else.  It might have been maybe for an award show.
 9        Q    Okay.
10        A    Yeah, because -- no -- what's the date?
11        Q    November 2017.
12        A    November 2017.  November 2017.
13   November 9th, what page is this on?
14        Q    We were looking at the first page of the
15   exhibit.  And if you look to these dates there's
16   different dates on here.
17        A    Right.
18        Q    But if you go about three pages in on the
19   one stamped 70, you see there's an itinerary for
20   Cardi passenger Belcalis Almanzar, see that?
21        A    Right.
22        Q    That's for the same date looks like;
23   right?
24        A    November 9th, okay.
25        Q    Two different flights though; right?
```

Page 80

1      A     Yeah, two different flights.

2      Q     So she was leaving Los Angeles to go back

3   to JFK on a different flight than you on that date?

4      A     Seems so.

5      Q     Okay.  And your office -- who directed

6   TZell Travel to book these flights?

7      A     J Class, Julian.

8      Q     Who is that?

9      A     Somebody who assisted me?

10      Q     Okay.  On behalf of KSR?

11      A     Uh-huh.

12      Q     Okay.  When you say "uh-huh" you mean

13   "yes"?

14      A     Yes.

15      Q     Okay.

16      A     Yeah, I never book flights.

17      Q     I wasn't suggesting that you do, but you

18   tell people to book flights for you; right?

19      A     Yeah.

20      Q     And so as you see Cardi B's flight

21   itinerary here, does it refresh your recollection on

22   what she and you were here for at that period of

23   time --

24      A     No --

25      Q     -- on November 2017?

Page 81

```
 1        A    -- it doesn't, it could've been anything.
 2        Q    Did you make any effort to search for
 3   records showing where you or Cardi stayed while you
 4   were here in Los Angeles?
 5        A    I didn't even know about this.
 6        Q    Did you eat at restaurants while you were
 7   here?
 8        A    I'm sure we did.
 9        Q    Okay.  Do you remember where?
10        A    No.  No idea.
11        Q    Do you remember what else you did while
12   you were here?
13        A    I don't remember back that far.
14        Q    Okay.
15        A    I wish I did.
16        Q    Do you remember being here with her in
17   November 2017?
18        A    I'm not sure if I was with her.  Because
19   even though she's here, I don't be with her all the
20   time.  I don't even -- if it's an award show, I
21   might have went to the show and showed up to the
22   show and left.
23        Q    In any event, you were responsible for
24   booking her flight from L.A. back to --
25        A    Not me.
```

Page 82

```
 1         Q      Yeah.

 2         A      Only for you.

 3         Q      Just for me?

 4         A      Yes.

 5         Q      That's pretty kind of you.

 6         A      Yes.

 7         Q      How long are you here for?

 8         A      Tomorrow I'm gone.  When I'm done, I'm

 9    gone out of here.

10         Q      All right.  This is Exhibit 10.  Why don't

11    you take a moment to look it.  It's bates-stamped

12    KSR 79 through 95.

13         A      Yes.

14                (Whereupon, Plaintiff's Exhibit 10 was

15                 marked for identification by the court

16                 reporter and attached hereto.)

17    BY MR. CONLAN:

18         Q      What is this?

19         A      Seems like Cardi's deal with Atlantic.

20         Q      Is this something you negotiated for

21    Cardi?

22         A      She had her own attorney, but...

23         Q      Were you involved in this negotiation of

24    this contract?

25         A      I was involved for sure.
```

Page 92

1        Q     Okay.  And this was negotiated on behalf
2   of -- I guess that's Cardi's company, Washpoppin;
3   correct?
4        A     Correct.
5        Q     And it was negotiated on behalf of
6   Washpoppin by Rick Joseph in Beverly Hills?
7        A     Yes.
8        Q     Did you talk with Rick Joseph about this
9   agreement and what is being negotiated?
10       A     Yes.
11       Q     Did you talk to Cardi B about this
12  agreement and what is being negotiated?
13       A     Yes.
14       Q     And that was pursuant to your business
15  relationship, KSR and Cardi B; correct?
16       A     Yes.
17       Q     Okay.  What is Washpoppin?
18       A     That's Cardi's company.
19       Q     What does it do?
20       A     That's her company.  That's her company.
21       Q     Does it own rights to her music in any
22  way?
23       A     No, I don't think so.
24       Q     Why would Washpoppin be entering into an
25  agreement with Atlantic Recording Corporation?

Page 93

```
 1        A    I guess, it does -- the name never comes
 2   up, so...
 3             MR. DOWLING:  You're talking about rights
 4   of the music?
 5   BY MR. CONLAN:
 6        Q    Any kind of rights that you're aware of.
 7             MR. DOWLING:  That's self-evident from the
 8   document.  It has the right to enter into contracts
 9   for the recording services.
10             MR. CONLAN:  Yeah, I see that.
11             THE WITNESS:  I guess --
12             MR. CONLAN:  I'm trying to get his
13   understanding of it.
14             MR. DOWLING:  Okay.
15             THE WITNESS:  I guess Washpoppin entered
16   on behalf of Cardi with Atlantic.
17   BY MR. CONLAN:
18        Q    Does KSR have any agreements with
19   Washpoppin?
20        A    No.
21        Q    Okay.  This agreement was negotiated
22   around September 2016?
23        A    Uh-huh.
24        Q    You see that?  Did you make any trips to
25   California to negotiate it?
```

Page 94

```
 1    How would I pay Rick?  I'm not sure.  Was it Paypal?
 2    I'm not --
 3         Q    You don't know as you sit here?
 4         A    Possibly I just sent him a check.
 5         Q    You sent a check to his office in Beverly
 6    Hills?
 7         A    I sent him a check or would have been a
 8    wire transfer.
 9         Q    Okay.
10         A    I'm not sure.
11         Q    When you were doing work with Rick Joseph,
12    did you communicate with him by email?
13         A    Yeah.
14         Q    Okay.  Communicate with him by phone?
15         A    Yes.
16         Q    And did you understand that he was
17    generally working out of his office in Beverly
18    Hills?
19         A    I don't know where he was working out of.
20         Q    You understand his office is located in
21    Beverly Hills?
22         A    Yes.
23              MR. DOWLING:  The record should reflect
24    that Mr. Joseph is submitted to practice in New York
25    as well.
```

Page 98

```
 1    BY MR. CONLAN:

 2         Q    I'll set these aside for now.  Well,

 3    actually before I do that.  Mr. Raphael, if you

 4    could take a look at page 17 of Exhibit 10.

 5         A    Uh-huh.

 6         Q    Is that Cardi B's signature there?

 7         A    Yes, it is.

 8         Q    And that's her signature there

 9    individually above and to the right?

10         A    Uh-huh.

11         Q    And then if you look at Exhibit 11, page

12    15, that's her signature there accepted and agreed

13    for Washpoppin?

14         A    Page -- what page?

15         Q    Page 15 of Exhibit 11.

16         A    Yeah, she signed it.

17         Q    Okay.  Did you handle paying Rick Joseph

18    on behalf of Cardi B and Washpoppin for negotiating

19    these agreements?

20         A    Not all, no.

21         Q    Did you make any payments to Rick Joseph

22    for the negotiations of those agreements that he did

23    on behalf of Cardi B and Washpoppin?

24         A    No.  The label paid Rick Joseph, I didn't

25    pay him.
```

Page 99

```
 1        Q     And it also does marketing?

 2        A     Yes.

 3        Q     And it owns rights to music created by the

 4   artist that sign with it; correct?

 5        A     Correct.

 6        Q     This is Exhibit 13.

 7              (Whereupon, Plaintiff's Exhibit 13 was

 8               marked for identification by the court

 9               reporter and attached hereto.)

10   BY MR. CONLAN:

11        Q     Take a look through it and tell me what it

12   is.

13        A     It's a recording agreement.

14        Q     Between whom?

15        A     Me and Cardi.

16        Q     When you say "me," you mean KSR; right?

17        A     KSR, yep.

18        Q     Okay.  Did Rick Joseph negotiate this

19   agreement?

20        A     On my behalf.

21        Q     On your behalf?

22        A     Uh-huh.

23        Q     He did?

24        A     Uh-huh.

25        Q     Your counsel made a comment a couple
```

Page 102

```
 1    minutes ago about Rick Joseph being admitted in New
 2    York.  Do you have any knowledge of that?
 3          A    I don't know where he's at.
 4          Q    Okay.  Do you know what being admitted in
 5    New York means?
 6          A    No.
 7          Q    Do you know if he's a licensed New York
 8    attorney?
 9          A    I don't know.
10          Q    Have you ever known Rick Joseph to have
11    any offices in New York?
12          A    I don't know, we spoke over the phone.
13          Q    As far as you know, the only office that
14    you're aware of that Rick Joseph has is in Beverly
15    Hills?
16          A    Only office I've been to is once was in
17    Beverly Hills.
18          Q    When did you go to Rick Joseph's office in
19    Beverly Hills?
20          A    I just happen to be in the area.
21          Q    You stopped by and visited with him?
22          A    Just stopped by and say hi, yep.
23          Q    Okay.
24          A    But it wasn't for the business, though.
25          Q    Okay.  This is a recording agreement
```

                                          Page 103

```
 1    between KSR and Cardi B negotiated on KSR's behalf
 2    by Rick?
 3          A     On KSR's behalf.
 4          Q     Right.  Take a look at page six of the
 5    agreement --
 6          A     Uh-huh.
 7          Q     -- paragraph 14.
 8          A     Yep.
 9          Q     Miscellaneous.  Do you see that?
10          A     Yep.
11          Q     Do you see it says "This agreement shall
12    be governed by the laws of the State of California"?
13          A     Uh-huh.
14          Q     "And only the courts located in Los
15    Angeles County will have jurisdiction of any
16    controversies regarding or arising under this
17    agreement"?
18          A     Yeah.
19          Q     And that's a provision you agreed to and
20    Rick Joseph negotiated on your behalf; correct?
21          A     I'm not sure.
22          Q     Well, turn to the next page.
23          A     Uh-huh.
24          Q     That's your signature; right?
25          A     That's my signature.
```

Page 104

```
 1          Q      Under KSR?

 2          A      Correct.

 3          Q      So you agreed to that paragraph?

 4          A      Yeah.

 5          Q      And Cardi B also agreed to it under her

 6   given name Balcalis Almanzar?

 7          A      Yep.

 8          Q      That's her signature there above yours?

 9          A      That's correct.

10          Q      Why didn't you produce this document in

11   your document production in this case?

12          A      Say it again.

13          Q      Why didn't you produce this agreement,

14   this recording agreement between KSR and Cardi B, as

15   part of your document production in this case?

16          A      I have no clue.

17          Q      Set that aside for a moment.

18                 On behalf of KSR have you ever been

19   involved in producing any YouTube content for

20   Cardi B?

21          A      Maybe early, early stage.

22          Q      Okay.  Let me ask you a question about

23   that then.  This is Exhibit 14.

24                      (Whereupon, Plaintiff's Exhibit 14 was

25                       marked for identification by the court
```

                                              Page 105

1    this video that was posted on YouTube, Cardi B's
2    travels to California?
3         A    I don't remember.  That's just a regular
4    silly video.
5         Q    Do you remember why she was here traveling
6    to California in April of 2015?
7         A    2015?  Well, at that point she wasn't --
8    it wasn't because of music.  So, definitely wasn't
9    for music.  Not yet, she wasn't popular yet.
10        Q    But it was during the time that KSR and
11   Cardi B were in a business relationship?
12        A    I might have managed at the time.
13        Q    How long was she here on her travels to
14   California?
15        A    I have no idea.
16        Q    I'll give you 15.
17        A    Uh-huh.
18             (Whereupon, Plaintiff's Exhibit 15 was
19              marked for identification by the court
20              reporter and attached hereto.)
21   BY MR. CONLAN:
22        Q    What is Exhibit 15?
23        A    It's her hosting at a strip club.
24        Q    Sam's Hofbrau?
25        A    Yes, it's a strip club.

                                        Page 108

```
 1       Q     Also known as a gentleman's club?

 2       A     Gentleman's club.

 3       Q     Sometimes.  And so Cardi B was in a Sam's

 4   Hofbrau, a gentleman's club, located in Los Angeles?

 5       A     Yeah, she was dancing.

 6       Q     You've been there?

 7       A     Yeah, I've been there.

 8       Q     Were you there for this event?

 9       A     Possibly.

10       Q     Okay.  Anyway, she was there dancing on

11   February 17, 2016; right?

12       A     Yes.

13       Q     Okay.  She was hosting?

14       A     Yeah.

15       Q     An event there?

16       A     Dancing.

17       Q     Okay.  It says hosted by Cardi B that's

18   why I asked.

19       A     Same thing, yeah.

20       Q     Okay.  So, at the top of that post it says

21   KSR Group, see that?

22       A     That's my Instagram that posted that.

23       Q     Okay.  This is KSR's Instagram; right?

24       A     Yeah.

25       Q     This is KSR doing marketing for Cardi B
```

Page 109

```
 1   for an event in California; correct?
 2        A     No, it's not marketing.  KSR don't have
 3   that many followers, so no, not marketing.
 4        Q     Why was KSR putting it on Instagram then?
 5        A     Probably because as Cardi is getting
 6   booked that's the only reason.
 7        Q     You were -- you and KSR were trying to
 8   generate some interest in Cardi B; correct?
 9        A     No.  Well, anything she booked I think KSR
10   posted.
11        Q     Why?
12        A     Because she was sign -- that was -- that
13   was -- that was the artist, the company's artist.
14        Q     Right.  And then the more recognition she
15   got and the more people knew about her, then there's
16   more potential upside for KSR as well; correct?
17        A     I don't think there was any potential by
18   posting her.  I disagree, no.  I don't post.  I
19   never posted.  So, that's -- we just -- they just
20   posted -- at this time I had somebody -- somebody
21   else was working my gram and she just posted all the
22   events that she booked.  That wasn't me.
23        Q     Well, you say it wasn't you.  You mean it
24   wasn't you Shaft; right?
25        A     Right.  The person that booked this was
```

Page 110

```
 1    the person that was booking her -- that was booking

 2    her gigs.

 3         Q    Okay.  And does that person have the

 4    rights to access KSR's --

 5         A    Yes.

 6         Q    -- instagram account?

 7         A    Yes.  Yeah, yeah, definitely.

 8         Q    Who was it?

 9         A    I believe at that time -- what's the date?

10         Q    February 2016.

11         A    It might have been Ann Legal.

12         Q    Who?

13         A    Ann Legal.

14         Q    A-N-N?

15         A    Ann, A-N-N, Legal, L-E-G-A-L.  She doesn't

16    work for me.

17         Q    She used to?

18         A    She used to.

19         Q    And she used to work for KSR?

20         A    Yeah.

21         Q    As an assistant?

22         A    Yeah, as an assistant, yeah.

23         Q    Where was she located?

24         A    Queens.

25         Q    Are you from Queens?
```

Page 111

```
 1        A     Yeah.
 2        Q     Okay.  So, in any event she, Ann Legal,
 3   you think posted this to KSR's Instagram feed?
 4        A     Ann would post something like that.
 5        Q     To promote this appearance --
 6        A     I mean, she posted because Cardi --
 7   anything that Cardi did I think she put it up.
 8        Q     And was that at your instruction?
 9        A     No, definitely not.  I don't post to
10   Instagram that much?
11        Q     But you didn't object --
12        A     No, I didn't object to it, no.
13        Q     -- to her posting?
14        A     Not much.
15        Q     Okay.  But you do sometimes?
16        A     Yeah.
17        Q     You understand how it works?
18        A     Of course.
19        Q     So take a look to the right.  That's
20   Cardi B in the picture; right?
21        A     That is Cardi B.
22        Q     She's wearing a pink wig?
23        A     Yes.
24        Q     And taking a selfie?
25        A     Yep.
```

                                        Page 112

1      Q      And to the right of that image you see

2  that's her hashtag, iamcardib?

3      A      Yes.

4      Q      #Los Angeles.

5      A      Yes.

6      Q      #California?

7      A      Yes.

8      Q      #Sam's Hofbrau?

9      A      Yep.

10     Q      #KSR group?

11     A      Yep.

12     Q      What do those hashtags mean?

13     A      Hashtag is just ways of people following,

14 that's it.

15     Q      Right.  So if Ann Legal on behalf of KSR

16 posted this and included #Los Angeles and

17 #California, what is the  purpose of that?

18     A      I have no clue.  I don't know.

19     Q      Okay.

20     A      I mean, probably because the event was in

21 California so she hash tagged California to know

22 where the place -- where the event is at.  That's

23 it.

24     Q      Okay.  And so, if this is being posted on

25 KSR's Instagram feed, is part of the reason to

                                        Page 113

```
 1    generate some attention for Cardi B's appearance in

 2    California?

 3         A    No.

 4         Q    Not at all?

 5         A    KSR has no followers.

 6         Q    How many followers does it have?

 7         A    At that time it didn't have a lot.

 8         Q    Okay.  Well, you got 24 likes there.  Do

 9    you see that?

10         A    That's -- that's nothing.  24 likes is

11    nothing.  That's people who probably like me.

12    That's not a lot.

13         Q    I didn't say it was.  The reason is to get

14    the word out by Cardi B?

15         A    No, not to get the word out, not on that

16    that, no.

17         Q    What's the reason for it.

18         A    When Cardi -- if Cardi posted it, that

19    would be the reason, you know, to let people know

20    she's coming out.  So her fans support and come and

21    show love.

22         Q    Okay.

23         A    But not off KSR.  KSR is -- not at that

24    time, there's nobody following.

25         Q    Then what would be the reason to post it
```

                                              Page 114

```
 1    for KSR?

 2         A    Once again, that's what Ann did.  I don't

 3    know, you have to ask Ann.

 4         Q    Did you ever ask Ann why she was posting

 5    it to KSR Instagram's feed?

 6         A    Yeah, I assume because Cardi is my artist.

 7         Q    And the reason she would post it on behalf

 8    of Cardi B as KSR's artist is to get the word out

 9    for Cardi B; correct?

10              MR. DOWLING:  Calls for speculation.

11              THE WITNESS:  Say that one more time.

12    BY MR. CONLAN:

13         Q    The reason Ann as an employee of KSR would

14    post something about Cardi B on KSR's Instagram feed

15    is at least in part to get -- help get the word out

16    about Cardi B; right?

17              MR. DOWLING:  Again, calls for

18    speculation.

19              THE WITNESS:  Whatever Cardi did when Ann

20    was there she posted.  Cardi was on TV, she posted

21    it.  Cardi was anywhere, she posted it.

22    BY MR. CONLAN:

23         Q    You knew she was doing it; right?

24         A    I knew she had control of the account.

25    But why what she did, I have no control of.
```

                                        Page 115

```
 1        Q      Did you monitor the KSR Instagram account?

 2        A      No, I don't monitor.

 3        Q      Even know you don't?

 4        A      Actually, no.  If you look on it there's

 5   probably no post on it ever because I never posted.

 6        Q      Well, somebody posted on behalf of KSR;

 7   right?

 8        A      Yeah.

 9        Q      Okay.  All right.  Did -- when Cardi B was

10   dancing at Sam's Hofbrau, did you have someone

11   arrange her travel out to Sam's out to L.A.?

12        A      If somebody did it probably would have

13   been Ann.

14        Q      Okay.  And did Ann also arrange for a

15   hotel in Los Angeles where Cardi stayed?

16        A      Ann would probably do that as well?

17        Q      Do you remember where Cardi stayed?

18        A      No, I don't remember that.

19        Q      Did you come out here for that

20   performance?

21        A      I believe I did.

22        Q      Do you remember where you stayed?

23        A      No, I don't remember where I stayed.

24        Q      Okay.  This is 16.

25        A      Yep.
```

Page 116

 1                    (Whereupon, Plaintiff's Exhibit 16 was

 2                         marked for identification by the court

 3                         reporter and attached hereto.)

 4    BY MR. CONLAN:

 5         Q    All right.  So, this is -- might be handy

 6    to have these.  We just looked at an Instagram from

 7    KSR for an appearance on February 17th, 2016.

 8         A    Uh-huh.

 9         Q    And then Exhibit 16 is -- looks like

10    another appearance on February 18th.  Do you see

11    that?

12         A    Yep.

13         Q    And that's in Oakland?

14         A    Yeah.

15         Q    Okay.  And this is something called the

16    Little Red Dress Affair?

17         A    Okay, yep.

18         Q    "Yes"?

19         A    Yes.

20         Q    Is that -- and that is a picture of

21    Cardi B there?

22         A    Yes.

23         Q    And this is something that was posted to

24    KSR Group's Instagram feed; right?

25         A    Yep.

```
 1              MR. DOWLING:  Do we know what year this
 2      is?
 3              THE WITNESS:  It says 2016, I think.
 4              MR. CONLAN:  Yeah.  If you look down
 5      there's -- it's faded but it says February 2016.
 6              MR. DOWLING:  Uh-huh.
 7      BY MR. CONLAN:
 8         Q    Whether -- so do you recall that Cardi
 9      traveled from Los Angeles up to Oakland for this
10      appearance?
11         A    I don't recall this because that event is
12      for Cardi's best friend.  I don't know if Cardi got
13      paid for it.
14         Q    Was it something that KSR helped
15      coordinate for travels?
16         A    Ann might have helped with travels getting
17      Cardi to Oakland.
18         Q    Okay.
19         A    But as far as the event that was for her
20      best friend.
21         Q    Okay.  Who is this woman named Ashanti?
22         A    Uh-huh.
23         Q    Okay.  And then did Ann on behalf of KSR
24      book Cardi a hotel in Oakland?
25         A    No.  Probably -- I'm not sure.
```

Page 118

```
 1    BY MR. CONLAN:
 2        Q     Did Cardi appear at this event in Oakland
 3    do you recall that for her friend Ashanti?
 4        A     Yeah, I didn't go because it was just --
 5    it was personal, so I didn't go.
 6        Q     But --
 7        A     I know she went.
 8        Q     Okay.
 9        A     But I wasn't there, so I don't know.
10        Q     Got it.  If you look at the text on this
11    thing over to the right you'll see there's early
12    bird tickets $20 link in my bio.  Hit me for
13    bottles.  It says #iamcardib, #KSRgroup?
14        A     She probably reposted it.
15        Q     #Oakland, #California.  See that?
16        A     Like once again perfect example this is
17    not our event.  So why would Ann post it?  I have no
18    clue, but that has nothing to do with me.
19        Q     But she did post it?
20        A     Obviously she posted it.
21        Q     And she tagged KSR group on it?
22        A     Yeah, because Cardi was on it, that's why.
23        Q     Okay.  And maybe this is a little bit out
24    of order, but this is Exhibit 17.
25                    (Whereupon, Plaintiff's Exhibit 17 was

                                        Page 120
```

```
 1                    marked for identification by the court
 2                    reporter and attached hereto.)
 3      BY MR. CONLAN:
 4           Q     And this is another instagram post from
 5      the KSR Group Instagram page.  And this says KSR
 6      Group La La Land.  Do you see that to the right?
 7           A     Uh-huh.
 8           Q     What does that mean?
 9           A     I have no idea.
10           Q     Okay.  Is this something that Ann Legal
11      posted for KSR?
12           A     Definitely.
13           Q     Okay.  And then looks like she's
14      promote -- at least Cardi B or Washpoppin is
15      promoting some model call for Washpoppin eyeshadow.
16      See that?
17           A     I see that.
18           Q     Los Angeles area only?
19           A     Right, I see that.
20           Q     And this is an event that took place at
21      Blue Dots Studios?
22           A     Yeah, I have -- I have.
23           Q     At Olympic and Olive?
24           A     Okay, yeah.
25           Q     Okay.  Is that something that KSR was
```

Page 121

```
 1    associated with, this event?
 2         A     No, I don't know what the -- I don't know
 3    what this is really about.
 4         Q     Okay.
 5         A     It has to do with makeup.
 6         Q     Did KSR have rights to any of the
 7    Washpoppin makeup collection at any time?
 8         A     No, we just made percentage of what she
 9    sold.
10         Q     Through Washpoppin.
11         A     Yeah, through Washpoppin.
12         Q     Okay.  So, were you involved in this
13    event, this model call at all?
14         A     I don't -- I don't -- I don't recall.  I
15    don't recall this.
16         Q     You don't remember going to a model call
17    in February 2016?
18         A     I don't remember.
19         Q     This looks like it was maybe the day
20    between the Sam's Hofbrau performance?
21         A     Why she was down here.
22         Q     So it was part of that trip?
23         A     Yeah.
24         Q     Okay.
25         A     This is a whole different -- that's a
```

                                        Page 122

```
 1    whole different world.  That has nothing to do with
 2    music.
 3         Q    Right.  This is also something that was
 4    posted by Ann Legal?
 5         A    Once again Ann posted everything.
 6         Q    Okay.  All right.  I'll give you 18.
 7              (Whereupon, Plaintiff's Exhibit 18 was
 8               marked for identification by the court
 9               reporter and attached hereto.)
10    BY MR. CONLAN:
11         Q    All right.  18 is another KSR Group's
12    Instagram post.  It says "KSR Group Hollywood,"
13    three explanation points. What is this for?
14         A    No idea.
15         Q    Got 77 views.  Says light camera action,
16    #KSRgroup, #iamcardib, #watchwework, #Hollywood,
17    #California.
18         A    I have no idea.
19         Q    Looks like it's a still from a video and
20    it says Stage 30.  You don't know what this is for?
21         A    No, I don't know what this is for.
22         Q    This is also a February 2016 event or
23    whatever it was.  Do you see the date on there?
24         A    Uh-huh.
25         Q    This also would have been posted by Ann
```

```
 1    Legal?

 2         A    If it's on that page, absolutely.
```

```
 3         Q    Okay.  All right.  So maybe I don't know

 4    if this next exhibit helps refresh your recollection

 5    or not.

 6              This would be Exhibit 19.

 7                   (Whereupon, Plaintiff's Exhibit 19 was

 8                    marked for identification by the court

 9                    reporter and attached hereto.)

10    BY MR. CONLAN:

11         Q    This is another February 2016 post.  This

12    one got 153 views from KSR Group's Instagram feed.

13         A    Uh-huh.

14         Q    "Another KSR group La La Land.  Thank

15    you."

16         A    Same trip.

17         Q    Same trip?

18         A    Uh-huh.

19         Q    Some video that was created while she was

20    out here?

21         A    No, she's at Sam Hofbrau.  I don't know

22    what this is.  I don't know what video this is.

23         Q    But this also something that Ann Legal

24    posted for KSR to the instagram feed?

25         A    Ann would have posted this, yeah.  What
```

Page 124

1    for, I have no idea.

2         Q    This will be Exhibit 20.

3              (Whereupon, Plaintiff's Exhibit 20 was

4               marked for identification by the court

5               reporter and attached hereto.)

6    BY MR. CONLAN:

7         Q    Exhibit 20 is another KSR Group's

8    Instagram post I assume by Ann legal?

9         A    Definitely.

10        Q    Okay.  And this is --

11        A    It's a repost actually.

12        Q    Okay.  It's a repost, but this looks like

13   for an event on February 23rd, see that?

14        A    Yeah.  I also worked with DJ Self.  I

15   managed Self at that time as well.

16        Q    Okay.  And he's a DJ at New York?

17        A    Yes.

18        Q    He was out here in California doing an

19   appearance with Cardi B?

20        A    I guess he had an appearance with Cardi.

21        Q    And this is at the OHM in Los Angeles?

22        A    Yeah.

23        Q    Okay.  Were you here at this event?

24        A    I don't remember if I was here.  It says

25   she was in the City.

Page 125

1      Q    Yeah.  It says L.A. turn up, I'll be in

2  your city.  See that?

3      A    That's a repost, that's from Self.

4      Q    So Cardi B posted it and then KSR reposted

5  it?

6      A    No, that's Self that posted.

7      Q    Oh, DJ Self posted it?

8      A    Yeah, DJ Self posted it.

9      Q    Okay.  And then KSR reposted?

10     A    Ann reposted it.

11     Q    For KSR; right?

12     A    I mean, she did it for herself.

13     Q    She wasn't posting it to Ann Legal's

14  instagram page; correct?

15     A    Correct.  I mean, she just posted it.

16     Q    And one of these -- there's a couple

17  hashtags there.  One says KSR Group, another says

18  KSR group promo.  What does that mean hashtag KSR

19  Group promo?

20     A    I don't know why she put that.

21     Q    Did --

22     A    I didn't instruct her to, so I don't know.

23     Q    Did Cardi B get paid for this appearance?

24     A    If she's there, she has to get paid.

25     Q    Did DJ Self get paid for this appearance?

Page 126

```
 1          A     They were coming to get paid, yes.

 2          Q     And if they got paid, KSR got paid?

 3          A     If Cardi got paid, then I would have got

 4    paid.

 5          Q     So this is Cardi's trip to California,

 6    February 2016.  When did Gangsta Bitch drop, do you

 7    remember?

 8          A     I don't know.  Probably in March sometime.

 9          Q     Okay.

10          A     What year I'm not sure.

11          Q     And before it dropped was KSR trying to

12    get the word out about it?

13          A     About what?

14          Q     Gangsta Bitch.

15          A     Before it dropped?

16          Q     Yeah.

17          A     No.

18          Q     So take a look at Exhibit 21, which is

19    another post from the KSR Group Instagram feed.

20    This is another KSR Group La La Land.

21          A     Same club.

22                     (Whereupon, Plaintiff's Exhibit 21 was

23                      marked for identification by the court

24                      reporter and attached hereto.)

25

                                            Page 128
```

```
 1    BY MR. CONLAN:
 2         Q    This is OHM nightclub L.A.; right?
 3         A    Uh-huh.
 4         Q    You see there #iamcardib, #djself,
 5    #iamshaft.  That's you; right?
 6         A    Uh-huh.
 7         Q    #ohmnightclub, #gbmv1.
 8         A    Uh-huh.
 9         Q    That's Gangsta Bitch Music volume 1;
10    correct?
11         A    That's what that would have meant, yes.
12         Q    Okay.  And #Los Angeles, #California.
13         A    Okay.
14         Q    And then further down
15    #gangstabitchmusicvolone spelled out.
16         A    Spell wrong, but yeah.
17         Q    Is this something that Ann Legal posted to
18    the KSR Group's Instagram feed --
19         A    This is something that Ann posted.
20         Q    Okay.  And this is and the reason she
21    included a hashtags for GBMV1 and hashtag gangsta
22    bitch music volume one was part of a promotion of
23    Cardi B?
24         A    I'm not sure.
25              MR. DOWLING:  Calls for speculation.
```

Page 129

```
 1              THE WITNESS:  Yeah, I don't know.
 2    BY MR. CONLAN:
 3        Q    As you sit here and look at it do you
 4    understand that that's -- that would be at least one
 5    of the reasons for this?
 6        A    I don't know.  No idea.
 7        Q    No idea why she would tag GBMV1?
 8        A    No idea why at that time she would tag it,
 9    no.
10        Q    Sitting here now looking at it and having
11    your understanding of Instagram, do you understand
12    it to be an attempt or an effort to promote Gangsta
13    Bitch Music Volume 1 Mix Tape?
14        A    No.
15             MR. DOWLING:  Objection; calls for
16    speculation.
17    BY MR. CONLAN:
18        Q    You can go ahead and answer.
19        A    No.  She would have said -- if she
20    promoted Gangsta Bitch it wouldn't have been this.
21    It would have been Cardi in the club.  She still --
22    she's here for TV Love & Hip Hop and she didn't post
23    Love & Hip Hop, so that's not the case.
24             This party here was for Love & Hip Hop.
25        Q    What does the hashtag GBMV1 mean?  What
```

                                            Page 130

1    does it refer to?

2         A    Gangsta Bitch Music Volume 1 hashtag

3    probably means Gangsta Bitch Music Volume 1.

4         Q    Okay.

5         A    But Cardi ain't dropped no music yet so it

6    doesn't make no sense.

7         Q    Take a look at Exhibit 22.

8                   (Whereupon, Plaintiff's Exhibit 22 was

9                    marked for identification by the court

10                   reporter and attached hereto.)

11   BY MR. CONLAN:

12        Q    This is KSR Group post March 6, 2000 --

13        A    Yeah.

14        Q    '16?

15        A    Uh-huh.

16        Q    Got a little more than 1600 views.  See

17   that?

18        A    Uh-huh.

19        Q    This is the cover art or maybe a still of

20   some kind of video posted in Instagram; right?

21        A    Right.

22        Q    From the KSR Instagram feed?

23        A    Right.

24        Q    At that time was that still Ann Legal

25   posting this on behalf of KSR?

                                        Page 131

```
 1        A     Definitely.

 2        Q     And that's the cover art for Gangsta

 3   Bitch --

 4        A     Maybe not, maybe not.  She might have been

 5   fired by then.  I'm not sure who posted that.

 6        Q     Who followed her as your assistant at KSR?

 7        A     I'm not sure.  There's a time when it was

 8   two or three different people.

 9        Q     Okay.  And so how did they know what to do

10   in terms of posting to KSR's Instagram feed?  Were

11   they given instructions by you?

12        A     I'm not sure.  This right here is

13   definitely saying the mix tape is coming out.

14        Q     Okay.  This is --

15        A     Yeah, it's a free link.

16        Q     Right.  And this particular post is

17   promoting Gangsta Bitch Music Volume 1; correct?

18        A     Yeah, to get it for free.

19        Q     Okay.

20        A     The whole mix tape was made to go free.

21        Q     Do you know who QueenPee is?

22        A     QueenPee?

23        Q     Where is that at?

24        A     Jewelry designer.  Where are you looking

25   at?
```

                                        Page 132

1        A      I have no idea.

2        Q      Okay.

3        A      So she got gifted.

4        Q      It also says makeup@makeupofaz and hair by

5    @hairby_beau, see that?

6        A      Yeah.

7        Q      Are they out here?

8        A      I have no clue.

9        Q      Okay.  And in any event it also says

10   #iamcardib, #KSRgroup, #Los Angeles, #California?

11       A      Same time she was in California.

12       Q      And was she -- this was part of a trip

13   that KSR had helped to coordinate; right, these

14   appearances in California?

15              MR. DOWLING:  Misstates the witness'

16   testimony.  You can go ahead and respond.

17   BY MR. CONLAN:

18       Q      February 2016 this trip when she was out

19   here working in California?

20       A      It was a booking she had in California.

21       Q      Well, she made a number of appearances out

22   here.

23       A      With DJ Self.

24       Q      DJ Self, Sams Hofbrau, the place up in

25   Oakland, all part of the same trip or did she go

                                           Page 134

```
 1   back and forth?
 2        A    No, she didn't -- didn't -- I'm not sure
 3   if it was OHM and Self on the same weekend.
 4        Q    It looks like it all was around that.  It
 5   was all at least in February 2016, you don't
 6   remember?
 7        A    It was probably all the same weekend.
 8        Q    Okay.  This will be Exhibit 24.
 9             (Whereupon, Plaintiff's Exhibit 24 was
10              marked for identification by the court
11              reporter and attached hereto.)
12   BY MR. CONLAN:
13        Q    So this is March of 2016?
14        A    Uh-huh.
15        Q    And this is another post from KSR Group
16   Instagram feed; correct?
17        A    Yep.
18        Q    You're not sure who was doing this post
19   for KSR at the time?
20        A    No, I'm not.  I wasn't -- I'm not sure.  I
21   mean, around March I think Ann stopped working, so
22   I'm not sure who is doing this.
23        Q    Okay.  And this is advertising an
24   appearance by Cardi B at Spearmint Rhino in
25   Torrance?
```

Page 135

1      A     It's just -- at that time it's just
2   reposting her gig.
3      Q     This gig when she traveled out back to
4   California, March 2016, is this something that was
5   planned by KSR on her behalf?
6      A     No, this is -- this is a -- Spearmint
7   Rhino probably requested her to come out.
8      Q     So when Spearmint Rhino -- at this point
9   in time KSR was representing Cardi B; right?
10     A     Uh-huh.
11     Q     So if Spearmint Rhino wanted her to come
12   out --
13     A     We had multiple artists that we sent out
14   actually.
15     Q     Okay.  KSR did?
16     A     Uh-huh.
17     Q     Okay.  And so, did Spearmint Rhino reach
18   out to KSR and say, hey, I want you to send out some
19   of these artists out for this appearance?
20     A     I'm not sure how Ann would have been
21   responsible for that.  I'm not sure.  I can't say
22   that.
23     Q     This is March of 2016 I thought you said
24   Ann had been fired at this point in time.
25     A     No, I said around that time she might have

                                        Page 136

```
 1        A     Ann did all that.  But once again it could
 2   have been another artist that she sent out.  I'm
 3   pretty sure there's other artists that she sent out
 4   to different venues.
 5        Q     In California?
 6        A     Not in California.  Anywhere.  Not in
 7   California.  There's other venues outside of
 8   California that Cardi also did.  Not just that.
 9        Q     Not just California, but she did make
10   appearances in California?
11        A     Uh-huh.
12        Q     And KSR helped plan the trips?
13        A     Yeah.
14        Q     Okay.  So this is -- this is another post
15   from KSR Group Instagram page.
16              (Whereupon, Plaintiff's Exhibit 25 was
17               marked for identification by the court
18               reporter and attached hereto.)
19   BY MR. CONLAN:
20        Q     This is an appearance on Sunday, March 13,
21   2016 at Hush Gentleman's Nightclub and that's in
22   Corona; right?
23        A     Yeah.
24        Q     Do you see that?
25        A     Uh-huh.
```

Page 138

```
 1        Q     Were you here for that?

 2        A     I don't think so.

 3        Q     Says KSR Group Sunday night, March 13th,

 4   Cardi B.  This is something that KSR Group is

 5   advertising through its Instagram feed for this

 6   appearance by Cardi B?

 7        A     She reposted, that's not advertising.

 8        Q     Why would it say KSR Group and then the

 9   date?

10        A     Because Cardi is probably on it, that's

11   the only reason.

12        Q     And if there's a benefit to Cardi B,

13   there's a benefit to KSR Group; right?

14              MR. DOWLING:  I'm not sure what benefit

15   means, it's vague and ambiguous.

16   BY MR. CONLAN:

17        Q     Monetary benefit.

18        A     Not when she did stuff for free, no.

19        Q     Did she do this for free?

20        A     I'm not sure of this contract.  I'm pretty

21   sure not this one.  But when she did stuff for free,

22   we post that too, like her friends.  It's not always

23   beneficial.

24        Q     Okay.  Well, it's not always -- there's

25   not always an immediate monetary benefit is what
```

Page 139

```
 1    you're saying; right?
 2        A    It's not always a benefit.  Period.  If
 3    she does something for a friend, there's no benefit
 4    to nobody.
 5            MR. DOWLING:  Except the friend.
 6    BY MR. CONLAN:
 7        Q    This event when she danced at Hush in
 8    Corona, if she got paid -- if Cardi B got paid, KSR
 9    got paid; right?
10        A    If she got paid, yes.
11        Q    And at this point in time March 2016 she
12    would have gotten paid for this appearance; correct?
13        A    Not sure.  If there's a contract for it,
14    yes.  If there's not...
15        Q    Okay.
16        A    I don't remember this.
17        Q    How would you know if there was a contract
18    for this appearance?
19        A    Probably have to ask Ann and put all this
20    together.
21        Q    Well, wouldn't Ann keep a record of any
22    contract in KSR's files, electronic or paper?
23        A    Maybe by email.  But she did all the
24    contracts at that time when she was working.
25        Q    What would the contract be?  Just an
```

                                        Page 140

```
 1        A      Probably because Ann no longer works for
 2    us anymore.
 3        Q      Do you believe those email communications
 4    would exist for related to the appearances that
 5    Cardi made if they were doing it through KSR?
 6               MR. DOWLING:  Assuming they exist in the
 7    first place.
 8               THE WITNESS:  If there is, I'm not sure.
 9    That was probably two years, three years ago, two
10    years ago.
11    BY MR. CONLAN:
12        Q      Do you -- but you don't know what Denise
13    searched for; right?
14        A      Whatever Alan asked her for, that's what
15    she did.
16        Q      Okay.  But you didn't talk to Denise about
17    what she searched for?
18        A      No, she spoke directly to Alan.
19        Q      And you never had any conversations with
20    her separately about what she was looking for and
21    what she found?
22        A      No.
23               MR. DOWLING:  And whatever I got from her
24    was produced to you.
25
```

Page 142

```
 1            MR. CONLAN:  26.  Okay.  This is another
 2   event on March 13th.  She is pretty busy.
```

```
 3            MR. DOWLING:  A couple of days at a time.
 4            THE WITNESS:  Same days.
 5                (Whereupon, Plaintiff's Exhibit 26 was
 6                 marked for identification by the court
 7                 reporter and attached hereto.)
 8   BY MR. CONLAN:
```

```
 9       Q    Same day; right?
10       A    Right.
11       Q    This is from KSR Group Instagram page?
12       A    Uh-huh.
13       Q    KSR day party alert; right?
14       A    Uh-huh.
15       Q    Los Angeles, California; correct?
16       A    Okay.
17       Q    Meet me at House Macau hosted by
18   @iamcardib and @missnikkibaby for my initial Mixtape
19   release party Gangsta Bitch Music, Volume 1.
20       A    Right.  That's the promoter called that,
21   that's now our -- that would be a promoter event.
```

```
22       Q    Okay.
23       A    So just because it says official mixtape
24   release party doesn't mean that it was.  It's just
25   an event for people to go to.  The promoter called
```

Page 143

```
 1          A      I have no idea.

 2          Q      This is at House of Macau?

 3          A      It's a repost.

 4          Q      Okay.

 5          A      I have no idea.

 6          Q      If Cardi got paid this time in March 2016,

 7   then KSR got paid; right?

 8          A      If she got paid, yes.

 9          Q      Were you at the event at the House of

10   Macau at Los Angeles?

11          A      No, I don't remember.

12          Q      Okay.  So we've seen -- we've already seen

13   KSR Group Instagram post for multiple appearances in

14   February of 2016 and March of 2016.  Now, I'm going

15   to hand you another Exhibit which is 27.  And this

16   is another post from the KSR group Instagram feed.

17   And this is -- it -- and this says that #KSRgroup

18   wave don't miss it, #LosAngeles, #GBMV1.

19          A      Yeah.

20                 (Whereupon, Plaintiff's Exhibit 27 was

21                  marked for identification by the court

22                  reporter and attached hereto.)

23   BY MR. CONLAN:

24          Q      Okay.  And this is -- this is another trip

25   by Cardi out to Los Angeles in April of 2016; is
```

Page 145

```
 1        A     In the past, that passed.
 2        Q     And KSR was helping get the Cardi B brand
 3   out there through its instagram post; right?  Trying
 4   to -- I'm not saying KSR is promoting an event, but
 5   KSR is promoting the Cardi B brand at the time;
 6   right?
 7        A     At that time, no.  KSR is promoting KSR
 8   wave, not Cardi.
 9        Q     Well, it's also promoting Gangsta Bitch
10   Music Volume 1; right?
11        A     At this point it's promoting ourselves.  A
12   hashtag is not promotions.
13        Q     What is it?
14        A     A hashtag?
15        Q     Yeah.
16        A     It's just people -- for example, if
17   somebody wants -- somebody hashtags shade room, it's
18   because shade room has -- is -- if I hashtag shade
19   room, it doesn't mean I'm promoting shade room.  It
20   just means that you're trying to get people to view
21   your posts.
22        Q     So if you hashtag GBMV1, you're marketing
23   GMV1?
24        A     Not totally marketing.  It's -- once again
25   this is Ann posting, so I shouldn't be talking on
```

                                           Page 148

```
 1    her behalf.  So I don't know.
 2         Q    But Ann was working for KSR Group at the
 3    time?
 4         A    At the time she was a consultant.
 5              MR. DOWLING:  This is April of '16?
 6              THE WITNESS:  Huh?
 7              MR. DOWLING:  April of '16?
 8              THE WITNESS:  Yeah.
 9    BY MR. CONLAN:
10         Q    Okay.  Take a look at the content on the
11    right side of that picture.  It says this is from
12    somebody named karmakarezza "Hello KSR Group LLC.  I
13    have been reaching out to you all for the past three
14    months in regards to my advertisement.  I met Cardi
15    at the Bronner Bros Hair Show in February."
16         A    Okay.
17         Q    Do you remember where that was?
18         A    That was probably in Atlanta.  Bronner
19    Bros is in Atlanta.
20         Q    "And she agreed to advertise my product on
21    her social media."
22         A    I don't know.
23         Q    Do you know if that was done?
24         A    I have no clue.
25         Q    Bronner Bros is in Atlanta?
```

Page 149

```
 1        A     Yeah, Bronner Bros show is in Atlanta.

 2        Q     This will be 28.

 3              (Whereupon, Plaintiff's Exhibit 28 was

 4               marked for identification by the court

 5               reporter and attached hereto.)

 6   BY MR. CONLAN:

 7        Q     28 is from the iamcardib instagram page.

 8   Have you seen this before?

 9        A     No.

10        Q     Okay.  Was KSR involved in an appearance

11   that Cardi B made in Fresno in May of 2016?

12        A     What's the date?

13        Q     May of 2016.

14        A     I assume so.

15        Q     Okay.  And it's Cardi B Invasion of

16   Privacy?

17        A     Uh-huh.

18        Q     Is that an album or mix tape?

19        A     That's an album.

20        Q     And KSR owned the rights --

21        A     Hold on a second.  Cardi B Invasion of

22   Privacy out now.  That's a album, yeah.

23        Q     And KSR owned the rights to that album at

24   the time, May of 2016?

25        A     Atlantic, Inc.
```

Page 150

```
 1        Q    Did KSR own any rights related to Invasion
 2   of Privacy?
 3        A    Some rights, yes.
 4        Q    Okay.  And so this is Cardi B appearing in
 5   Fresno to promote the Invasion of Privacy album?
 6        A    I have no idea why she is going to Fresno.
 7        Q    Well, you can see in the background of the
 8   post it's something related to Invasion of privacy;
 9   right?
10        A    I have no idea.
11             MR. DOWLING:  Do you know when Invasion of
12   Privacy was released?
13             THE WITNESS:  It was released -- Invasion
14   of Privacy was released probably in maybe -- maybe
15   March -- maybe.  No, no, no.  I'm not sure.  I don't
16   remember.
17   BY MR. CONLAN:
18        Q    Okay.  So if Cardi B was making an
19   appearance in Fresno in May of 2016, she says
20   "Fresno Washpoppin.  I'll be in your city tomorrow."
21   So looks like that would be May 5th, 2016.  That's a
22   trip that KSR would have planned for her; correct?
23             MR. DOWLING:  Excuse me, this is -- this
24   doesn't make sense.  I don't mean to interrupt.
25             THE WITNESS:  Yeah.
```

Page 151

1        Q     May of 2016.

2        A     Yeah.

3        Q     Which means flight reservations and hotel

4   reservations in California would have been made by

5   somebody at the direction of KSR?

6        A     No, not necessarily.  No.  The promoter

7   might have did it.

8        Q     Okay.

9        A     The promoters book the flights and hotels.

10        Q     Okay.  And if there was a promoter

11   involved, that means Cardi B was getting paid;

12   right?

13        A     Correct.

14        Q     And if Cardi B got paid, then KSR got

15   paid; right?

16        A     Sometimes, yes.

17        Q     If Cardi B got paid for an appearance in

18   Fresno in May of 2016, then KSR got some piece of

19   that fee?

20        A     If she got paid, yes.

21        Q     Okay.  Just, I guess for reference this is

22   29.

23              (Whereupon, Plaintiff's Exhibit 29 was

24               marked for identification by the court

25               reporter and attached hereto.)

                                              Page 153

```
 1    BY MR. CONLAN:

 2         Q    Looks like it's the same thing?

 3         A    Same thing.

 4         Q    It back ups to Invasion of Privacy.  I

 5    don't know why, but this is all related to this

 6    appearance in Fresno.  She says I'm out here in

 7    Fresno and the date is --

 8         A    Same thing.

 9         Q    -- May 5th, 2016.

10         A    Same thing.

11         Q    She's out there.  What was she doing in

12    Fresno?

13         A    Probably hosting.

14         Q    Hosting what?

15         A    I mean, at that time she was famous on the

16    TV, she was probably hosting a party or something.

17         Q    And if she was hosting a party May of

18    2016, she would be getting paid?

19         A    I'd assume so.

20         Q    Okay.  And then KSR would be getting paid

21    for that appearance in California as well; right?

22              MR. DOWLING:  Calls for speculation unless

23    you recall specifically.

24              THE WITNESS:  So...

25
```

Page 154

```
 1    BY MR. CONLAN:

 2         Q    If cardi B appeared in Fresno at an event,

 3    whether she was hosting or appearing, dancing,

 4    whatever it was and she got paid --

 5         A    If she got paid.

 6         Q    -- May of 2016, KSR got paid?

 7         A    If she got paid, KSR would get a

 8    percentage.

 9         Q    Okay.  And did you -- when you were

10    looking for documents and records to produce in this

11    case, was anything done by you or Denise or anyone

12    else on behalf of KSR to find out how much money KSR

13    made or Cardi B made for these appearances in

14    California?

15         A    No idea.

16         Q    You don't know what was done, if anything?

17         A    No, you'd -- no, you'd have to look at the

18    contract if anything.

19         Q    Did you look for any contracts for

20    appearances in Fresno?

21         A    I don't think Denise was asked for that.

22    That's --

23         Q    If Cardi B appeared at an event in Fresno,

24    would she have done so without some kind of contract

25    whether --
```

Page 155

```
 1    writing?
 2             MR. CONLAN:  No, I said in writing or
 3    verbally.
 4             MR. DOWLING:  Compound, but you can
 5    answer.  Can you make any sense of this?
 6             THE WITNESS:  I'm a little lost.
 7    BY MR. CONLAN:
 8        Q    He knows what I'm talking about.
 9        A    But I could say we are in different
10    cities, depending on who the person is, we go out
11    and she goes -- does for free.  Sometimes she does
12    it, sometimes it's contracted.  It's both.
13    Depending on who the person is.
14        Q    Depending on who what person is?
15        A    The promoter.
16        Q    So this is May 2016 still, this relates
17    to --
18             MR. DOWLING:  This is No. 30?
19             MR. CONLAN:  Yeah.  This is 30.
20                 (Whereupon, Plaintiff's Exhibit 30 was
21                  marked for identification by the court
22                  reporter and attached hereto.)
23    BY MR. CONLAN:
24        Q    This is another post from KSR Group's
25    Instagram page.  KSR Group, #Fresno, #California,
```

Page 158

1    #Cardi B, #KSR Group, #GBMV1, refers to Gangsta

2    Bitch Music Volume 1; right?

3         A    Yeah.

4         Q    May of 2016 who was posting on behalf of

5    KSR and KSR Instagram page?

6         A    I'm not sure.

7         Q    Somebody was, though; right?

8         A    Somebody was.

9         Q    Somebody that you hired?

10        A    Not necessarily.  Might be somebody I

11   hired, maybe a cousin or something.

12        Q    What cousins of yours have been in the

13   past posting on KSR Group's Instagram?

14        A    There's people who -- there's people who

15   just post like if I didn't have nobody, they would

16   post for me on my behalf.

17        Q    But you would have to give them

18   credentials --

19        A    Absolutely.

20        Q    -- for your KSR Group Instagram page?

21        A    Absolutely.

22        Q    Which means you're allowing them to post

23   on behalf of KSR; right?

24        A    Yeah.

25        Q    And this is KSR Group posting about an

                                           Page 159

```
 1    event that Cardi B was attending in Fresno and at

 2    least there was a tag for the Gangsta Bitch Music

 3    Volume 1 mix tape; right?

 4         A    Yeah.

 5         Q    What was underestimated?

 6         A    Underestimated?

 7         Q    Yeah.

 8         A    That's a tour.

 9         Q    To promote what?

10         A    It's just a tour.

11         Q    What mix tapes or albums did she have

12    out -- did Cardi B have out that -- prior to the

13    underestimated tour?

14         A    She probably had songs out, two or three

15    songs out.

16         Q    So she had the Gangsta Bitch Mix tape

17    which was out at that time in May of 2016; right?

18         A    Yeah.

19         Q    And then maybe some -- a few more songs?

20         A    That was for the whole label, though.

21         Q    What was?  The underestimated tour?

22         A    Uh-huh.

23         Q    Who else was on the tour?

24         A    HoodCelebrityy, Josh X.

25         Q    Okay.
```

Page 160

```
 1        A    That wasn't --

 2        Q    So this is 31.

 3              (Whereupon, Plaintiff's Exhibit 31 was

 4              marked for identification by the court

 5              reporter and attached hereto.)

 6   BY MR. CONLAN:

 7        Q    It looks like it's a similar screenshot

 8   from the Fresno event.

 9        A    Uh-huh.

10        Q    But this is actually -- this is your

11   instagram feed; right?  I am Shaft?

12        A    That's me.

13        Q    Okay.  It says I am Shaft, #Fresno,

14   #California, #KSR Group.  Did you post this?

15        A    Yes.  If it's on mine, I posted it.

16        Q    #GBMV1 --

17        A    Okay.

18        Q    -- gangsta bitch; right?

19        A    Yes.

20        Q    #foreva?

21        A    Foreva is just a name of a record.

22        Q    Whose record?

23        A    Cardi's.

24        Q    Okay.  And then #underestimatedtour --

25        A    Uh-huh.
```

                                        Page 161

```
 1        Q    -- coming soon.  That was a tour that KSR

 2   Group was planning?

 3        A    Yep.  Well -- yeah.

 4        Q    Okay.  And part of the tour was Cardi B,

 5   HoodCelebrityy and Josh X?

 6        A    Uh-huh.

 7        Q    And as part of -- did they make

 8   appearances in California for the underestimated

 9   tour?

10        A    Yes, there was one stop.

11        Q    Where?

12        A    The one stop in Oakland.

13        Q    Okay.  Just the one, that was the only

14   tour spot in California?

15        A    Uh-huh.

16        Q    When was that?

17        A    I don't -- I -- probably like in June,

18   July.  I don't know.

19        Q    Who was responsible for posting to Twitter

20   for KSR Group?

21        A    I'm not even sure.  Twitter, nobody uses

22   Twitter.

23        Q    Nobody in the world or --

24        A    Nobody, I don't know.

25        Q    Nobody at KSR?
```

Page 162

```
 1        Q     Somebody for KSR; right?

 2        A     Somebody that had access to KSR's handle.

 3        Q     Okay.  You wouldn't just give anybody

 4   access to your KSR social media; right?

 5        A     No, I don't give to strangers, no.

 6        Q     I mean, somebody either you or employee or

 7   somebody that you trusted to post on your behalf?

 8        A     Somebody -- yeah, somebody that wanted to

 9   help.

10        Q     Okay.  This will be Exhibit 33.

11              (Whereupon, Plaintiff's Exhibit 33 was

12               marked for identification by the court

13               reporter and attached hereto.)

14   BY MR. CONLAN:

15        Q     This is an Instagram post from KSR Group

16   and looks like there's an opportunity to download or

17   listen to Gangsta Bitch Music Volume 1; is that

18   correct?

19        A     Yeah.

20        Q     And this -- I can't tell.  This looks like

21   maybe it's got March 2016 date?

22        A     May 29.

23        Q     May 20 --

24        A     May 29th .

25        Q     Okay.  May 29th, 2016.
```

Page 164

```
 1        A      Uh-huh.
 2        Q      Tell me how this worked, did you post
 3   this?
 4        A      I didn't post this.
 5        Q      Who posted it?
 6        A      I don't -- whoever was working for me at
 7   the time.
 8        Q      Okay.
 9        A      But this -- what this is, is -- this is
10   free downloads of Cardi B's music mix tape.
11        Q      Okay.
12        A      It's all free.
13        Q      So it says over 100,000 downloads?
14        A      Yeah.
15        Q      Who wrote that?
16        A      It's facts -- well, I don't know who wrote
17   it.  But it's factual because you can see it's
18   downloaded 100,000 times for free from datpiff.com.
19        Q      Is it datpiff or Spinrilla?
20        A      This one is datpiff.  Spinrilla is another
21   free website.
22        Q      Okay.  And were --
23        A      So basically this says 100,564 downloads
24   and 617,290 people listened to it on the website, on
25   the free website.
```

Page 165

```
 1        Q     And so your understanding is that the
 2   downloads and listens were nobody paid for any of
 3   them?
 4        A     It's all free, completely free.
 5        Q     How do you know that?
 6        A     That's what datpiff do.  It's free mix
 7   tapes.
 8        Q     Does datpiff pay KSR something?
 9        A     No, it's free.  No money exchange at all.
10        Q     How would you find out the total sales
11   over time from Gangsta Bitch Music Volume 1 on any
12   platform?
13        A     Just Empire that's it.
14        Q     So anything that was sold through iTunes
15   or Spotify or anything where purchase was made, all
16   that would flow through Empire?
17        A     That's correct.  Everything else and then
18   there's a whole lot of free websites, Spinrilla,
19   datpiff, that's not only that that gave it for free
20   as well.
21        Q     Okay.  And then apart from Gangsta Bitch
22   Music Volume 1 to find out the sales of all
23   Cardi B's music during the time that she was
24   associated with KSR Group, would that all come from
25   Empire as well?
```

Page 166

```
 1        A     No, you'd have to go to Atlantic.
 2        Q     Okay.  So up until the time that she
 3   signed with Atlantic, everything -- all records of
 4   sales would come through Empire?
 5        A     Yes.
 6        Q     And after that the records of the sales
 7   would come from Atlantic Recording Corporation?
 8        A     You got it.
 9        Q     Okay.  So we talked about the
10   underestimated tour and you mentioned an appearance
11   in Oakland.  This is Exhibit 34.
12        A     Yes.
13              (Whereupon, Plaintiff's Exhibit 34 was
14               marked for identification by the court
15               reporter and attached hereto.)
16   BY MR. CONLAN:
17        Q     This is a post from KSR Group's Instagram
18   page.  This is promoting the Oakland stop at the
19   Underestimated Tour?
20        A     It's not promoting.  Once again it's just
21   letting people know where we at.  Promoters pay for
22   those events and promoters promote those events.
23        Q     This is advertising the event?
24        A     Not advertising.  It's just letting
25   everybody know where -- where we going to be.
```

Page 167

1        Q    Well, what do you call that?  I mean, you
2    don't call that advertising?
3        A    Well, it's promoting the company.
4        Q    Okay.
5        A    Yes.
6        Q    Right.  So it's promoting KSR Group?
7        A    Yes.
8        Q    It's promoting the underestimated music
9    tour; correct?
10       A    It's -- well, promoting the company.
11       Q    KSR Group is the company that put on the
12   underestimated tour; right?
13       A    Yeah.  We put the tour together, but
14   promoters are the ones that promote the event.
15       Q    I got it.
16       A    I didn't promote that event.
17       Q    Okay.
18       A    Okay.
19       Q    But in this post you were advertising the
20   event; correct?
21       A    As I show everything else I do.  If that's
22   called advertising.
23       Q    What do you call it marketing?
24       A    Marking.  I'd rather marketing.
25       Q    Okay.

Page 168

1      A      Advertising -- I assume advertising, I

2   equate it to dollars.  So I'd rather -- marketing,

3   yes.  I prefer that.

4      Q      You equate advertising to dollars because

5   you got paid for it, is that what you mean?

6      A      No.  Advertising, like when you advertise

7   something is because you want to make money.

8      Q      Okay.

9      A      There's -- I'm not -- there's no -- by her

10  posting there, there's no money exchange that is

11  going to be made for my company.

12     Q      Well, you're getting the word out; right,

13  about the event?

14     A      I mean -- once again, I mean, if I was --

15  KSR Group not getting the word out.  I think it's

16  promoting, marketing the company, that's what it's

17  doing.

18     Q      Did Cardi B perform songs from Gangsta

19  Bitch on the underestimated tour?

20     A      Yes, she did.

21     Q      How much money did KSR make from the

22  underestimated tour?

23     A      I'm not sure.  Promoters paid for her to

24  come and perform, so I'm not exactly sure what the

25  total is.

                                      Page 169

```
 1        Q     KSR Group put the tour together; right?

 2        A     Yeah, we put together all the artists, all

 3   our artists; correct?
```

```
 4        Q     Right.  So what was KSR's -- what revenues

 5   were generated for KSR from the underestimated tour?

 6        A     I'm not sure.  I don't remember exactly

 7   how much promoters paid for that.  But all the

 8   artists were included on the tour.

 9        Q     How many stops were there on the tour?

10        A     Maybe 12.

11        Q     And Cardi B was the headliner?

12        A     Cardi B is the headliner.  She one of --

13              MR. DOWLING:  All the stops in California?

14              THE WITNESS:  No.

15   BY MR. CONLAN:

16        Q     Well, only Oakland --

17        A     Only Oakland.

18        Q     -- is the only stop in California?

19        A     Only Oakland, yeah.

20        Q     Did the tour -- did the artist on the

21   tour, on the underestimated tour, travel anywhere

22   else in California before or after the appearance in

23   Oakland?

24        A     No.

25        Q     Did the group of artists travel together?
```

Page 170

1    around the time of that underestimated tour stop in

2    Oakland?

3         A    Okay.

4         Q    And this -- this is from something called

5    club life media and it seems to show her making an

6    appearance at some event in secret Sundays in

7    Hollywood.  Do you see that?

8         A    Uh-huh.

9         Q    So if -- if she was down there in

10   Hollywood after the show in Oakland, does that mean

11   the rest of the underestimated tour was also in

12   L.A.?

13        A    Most likely.  I mean, the whole group was

14   together during the tour, so...

15        Q    Where was Oakland in the lineup of the

16   different tour stops?

17        A    That was the first.

18        Q    Oakland was the first one?

19        A    Uh-huh, I believe.

20        Q    So, looks like the Oakland stop was

21   July 2nd, 2016 and this Exhibit 35 looks like it

22   says July 6th, 2016.  Do you see that?

23        A    July 6?

24        Q    It's hard to see.

25        A    July 6.

Page 173

```
 1        A    Yes.

 2        Q    Where did you stay?

 3        A    I don't remember.

 4        Q    June 2017?

 5        A    Yeah, I don't remember where I stayed at.

 6   Probably SLS.

 7        Q    Okay.  37.

 8             (Whereupon, Plaintiff's Exhibit 37 was

 9              marked for identification by the court

10              reporter and attached hereto.)

11   BY MR. CONLAN:

12        Q    Was KSR managing Cardi B when she appeared

13   at the VMAs?

14        A    Yes.

15        Q    And this was at the forum in the

16   Inglewood?

17        A    Uh-huh.

18        Q    "Yes"?

19        A    Yes.

20        Q    Did you travel out here for the VMAs?

21        A    Yes, we traveled.

22        Q    Did you travel with Cardi?

23        A    I'm pretty sure I did.

24        Q    Okay.  Where did you stay?

25        A    I don't remember.
```

Page 176

1      Q     Did KSR earn a fee for Cardi's appearance

2    at the VMA preshow?

3      A     Probably not.  I'm not sure.

4      Q     How long -- how long were you here in

5    August of 2017 --

6      A     I'm not --

7      Q     -- here in Los Angeles?

8      A     I'm not sure because I don't travel with

9    the group all the time, so I don't know.  I don't

10   remember.

11     Q     Okay.  But you were definitely here in

12   August of 2017 in Los Angeles?

13     A     For the VMAs, I was definitely.

14     Q     And Cardi was definitely here for the VMAs

15   August of 2017?

16     A     Definitely.

17     Q     Any other KSR artists here for that trip

18   to California in August of 2017?

19     A     No.

20     Q     Did Cardi come back out to California in

21   September of 2017 for a show in Oakland?

22     A     I'm not sure.  Can I see?

23     Q     Let me show you.

24                (Whereupon, Plaintiff's Exhibit 38 was

25                 marked for identification by the court

                                        Page 177

```
1    STATE OF CALIFORNIA      )

2    COUNTY OF LOS ANGELES   )   ss.

3

4            I, JESSICA N. NAVARRO, C.S.R. NO. 13512, in

5    and for the State of California, do hereby certify:

6            That prior to being examined, the witness

7    named in the foregoing deposition was by me duly sworn

8    to testify to the truth, the whole truth, and nothing

9    but the truth;

10           That said deposition was taken down by me in

11   the shorthand at the time and place therein named and

12   thereafter reduced to typewriting under my direction,

13   and the same is a true, correct, and complete transcript

14   of said proceedings;

15           That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the transcript

18   [ ] was [ ] was not required.

19           I further certify I am not interested in the

20   event of the action.

21           Witness my hand this 27th day of January,

22   2019.

23

24           CERTIFIED SHORTHAND REPORTER

25           FOR THE STATE OF CALIFORNIA
```

Page 186

# EXHIBIT B

Pursuant to L.R. 79-5.2.2(a)(iv)

REDACTED - FILED UNDER SEAL

# EXHIBIT C

## Pursuant to L.R. 79-5.2.2(a)(iv)

## REDACTED - FILED UNDER SEAL

# EXHIBIT D

## Pursuant to L.R. 79-5.2.2(a)(iv)

## REDACTED - FILED UNDER SEAL

# EXHIBIT E

Pursuant to L.R. 79-5.2.2(a)(iv)

REDACTED - FILED UNDER SEAL

# EXHIBIT F

Pursuant to L.R. 79-5.2.2(a)(iv)

REDACTED - FILED UNDER SEAL

# EXHIBIT G

| Date | Event Name |
|------|-----------|
| Feb 18 2016 | The Little Red Dress Affair Hosted By LHHNY "Cardi B" |
| July /3/2016 | Cardi B 4th of July Weekend Live |
| June/21/2017 | "Cardi Party" at Liaison Hollywood Featuring Cardi B Live |
| June/24/2017 | 2017 BET Experience (Radio Broadcast Center, 2017 BET Experience / Performance) |
| June/25/2017 | 2017 BET Awards (Pre-Show - Live! Red! Ready!, Red Carpet, Awards, & Post Show) |
| Aug/27/2017 | CARDI B AT PROJECT NIGHTCLUB |
| Aug/27/2017 | 2017 MTV Video Music Awards |
| Aug/28/2017 | Performance at Ace of Diamonds in Los Angeles |
| Aug/29/2017 | Performance and Vive Tequila Lounge & Nightclub in Pomona |
| Sept/21/2017 | Last Day of Summer w/ Migos, Cardi B at Oracle Arena in Oakland |
| | |
| Nov/18/2017 | Real 92.3 Presents The Real Show |
| | Lineup: J. Cole, French Montana, Yo Gotti, Cardi B, Jessie Reyez, Zoey Dollaz, Cozz and Young California |
| Nov/19/2017 | Performance at Fluxx in San Diego |
| Dec/16/2017 | Cardi B, Migos + Special Surprise Guest Performance at Project LA in Los Angeles |

**<u>Location</u>**

New Parish 579 18th Street, Oakland, CA 94612

Project LA in Los Angeles, California

LiaisonLA 1638 N. Las Palmas Ave, Los Angeles, CA 90028

Los Angeles Convention Center

Microsoft Square

Project LA in Los Angeles, California

The Forum in Inglewood, California

ACE OF DIAMONDS LOS ANGELES 652 N La Peer Dr, West Hollywood, CA

VIVE TEQUILA LOUNGE & NIGHTCLUB 184 W 3rd St, Pomona, CA 91766

Oracle Arena 7000 Coliseum Way, Oakland, CA 94621-1945


The Forum in Inglewood, California

Fluxx 500 Fourth Ave, San Diego, CA 92101

Project LA in Los Angeles, California

**Link to event**

https://www.bandsintown.com/en/e/14045762-cardi-b-at-new-parish?came_from=251&utm_medium=web&utm_source=artist

https://www.seetickets.us/event/Cardi-B-4th-of-July-Weekend-Live/329975

https://www.facebook.com/events/239514849877129/

https://www.bandsintown.com/en/e/19575099-cardi-b-at-ace-of-diamonds-los-angeles?came_from=251&utm_medium=web&u

https://www.bandsintown.com/en/e/19593749-cardi-b-at-vive-tequila-lounge-and-nightclub?came_from=251&utm_medium=w

https://www.bandsintown.com/en/e/19656049-cardi-b-at-oracle-arena?came_from=251&utm_medium=web&utm_source=arti

https://www.bandsintown.com/en/e/20505699-cardi-b-at-fluxx?came_from=251&utm_medium=web&utm_source=artist_page

https://www.bandsintown.com/en/e/20854029-cardi-b-at-project-club-la?came_from=250&utm_medium=web&utm_source=ar

**Video/Photos**

https://www.youtube.com/watch?v=lcQK93xwY_g

https://www.instagram.com/p/BHi644Vj0z0/

http://www.zimbio.com/photos/Cardi+B/2017+BET+Experience+Main+Stage+Performanc https://www.youtube.com/watch?v=GHaWeZByrxU

https://www.youtube.com/watch?v=04Uk2gV4WmM      http://www.zimbio.com/photos/Cardi+B/2017+BET+Awards+Show/n

https://www.instagram.com/p/BYWSo1hHrLo/      https://www.universe.com/events/cardi-b-live-secretsundayz-mtv-vn

https://www.billboard.com/articles/events/vma/7942200/cardi-b-colin-kaepernick-vmas-   Red Carpet - https://www.youtube.com/watch?v=eXdBucRf4iw

https://pagesix.com/2017/08/29/cardi-b-returns-to-the-stripping-stage-and-more-star-snaps/slide-1/

https://www.youtube.com/watch?v=j3EV1__pl9s

st_page&utm_campaign=event

https://real923la.iheart.com/featured/real-show/content/2017-11-20

https://real923la.iheart.com/featured/real-show/content/2017-11-17-cardi-b-g-eazy-and-

&utm_campaign=event

rtist_page&utm_campaign=event

http://www.zimbio.com/photos/Cardi+B/2017+BET+Awards+Radio+Broadcast+Center+Day/p94XmTEQLbs

http://www.zimbio.com/photos/Cardi+B/2017+BET+Award https://www.gettyimages.com/detail/news-photo/cardi-b http://www.zimbio.com/photos/Cardi+B

https://www.instagram.com/p/BYZoyX8n02u/

Performance - https://www.youtube.com/watch?v=qDlzjz6UsWM

-watch-j-cole-drop-some-gems-to-cardi-b/

https://www.alamy.com/stock-photo-cardi-b-at-arrivals-for-2017-bet-awards-part-2-mi

# EXHIBIT H

PARTIALLY REDACTED -
UNREDACTED VERSION
FILED UNDER SEAL



Brophy v. Almanzar, et al.
USDC, CD CA, 8:17-cv-01885-CJC-JPR

KSR0001
CONFIDENTIAL

From: Timm Gooden <mr.nojo@gmail.com>
Date: November 3, 2017 at 3:12:33 PM CDT
To: Shaft <shaft@ksrgroupllc.com>
Subject: COVER PHASES



Brophy v. Almanzar, et al.                          KSR0002
USDC, CD CA, 8:17-cv-01885-CJC-JPR                  CONFIDENTIAL



Brophy v. Almanzar, et al.
USDC, CD CA, 8:17-cv-01885-CJC-JPR

KSR0003
CONFIDENTIAL



Brophy v. Almanzar, et al.
USDC, CD CA, 8:17-cv-01885-CJC-JPR

KSR0004
CONFIDENTIAL



KSR0005
CONFIDENTIAL

REDACTED

Brophy v. Almanzar, et al.
USDC, CD CA, 8:17-cv-01885-CJC-JPR

KSR0006
CONFIDENTIAL

# EXHIBIT I

## Pursuant to L.R. 79-5.2.2(a)(iv)

## REDACTED - FILED UNDER SEAL

# EXHIBIT J

# EXHIBIT 2



Case 8:17-cv-01885-CJC-JPR  Document 56-4  Filed 08/05/19  Page 140 of 285  Page ID
#:781
Dec 23 17,05:57a                                                                                                    p.1
                    Case 1:18-cv-03710-VEC  Document 30-2  Filed 07/05/18  Page 2 of 11

RECORDING AGREEMENT

This is an Agreement ("Agreement") dated as of October 17, 2016, between KSR Group, LLC ("we" "us"), whose address is 244 fifth Avenue, Suite K261, New York, NY 10001, and Belcalis Almanzar p/k/a Cardi B ("you"", "your"), whose address is: 1222 Nelson Ave, 2 Floor, Bronx, NY 10452 whereby you agree to render your services exclusively to us as a recording artist for the Term hereof throughout the universe (the 'Territory"). Until such time as a more formal agreement is entered into between the parties the terms and conditions of this Agreement shall govern and be a binding and enforceable contract between you and us. More particularly:

1.    **Distribution Agreement:** We shall have the exclusive right during the Term to solicit a recording agreement with third party record label (the "Distributor") pursuant to which we shall have the right to (i) deliver recordings to the Distributor for distribution through all channels of trade throughout any and all territories throughout the world; and/or (ii) furnish your exclusive services as a recording artist in the music industry to the Distributor, and otherwise assign all of our rights under this Agreement to Distributor (the agreement with the Distributor and us is referred to herein as the "Distribution Agreement"). Upon our entering into a Distribution Agreement, then notwithstanding anything to the contrary contained in this Agreement it is of the essence that you agree to the following:

(i)    the Term hereof shall be deemed extended to be co-extensive with the term of the Distribution Agreement, plus an additional one hundred and twenty (120) days;

(ii)    you shall comply with all of the terms and conditions of this Agreement and the Distribution Agreement to enable us to fulfill all of our obligations under the Distribution Agreement. We shall provide you with a copy of the Distribution Agreement promptly following its execution and shall meaningfully consult with your attorney during the negotiation of the Distribution Agreement regarding the terms that pertain to you.

(iii)    you hereby agree to duly execute any letters of inducement and any other documents necessary or desirable to effectuate the terms of this Agreement or of the Distribution Agreement that may be required by the Distributor or us.

(iv)    in the event of any inconsistency between the definitions in this Agreement and the definitions contained in the Distribution Agreement (if applicable), then the definitions of the Distribution Agreement shall control.

2.    **Term/Recording/Delivery Commitment:** The Initial Term of this Agreement shall commence on the date hereof and continue for a period of twelve (12) months from date you deliver to us a minimum of two (2) recordings that are commercially and technically acceptable. You grant us six irrevocable and consecutive options to extend the Term hereof and you will deliver one additional Album to us during each option period. The first Option Period shall be deemed to commence upon expiration of the Initial Term. Each option period thereafter will be deemed to have been automatically exercised by us on the date (the "Option Date") occurring one year after our release in the United States of the immediately preceding Album in accordance with all of the terms and conditions hereof. Each such option shall be deemed automatically exercised by us as of the Option Date unless we notify you in

Case 8:17-cv-01885-CJC-JPR   Document 56-4   Filed 08/05/19   Page 141 of 285   Page ID
#:782
Dec 23 17.05:58a                                                                                          p.2
Case 1:18-cv-03710-VEC   Document 30-2   Filed 07/05/18   Page 3 of 11

writing (the "Non-Exercise Notice") that we do not wish to exercise the option concerned.  In addition, we may notify you in writing (the "Termination Notice") that we wish to terminate the term of this agreement.  Also, if you do not deliver an Album to us in accordance with all of the terms and conditions hereof in any two-year period, we will have the right to terminate the term of this agreement by written notice to you.  If we send you a Non-Exercise Notice or Termination Notice or we terminate the term pursuant to the preceding sentence or as otherwise provided herein, the term will end on the earlier of the next Option Date or the date set forth in the notice concerned, and we will have no liability to you for any undelivered Albums.  If we do not send you a Non-Exercise Notice, Termination Notice or Non-Delivery Notice, the term will end nine months after we release the last option Album hereunder (i.e., the fifth Album under this agreement). To be clear, if we exercise all of our options you will record and deliver a minimum total of seven (7) Albums, or six (6) Albums and one EP; provided, that we may elect to reduce your minimum recording commitment to Delivery of an EP rather than an Album in any Option Period, in which event the applicable Option Period will continue until one (1) year after the commercial release of the EP in the United States. You shall Deliver to us one Album not later than four (4) months from the commencement of each Option Period. We shall have the right to suspend any term of this Agreement if you fail or refuse to comply with any material term contained herein. We shall have the right to extend the Initial Term for a period of up to 120 days if we have commenced good faith negotiations with a Distributor for the purpose of entering into a Distribution Agreement.  We shall be deemed to have commenced good faith negotiations if we have received a written offer from a Distributor to enter into a Distribution Agreement during the Initial Term.

3.     **Sharing of Royalties/Advances from Distributor/Advances**: If we enter into a Distribution Agreement we shall instruct the Distributor to account to you directly for fifty (50%) percent of all net advances and royalties otherwise payable to us pursuant to the Distribution Agreement. You shall be subject to all of the same provisions affecting us in connection with royalties accounted to us by Distributor

4.     **Royalties from Our Exploitation of "Revenue Pool Products"**: Provided you are not in breach of this Agreement, and solely with respect to Initial Recordings and Videos ("Revenue Pool Products") we exploit (as opposed to the exploitation recordings by a Distributor pursuant to a Distribution Agreement), we shall account and pay to you the royalties as described and defined in the attached Exhibit "1", incorporated herein by this reference.

5.     **Revenue Share**: You shall account and pay to us 25% (our "Revenue Share") of all compensation earned by you in Entertainment Industry resulting from any agreements substantially negotiated during the Term of this Agreement or within 6 months following the end of the Term, including live concert performances, merchandising, endorsements, songwriting, music publishing (but music publishing and songwriting is excluded in the event we acquire music publishing rights from you), record producing, scripted and non-scripted television performances, dramatic acting, any exploitation of Artist's name or likeness in any capacity or for any reason ("Gross Compensation"). In calculating our share of Gross Compensation, the following will be excluded: a total of up to 25% of Gross Compensation in the aggregate for personal management, business management, talent agent, broker, commissions or fees; and except with respect only to Gross Compensation from live touring revenues, a total of up to 35% of Gross Compensation in the aggregate for all such commissions or fees; provided, however, that our share of your Gross Compensation

Case 8:17-cv-01885-CJC-JPR  Document 56-4  Filed 08/05/19  Page 142 of 285  Page ID
#:783  p.3
Dec 23 17.05'58a
Case 1:18-cv-03710-VEC  Document 30-2  Filed 07/05/18  Page 4 of 11

from touring and all live music performances will be subject to a floor of not less than 10% of Gross Compensation from such activities. The Revenue Share is inclusive of any sums payable to the Distributor in connection with your activities in the Entertainment Industry.

(a) You shall account the Revenue Share to us as and when you are paid, or credited with, Gross Compensation during and after the Term hereof pursuant to (i) any and all contracts, engagements and commitments entered into or negotiated during the Term hereof (other than this agreement); including, any and all extensions, additions, substitutions, renewals, replacements, modifications and amendments of all such contracts, engagements and commitments; and, (ii) any and all judgments awards, settlements, payments, damages and proceeds relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of alleged breach, non-performance or infringement by others of any of the contracts, engagements, commitments, other agreements or rights referred to in subparagraph (i), above.

(b) Promptly upon our entering into a Distribution Agreement, you shall appoint a business manager that is experienced in the entertainment industry who will be authorized and directed to pay the Revenue Share to us per the terms hereof as and when you receive, or are credited with, Gross Compensation. The Revenue Share shall be accounted and paid to us promptly, but not later than thirty (30) days, after you are paid or credited with Gross Compensation. The assignment to us of the Revenue Share is irrevocable and is intended to create an agency coupled with an interest. You shall submit Letters of Direction to any third party with whom you may expect to receive Gross Compensation in connection with any contracts and engagements in the Entertainment Industry instructing such party to pay the Revenue Share to us directly on your behalf. Should you, or anyone with whom you enter into an agreement and engagement in the Entertainment Industry fail to account and pay us the Revenue Share in connection with Gross Compensation, we shall, in addition to any other remedies, all of which are reserved, have the right to deduct the unpaid Revenue Share from any monies due to you under this, and any other agreement between you and us.

(c) The term "Entertainment Industry" shall include any and all branches of such fields now existing or hereafter developed, conceived, or used, including, but without limiting the generality of the foregoing, the following: motion pictures, free and pay television, home video, theatrical engagements, legitimate stage, personal appearances, concerts, public appearances in places of amusement and entertainment, video games and devices, record production, music and literary publishing and songwriting, radio, and the use and licensing of your name(s), likeness and/or talent for purposes of merchandising, commercial exploitation, advertising and/or trade.

(d) Except for money payable to you by us under this and any other agreement between us, the term "Gross Compensation" shall include all forms of income derived from your professional career in the Entertainment Industry, and paid or credited to you without deductions, except as may otherwise be provided herein, including, but without limiting the foregoing, the total compensation, salaries, earnings, fees, royalties, advances, residuals, repeats and/or re-run fees, bonuses and the total amount paid for any endorsements, or any entertainment package or package program, live or recorded, earned and received, directly by you, and your heirs, executors, administrators or assigns, or any other person, firm or corporation in your behalf, or in which you have an interest of any kind.

(e) The terms "engagements", "contracts", "agreements", and "employment" shall

Case 8:17-cv-01885-CJC-JPR  Document 56-4  Filed 08/05/19  Page 143 of 285  Page ID
#:784
Dec 23 17,05:58a                                                                              p.4
Case 1:18-cv-03710-VEC  Document 30-2  Filed 07/05/18  Page 5 of 11

include any and all engagements, contracts, agreements or employment of any kind whatsoever entered into during the Term hereof, or substantially negotiated during the Term hereof, which relate in any way to your activities in the Entertainment Industry.

(f) We may conduct audits to verify the accuracy of your books and records in respect of Gross Compensation and your accountings to us. Any audit conducted by us will be at your usual place of business or wherever your books and records are kept, and during usual business hours. Timely payment of the Revenue Share is of the essence of this Agreement and we may, in addition to and not in limitation of, among other remedy available to us, suspend the Term of this Agreement in the event you fail to remit the Revenue Share to us, until such time as remittance is made.

(g) You will use your best efforts to ensure that all agreements in connection with your activities in the Entertainment Industry shall otherwise irrevocably instruct and direct all Persons with whom you are contracting with to account and pay the Revenue Share directly to us, at the same times as you are accounted to with respect to the Entertainment Activity concerned, and subject to the same conditions. You shall also use best efforts to cause each such third party agreement to provide that we will] have the same right to examine the applicable Person's books and records relating as apply to your audit rights. You shall sign any documents as we may reasonably request to effectuate and secure our rights under this paragraph.

6.    **Music Publishing:** Provided we secure a Distribution Agreement, you and your music publishing entity, any company or person controlled by you, shall assign to our music publishing affiliate an undivided fifty percent (50%) interest of your entire interest, and the sole and exclusive right to administer our share of your rights granted there under for the length of copyright  throughout the world, in each and every musical composition ("Compositions" and each a "Composition") written by you during the Term hereof(which shall include the Distribution Term as well), as well as any musical composition written by you and embodied on an Existing Master or Video, referenced in paragraph 9, below, and otherwise embodied on any recording released by us or Distributor. You and we agree to enter into a more formal Co-Publishing agreement incorporating the terms hereof, but until such time, if ever, that the parties enter into such more formal agreement, it is agreed that: (1) we are the sole and exclusive administrator of your and our copyright interest in the Compositions throughout the world for the length of copyright; (2) we shall account 75% of all income and revenues from the sales and exploitations of the Compositions, except that your publisher share of public performance royalties shall be 50% thereof; and (3) we may deduct actual administration fees and other third party charges such as subpublisher fees from amounts due to you hereunder.

7.    **Re-Recording Restrictions**: During the Term of this Agreement you will not perform for the purpose of making phonograph records for any person, firm or corporation other than us. During a period of five years after the expiration or termination of this Agreement you will not perform any selection recorded hereunder for any other person, firm or corporation for the purpose of making phonograph records, or including such recorded performances in the soundtrack of a audio visual production of any kind, including, but not limited to motion pictures, television programs, and music videos.

8.    **Our Rights in Masters/Videos:** All of the audio and audiovisual recordings ("Records" and "Recordings") made by you pursuant to this Agreement, including the Initial Recordings, Existing Masters and Audiovisual Recordings referenced in paragraph 9A, (each individually a "Master," and

Case 8:17-cv-01885-CJC-JPR  Document 56-4  Filed 08/05/19  Page 144 of 285  Page ID
#:785
Dec 23 17,05:59a                                                                                          p.5
Case 1:18-cv-03710-VEC  Document 30-2  Filed 07/05/18  Page 6 of 11

collectively the "Masters", or "Video" and collectively "Videos" depending on the context) and all rights
therein (including, without limitation, all copyrights) shall be owned solely and exclusively by us
throughout the Territory in perpetuity, as works-made-for-hire within the meaning of the U.S. Copyright
Act, and we shall have the right to exploit same by any means now known or hereafter devised, and to
authorize others to do any or all of the foregoing.  To the extent the Masters or Videos or any part of
them are ever deemed not to be "works-made-for-hire" owned solely by us, then you hereby
irrevocably and exclusively grant to us all rights in the Masters and Videos (including, without limitation,
all copyrights therein, but excluding the copyrights in the underlying musical compositions unless
assigned per the provisions of paragraph 6, above) throughout the Universe in perpetuity, and all
extensions, renewals and reversions thereof.  In the event we exploit such Masters and Videos (as
opposed to exploitation of Records and Masters by Distributor), we shall account and pay you royalties
set forth in Exhibit "1".

        9.        **Existing Master Recordings and Audiovisual Recordings:**  Set forth on the attached
Exhibit "2" is a list of Existing Masters and Videos which shall be deemed Masters and Videos hereunder
pursuant to which we shall have all of the rights we are otherwise entitled to hereunder in connection
with Masters and Videos, including, but not limited to, copyright ownership thereto as set forth in
paragraph 8, above; and your warranties and representations shall also extend to the Existing Masters
and Videos. To the extent the Existing Masters and Videos, or any part of them, are ever deemed not to
be "works-made-for-hire" owned solely by us per the provisions of paragraph 8 above, then you hereby
irrevocably and exclusively assign and grant to us all rights under copyright, excluding the underlying
musical compositions, in the Existing Masters and Videos (including, without limitation, all copyrights)
throughout the universe in perpetuity, and all extensions, renewals and reversions therein.

        10.        **Your Name and Likeness:**  We shall have the right in perpetuity throughout the Territory
to use, and to permit others to use your name (both legal and professional) and approved likeness and
approved biographical material concerning you for advertising and purposes of trade, and otherwise
without restriction, in connection with the exploitation of phonograph records. We shall have the
further right to refer to you by your professional name, as our exclusive recording artist, and you shall,
in your activities in the entertainment field. During the term of this Agreement you shall not authorize
your legal or professional name or your likeness to be used in connection with the advertising or sale of
phonograph records other than those approved by us.

        11.        **We Will Send You Statements:**  Statements as to royalties payable to you hereunder shall
be sent by us to you within ninety (90) days following the end of each semi-annual accounting period
ending December 31st and June 30th during which we receive revenues in connection with the
exploitation of Records, Videos, Controlled Compositions, and any of our rights hereunder, whether
from Distributor or otherwise. We will provide you with a true copy of each royalty/sales statement
which we receive from our Distributor with each royalty statement rendered by you.  You shall be
deemed to have consented to all royalty statements and all other accounts rendered by us to you, and
said statements and other accounts shall be binding upon you and not subject to any objection by you
for any reason, unless specific objection in writing, stating the basis thereof, is given by you to us within
two (2) years from the date such statement was rendered. We shall maintain books of account records
hereunder. You or a certified public accountant in your behalf may, at your expense, at our offices,
examine our books pertaining to the records made hereunder during our usual business hours and upon
reasonable notice. Our books relating to activities during any accounting period may only be examined

as aforesaid during the two (2) year period following the date such statement was due hereunder. Notwithstanding the foregoing, we shall instruct the Distributor to pay royalties and all other amounts due to you hereunder directly to you consistent with the terms and conditions contained herein. We may deduct such amount, if any, which we may be required to withhold pursuant to the U.S. Tax Regulations or any other applicable statute, regulations, treaty or law. Solely with respect to physical product only that embodies Records and Videos, we shall have the right to deduct returns and credits of any nature and to withhold reasonable reserves (which shall not exceed 25) from payments otherwise due to you. For purposes herein, the "reasonableness" of such reserves shall be determined by SoundScan sales figures. Each royalty reserve against anticipated returns and credits will be liquidated not later than the end of two years following the accounting period during which it is established. Any action, suit or proceeding concerning royalty statements or other accountings rendered to you by us shall be limited to a determination of the amount of royalties, if any, payable to you for the accountings periods in question, and your sole remedy shall be the recovery of those particular royalties; and, you specifically waive the right to seek any equitable remedies in respect of any claims regarding the payment or non-payment of royalties. Notwithstanding the foregoing, with respect to recordings released by the Distributor, the reserve and liquidation provisions of the Distribution Agreement shall apply to recordings released by the Distributor.

12.    **Controlled Compositions/Mechanical Royalties:** A "Controlled Composition" is a musical composition written in whole or in part by you, owned or controlled in whole or in part by you, or any person or entity in which you have a direct interest. Solely with respect to Records (and Videos) we exploit (as opposed to Records and Videos that a Distributor may exploit), you agree to grant to us and our designees a gratis (meaning free) and irrevocable license, under copyright, to reproduce each Controlled Composition on Records and Videos and to distribute them in the United States of America and Canada. It is the essence of this Agreement that you acknowledge we are not obligated to account and pay so-called music publishing royalties with respect to Records and Videos solely exploited by us under this Agreement. At such time as we enter into a Distribution Agreement, you shall be accounted to with respect to Controlled Compositions according to the terms and conditions set forth in the Distribution Agreement and distributed or exploited by Distributor.

13.    **Warranties/Representations/Indemnities:** You warrant and represent that you are under no disability, restriction or prohibition, whether contractual or otherwise, with respect to your right to execute this Agreement and perform its terms and conditions, and with respect to your right to record any and all selections hereunder. You specifically warrant and represent that no selections recorded or to be recorded by you hereunder are subject to any re-recording restrictions under any previous agreements to which you may be a party. You agree to and do hereby indemnify, save and hold us harmless from any and all loss and damage (including attorneys' fees) arising out of or connected with any claim by a third party which is inconsistent with any term of this Agreement, and you agree to reimburse us, on demand, for any payment made by us at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies is reduced to a final judgment or mutually approved settlement. Pending the determination of any such claim, we may withhold payment of royalties or other monies hereunder.

14.    **Miscellaneous:** This Agreement shall be governed by the laws of the state of California and only the courts (state and federal) located in Los Angeles County will have jurisdiction of any controversies regarding, or arising under, this Agreement. Any action or other proceeding which involves such a controversy will be brought only in those courts located in Los Angeles County and not

Case 8:17-cv-01885-CJC-JPR Document 56-4 Filed 08/05/19 Page 146 of 285 Page ID
#:787 p.6
Dec 23 17.06:00a
Case 1:18-cv-03710-VEC Document 30-2 Filed 07/05/18 Page 8 of 11

elsewhere. Any action, suit or proceeding concerning statements or other accountings rendered to you by us shall be limited to a determination of the amount of royalties payable to you for the accountings periods in question, and your sole and exclusive remedy shall be the recovery of those particular royalties; and you specifically waive any other legal and equitable remedies. If any part of this Agreement, or its application as it applies to a particular party, shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall not affect the remainder of this Agreement, which shall continue in full force and effect, or the application of this Agreement to the remaining parties. In entering into this Agreement, and in providing services pursuant hereto, you have the status of an independent contractor. Nothing herein contained contemplates or constitutes you as our employee. This Agreement is not intended to become effective until and unless it is executed by all of the proposed parties to it. Notwithstanding anything to the contrary contained herein, the Term of this Agreement is not intended to exceed that number of years that a personal services contract may be enforced. If it is determined that the Term of this Agreement does exceed that which is permissible under the law for the enforcement of personal services contracts, then the Term of this Agreement shall be deemed automatically amended so that it terminates on the next to the last day that a personal services agreement is enforceable under the laws of the state or jurisdiction that this Agreement is subject to. You expressly acknowledge that your services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach by you of any term, condition or covenant hereof we will be caused irreparable injury. You expressly agree that in the event you shall breach any provision of this Agreement we shall be entitled to injunctive relief and other equitable relief and/or damages, as we may deem appropriate, in addition to any other rights or remedies available to us, and we shall have the right to recoup any damages from any sums which may thereafter become due and payable to you hereunder, including sums otherwise payable to you after the expiration or termination of this Agreement.

If the foregoing correctly reflects your understanding and agreement with us, please so indicate by signing below.

Accepted and Agreed:

Belcalis Almanzar

10/18/16

SSN:

ALVARO S. LUCIANO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 4/11/2021

KSR GROUP, LLC

An Authorized Signatory

Case 8:17-cv-01885-CJC-JPR  Document 56-4  Filed 08/05/19  Page 147 of 285  Page ID
#:788
Case 1:18-cv-03710-VEC  Document 30-2  Filed 07/05/18  Page 9 of 11

Dec 23 17,06:01a                                                                                                p.7

Exhibit "1"
Royalties

1.      With respect to Records, Videos, and the sale and exploitation of any products and
services hereunder for which we are paid or credited with a payment (the "Revenue Pool Products"), we
will account to you on the terms and conditions as set forth below.

2.      Revenue Pool:  The "Revenue Pool" will consist of all gross revenues actually received by
us, or credited to us against advances previously received by us that are specifically attributable to the
Revenue Pool Products, and which were not counted as gross revenues hereunder, in the United States
that are directly attributable to sales and other exploitations of the Revenue Pool Products throughout
the Territory (e.g. foreign sales, direct licensing, and record clubs), less all actual returns, credits,
rebates, adjustments, and reasonable reserves against possible returns, which reserves shall take into
account sales data available from Soundscan.

3.      We will account to you for fifty (50%) percent of our Adjusted Gross Income in
connection with the sale and exploitation of Revenue Pool Products. "Adjusted Gross Income" shall
mean the following: the gross amount of the Revenue Pool less our out of pocket costs incurred or paid
by us in connection with recording Records, marketing, promotion, advertising and sale of all applicable
Revenue Pool Products such as:  (1) all Marketing and Promotion Costs; (2) all Artwork Costs; (3)
Audiovisual Production Costs; (4) all Manufacturing and Distribution costs; (6) Royalties to third parties
rendering services on Revenue Pool Products;  (7) advances and other amounts paid to you and on your
behalf; (8) Judgments and settlement amounts in respect of third party claims having to do with
Revenue Pool Products as well as reasonable outside legal fees and costs in defending such claims; and,
(9) all applicable taxes and union payments actually charged to us in connection with Revenue Pool
Products.

        (a)     "Marketing and Promotion Costs" are all third-party out-of-pocket marketing,
promotion, advertising, and publicity costs paid or incurred by us in connection with the Revenue Pool
Products.

        (b)     "Artwork Costs" are all artwork costs paid or incurred by us in connection with
the creation, design, and preparation of artwork for covers, sleeves, or other packaging elements in
connection with Revenue Pool Products.

        (c)     "Audiovisual Production Costs" are all costs paid or incurred by us associated
with the any production of Videos.

        (d)     "Manufacturing and Distribution Costs" are:  (1) all costs paid or incurred by us
associated with the manufacture of all configurations of Revenue Pool Products (e.g., the costs of
compact discs, vinyl discs, and tapes, packaging components, shrink wrapping and stickering and all
other service costs in connection therewith) and the delivery of Records and their components to us or
our distributor (e.g., freight charges and service charges actually charged to us by our distributor);  (2)

Case 8:17-cv-01885-CJC-JPR  Document 56-4  Filed 08/05/19  Page 148 of 285  Page ID
#:789
Case 1:18-cv-03710-VEC  Document 30-2  Filed 07/05/18  Page 10 of 11

Dec 23 17.06:02a                                                                                    p.8

the Distribution Fee (defined below); and (3) all other charges assessed to us by our distributor in connection with the manufacture and distribution of Revenue Pool Records (e.g., returns handling charges, freight charges, scraping fees, warehouse fees or charges, "loose unit" charges, service charges for the distribution of promotional records and refurbishing charges).

(e)      The "Distribution Fee" means the distribution fee payable by us to its distributor(s) plus a label services fee of five (5%) percent.

(f)      "Royalties" means all royalties and monies due to Persons ("Persons" means and refers to the persons and entities to whom a royalty is owed with respect to Revenue Pool Products), including, but not limited to, artists (which includes you), producers, mixers, and side artists rendering services in connection with the recording of the Records, as well as publishers of compositions embodied on Records. We may deduct reasonable reserves and liquidate such reserves within three accounting periods from the date each reserve is first established. You must provide us with true and correct copies of all relevant agreements with third parties regarding your royalty obligations prior to the release of a Record hereunder; and accurate information regarding the status of each applicable royalty account.

Exhibit "2"
[Existing Masters and Videos – Paragraph 9A]

Artist/Title(s)

# EXHIBIT K



EXHIBIT 14

Deponent K. Laquan
Date 1.8.19 Rptr 2512
WWW.DEPOBOOK.COM



Declaration of Lawrence J. Conlan
Exhibit 9





Declaration of Lawrence J. Conlan
Exhibit 10

EXHIBIT 1e
V. Raphael
Deponent
Date 1-16-19  Rptr 13512
WWW.DEPBOOK.COM

Declaration of Lawrence J. Conlan
Exhibit 12



ksrgroup • Follow

ksrgroup LaLa Land!!! Repost @iamcardib
with @repostapp.
· · ·
It's official! Tomorrow I'm choosing the
faces for Washpoppin Cosmetics By Cardi
B! Please pay attention to the details listed
below IF you are interested in participating
in tomorrows model call! Please be aware
that if you are chosen you will shoot in the
SAME location tomorrow evening!
Date: February 17, 2016
Time: Model Call will begin promptly at
4:00 PM
Where: Blue Dot Studios
409 W. Olympic Avenue (The Reserve
Building | Olympic & Olive) Suite 405
Attire: All black (NO EXCEPTIONS)

jimmiechoo__ brianababes, cptxo, felicia_kid,
ksrgroup, chelleyb__ shubandzz
bunny20785, lezerinofficial and cj9675515
like this

Add a comment...

WASHPOPPIN
# E Y E   S H A D O W
by Cardi B
MODEL CALL
LOS ANGELES
AREA ONLY!

iamcardib

© 2016 INSTAGRAM











Declaration of Lawrence J. Conlan
Exhibit 17

ksrgroup • Follow

ksrgroup Lala Land!!! @iamcardib @djself
@iamshaft @ohmightclubla #iamcardib
#djself #iamshaft #ohmightclubla #gbmv1
#losangeles #california
#girlfromthebronxcardib
#jacksonadministration #gwinnin
#ghangstabitchmusicvol1
#comingtoacitynearyou ♪
vegas_nikki L ❤ VE IT! ♣



429 views
FEBRUARY 24, 2018

Add a comment...

© 2018 INSTAGRAM

A𝜋 EXHIBIT  21
Deponent _Raphael_
Date _8 19_ Rpt _3512_
WWW.DEPOBOOK.COM



Declaration of Lawrence J. Conlan
Exhibit 18





# EXHIBIT L

Declaration of Lawrence J. Conlan
Exhibit 20





ksgroup • Follow

ksrgroup Torrance || California!!! Saturday March 📆📅|| 💥@CARDI_B💥
This Saturday come and party with this @VH1 Love and Hip Hop Superstar!!!
@TheSpearmintRhino is bringing The one and only @cardi_b! @iamcardib to @SpearmintRhino, Torrance to show you how to Boss Out 💃🎤🍾
Contact: 📞 310-532-2427 for VIP Bottles and Info ★·♥·♪·★·♥·♪·★·
#spearmintrhino
#rhinostyle
#rhinogirls
#laweekly
#vh1
#loveandhiphop
#iamcardib #girlfromthebronxcardib
#ghanstabitchmusicvol1
#gbmv1
#ksrgroup

59 likes

MARCH 9, 2016

Add a comment...

© 2018 INSTAGRAM

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS   PRIVACY   TERMS   DIRECTORY   PROFILES   HASHTAGS   LANGUAGE



Declaration of Lawrence J. Conlan
Exhibit 24





Declaration of Lawrence J. Conlan
Exhibit 25



Declaration of Lawrence J. Conlan
Exhibit 28

Instagram

ksrgroup · Follow

ksrgroup That #ksrgroup wave... Don't miss it.... #LosAngeles #GBMV1

karmakarezza Hello KSR Group LLC. I have been reaching out to you all for the past 3 MONTHS in regards to my advertisement. I met Cardi at the Bronner Bros Hair Show in February and she agreed to advertise my product (26/28/28 Brazilian Body Wave Hair Extensions) on her social media. The product was delivered March 4th and I didn't receive a response until April 18th stating the product is in reviewing process

504 views

APRIL 28, 2018

Add a comment...

© 2018 INSTAGRAM

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS   PRIVACY   TERMS   DIRECTORY   PROFILES   HASHTAGS   LANGUAGE



π EXHIBIT 27
Deponent Raphael
Dated 8-15 Rptr 12512
WWW.DEPOBOOK.COM



Declaration of Lawrence J. Conlan
Exhibit 33



Declaration of Lawrence J. Conlan
Exhibit 35



# EXHIBIT M



Declaration of Lawrence J. Conlan
Exhibit 29





Declaration of Lawrence J. Conlan
Exhibit 31

Instagram

ksrgroup · Follow

ksrgroup #fresno #california #carolb #ksrgroup #gbmv1 #foreva itslukeclubb 😂😂

dexhobbes See life through my eyes. Swing by my feed tell me what you think!

215 views

MAY 6, 2018

Add a comment…



© 2018 INSTAGRAM

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS   PRIVACY   TERMS   DIRECTORY   PROFILES   HASHTAGS   LANGUAGE

π EXHIBIT 22
Deponent: K Rayname
Date 1-8-19 Rptr. 12502
WWW.DEPOBOOK.COM

Declaration of Lawrence J. Conlan
Exhibit 32

Instagram

iamshaft · Follow

iamshaft #fresno #california #ksrgroup #gbmv1 #foreva #underestimatedtour coming soon

thatguymarz Ayeeee was just on the plane wit y'all from LA. 💯🙌

tsimoneguy @iamshaft I haven't spoken to you in a while. My friend told me she met you at the show with Doug E Fresh and you remembered her helping you with the makeup artist

mictheplug @iamshaft dm ur # i got new

388 views

MAY 6 2018

Add a comment...

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS   PRIVACY   TERMS   DIRECTORY   PROFILES   HASHTAGS   LANGUAGE

© 2018 INSTAGRAM

EXHIBIT 3
Deponent: Raphael
Date: 6-19-19  Rptr: 3912
www.pdfascoe.com

Declaration of Lawrence J. Conlan
Exhibit 36



ksrgroup • Follow

ksrgroup Tonight #KSRGROUP UNDERESTIMATED TOUR....We turning up in OAKLAND CA... GET YOUR TIX NOW!!! For Tix, More Cities, Dates & Music CLICK LINK IN BIO #AllAGES @joshexantus @cashflowharlem @swiftondemand @justvlad @iamcardib

royalphotobooth @georginaesthetics

bellxofficial. Hey angel brinks cardis stylist sent my info to her team, about doing her makeup for tonight's show in oakland 💋💄 I haven't got any response from email or anything my number is (209) 471-5781 my work @banks_beauty

bee.pg3 @iamcardib @swiftondemand

cheddar.trapacante follow back on my ig fam @ksrgroup

95 views

JULY 2ND 2016
VENUE OAKLAND AND JUNGLE PRESENT
THE KSR GROUP

UNDERESTIMATED
MUSIC TOUR

OAKLAND
LIVE PERFORMANCES BY
SWIFTONDEMAND JOSH X  CARDI B  CASHFLOW HARLEM  JUST VLAD
ALL AGES  DOORS OPEN AT 7 PM
VIP & GENERAL ADMISSION TIX AT
WWW.CARDIBCONCERTOAKLAND.EVENTBRITE.COM

420 14TH STREET  Venue  OAKLAND, CA

© 2018 INSTAGRAM

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS   PRIVACY   TERMS   DIRECTORY   PROFILES   HASHTAGS   LANGUAGE





Declaration of Lawrence J. Conlan
Exhibit 38

PLAINTIFF'S
EXHIBIT
44

Blumberg No. 5113





Blumberg No. 5113

PLAINTIFF'S
EXHIBIT
47



# EXHIBIT N

Declaration of Lawrence J. Conlan
Exhibit 43





Declaration of Lawrence J. Conlan
Exhibit 44



# EXHIBIT O



Declaration of Lawrence J. Conlan
Exhibit 27





4/23/2018                                   Cardi B Chart History | Billboard

# billboard

**CARDI B**

## Chart History

### Top R&B/Hip-Hop Albums ▼

RANKED BY PERFORMANCE ON CHART

**1** NO. 1 HIT    **1** TOP 10 HIT    **2** SONGS

**Invasion Of Privacy** ❯
Cardi B
★ Peaked at #1 on 4.21.2018

**Gangsta Bitch Music, Vol. 1** ❯
Cardi B
Peaked at #30 on 4.9.2016

© 2018 Billboard. All Rights Reserved.
Terms of Use    Privacy Policy    About Our Ads    Advertising
Billboard.com is a member of Billboard Music, a division of Billboard-Hollywood Reporter Media Group



PLAINTIFF'S
EXHIBIT
51

Blumberg No. 5113

Declaration of Lawrence J. Conlan
Exhibit 68
Page 1 of 3

1/1



# billboard

**CARDI B**

## Chart History

**Top Rap Albums** ▼

RANKED BY PERFORMANCE ON CHART
1 NO. 1 HIT    1 TOP 10 HIT    2 SONGS

### Invasion Of Privacy
Cardi B
★ Peaked at #1 on 4.21.2018

### Gangsta Bitch Music, Vol. 1
Cardi B
Peaked at #20 on 4.9.2016

© 2018 Billboard. All Rights Reserved.
Terms of Use    Privacy Policy    About Our Ads    Advertising

Billboard.com is a member of Billboard Music, a division of Billboard-Hollywood Reporter Media Group

Declaration of Lawrence J. Conlan
Exhibit 68
Page 2 of 3      1/1

4/23/2018                                     Cardi B Chart History | Billboard



© 2018 Billboard. All Rights Reserved.
Terms of Use     Privacy Policy     About Our Ads     Advertising
Billboard.com is a member of Billboard Music, a division of Billboard-Hollywood Reporter Media Group

Declaration of Lawrence J. Conlan
Exhibit 68
Page 3 of 3          1/1

# EXHIBIT P

4/18/2018

https://www.youtube.com/playlist?list=PLAJcdWq2a_cvZdJKIt8stOZm0kqB_jCII

Gangsta Bitch Music Vol 1 - YouTube - YouTube



YouTube

Search

≡

Home
Trending
History

BEST OF YOUTUBE

Music
Sports
Gaming
Movies
TV Shows
News
Live
Spotlight
360° Video

⊕ Browse channels

Sign in now to see your channels and

Gangsta Bitch Music Vol 1

13 videos • 508,919 views • Last updated on Apr 9, 2018

▶ PLAY ALL

Gangsta Bitch Music, Vol. 1

SUBSCRIBE

1  Trust Issues
Cardi B
2:25

2  Lit Thot
Cardi B
3:02

3  On Fleek
Cardi B
2:47

4  Washpoppi
Cardi B
3:21

5  Selfish
Cardi B
3:14

6  I Gotta Hurt You
Cardi B
4:12

7  Her Perspective
Cardi B

SIGN IN

Blumberg No. 5113

PLAINTIFF'S
EXHIBIT
50

Declaration of Lawrence J. Conlan
Exhibit 49

1/2

4/18/2018

https://www.youtube.com/playlist?list=PLAIcWq2a_cvZdJKlI8stOZm0kqB_jCll

Declaration of Lawrence J. Conlan
Exhibit 49

Gangsta Bitch Music Vol 1 - YouTube - YouTube



| # | Title | Artist | Duration |
|---|-------|--------|----------|
| 8 | Trick (Skit) | Cardi B | 2:08 |
| 9 | Sauce Boyz | Cardi B | 2:54 |
| 10 | Trick | Cardi B | 2:53 |
| 11 | Outro (Skit) | Cardi B | 0:37 |
| 12 | Intro (Skit) | Cardi B | 0:58 |
| 13 | Foreva | Cardi B | 3:24 |

# EXHIBIT Q

1   **Alan G. Dowling**
2   (California Bar No. 70686)
    Email:  agdowling@aol.com
3   **ALAN G. DOWLING,**
4   **A PROFESSIONAL CORPORATION**
    1043 Pacific Street, No. 1
5   Santa Monica, California 90405
6   Telephone: (818) 679-6395
    Fax:  (424) 238-5366
7   *Attorney for Defendants*

8

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11

12   KEVIN MICHAEL BROPHY, JR., an        **Case No. 8:17-cv-01885-CJC(JPRx)**
     individual,
13                                        Hon. Cormac J. Carney,
                                          U.S. District Judge
14                Plaintiffs,
                       v.
15                                        **RESPONSE AND OBJECTIONS**
16   BELCALIS ALMANZAR aka CARDI B,       **TO "PLAINTIFF'S FIRST SET OF**
     an individual; KSR GROUP, LLC, a New **SPECIAL INTERROGATORIES**
17   York limited liability company;      **(JURISDICTIONAL) TO**
     WASHPOPPIN, INC., a New York         **DEFENDANT BELCALIS**
18   corporation; and DOES 1-20, inclusive, **ALMANZAR AKA CARDI B"**
19
                  Defendants.
20

21

22

23

24

25

26

27

28

                                   1

PROPOUNDING PARTY:       Plaintiff

RESPONDING PARTY:        Defendant BELCALIS ALMAZAR AKA CARDI

B

SET NO.:                 One

Defendant BELCALIS ALMAZAR AKA CARDI B (hereinafter "Defendant" or "the Responding Party") hereby responds and objects as follows to **"PLAINTIFF'S FIRST SET OF SPECIAL INTERROGATORIES (JURISDICTIONAL) TO DEFENDANT BELCALIS ALMAZAR AKA CARDI B,"** dated May 14, 2018 (the "Requests"), pursuant to Rule 33 of the Federal Rules of Civil Procedure.

<u>INTRODUCTION, GENERAL OBJECTIONS AND DEFINITIONS</u>

1.      The Responding Party has not fully completed an investigation of all the facts relating to the subject matter of this action, has not completed all discovery in this action, and has not completed preparation for trial.  All of the responses contained herein are based only upon such information and documents as are presently available to and specifically known to the Responding Party, and disclose only those facts and documents that presently are known to and/or are available to the Responding Party. It is anticipated that further independent investigation, discovery, legal research and analysis may supply additional information, which may lead to substantial changes to the responses set forth below.   The following responses are consequently given without prejudice to the right of the Responding Party to introduce evidence of any subsequently discovered facts or documents which the Responding Party may later obtain or recall.

2.      The depositions of certain of the witnesses who would or possibly could testify as to the subject matter of the within action have not yet been commenced.  The documents that would or could form the basis of certain responses are still in the process of being discovered, and all such relevant documents may not have yet been produced or examined. Further, the significance of documents in the possession of the

Responding Party, or presently in the possession of the Propounding Party or a third party but not yet obtained from or produced by them, may only become apparent upon reviewing them in the context of other documents which have not yet been obtained or in the context of testimony not yet taken shedding light upon their relevance.

3.     The Responding Party accordingly reserves the right to change any and all responses set forth or referred to below, as additional facts may be ascertained, documents discovered, analyses made, legal research completed, and contentions made.  The responses contained below are made in a good faith effort to supply as much factual information and as much specification of the basis for legal contentions as is presently known and available to the Responding Party, but should in no way be construed to the prejudice of the Responding Party in relation to further investigation and/or discovery.

4.     This Responding Party's responses are made without waiver of, but, on the contrary, are intended to preserve and do preserve the following rights:

a.     the right to raise all questions of authenticity, foundation, relevancy, materiality, privilege and admissibility as evidence for any purpose, of the documents or information identified in response to the Requests, which may arise in subsequent proceedings in, or trial of, this or any other action;

b.     the right to object on any ground to the introduction into evidence of, or the use of, said documents or information identified in response to the Requests in any subsequent proceedings in, or trial of, this or any other action;

c.     the right to object on any ground at any time to other document requests or discovery involving said documents or information; and

d.     the right to amend or supplement this response in the event that any document or information is in the Responding Party's possession, custody or control, but is unintentionally omitted from production at this time.  Additionally, inadvertent identification or production of privileged documents or information by the Responding Party is not intended as, and shall not be construed as, a waiver of

3

1    any applicable privilege.

2        5.    This Responding Party further specifically objects to each and every

3    discovery Request in the set to which this response is directed, to the extent that it:

4            a.    seeks documents or information which are protected by the

5    attorney-client privilege or the attorney work product doctrine, or by the right of

6    privacy provided for in the Constitution of the United States of America or the

7    Constitution of the State of California, or which are by law otherwise privileged or

8    exempt from discovery;

9            b.    attempts or purports to seek the disclosure of documents or

10   information to which the Propounding Party has access or which the Propounding

11   Party has already obtained;

12           c.    attempts or purports to impose obligations on the Responding

13   Party exceeding those imposed or authorized by the Federal Rules of Civil

14   Procedure and/or the applicable Local Rules of the Court before which this action

15   is pending; or

16           d.    seeks information, or documents generated, outside the time

17   period relevant to this action or otherwise beyond the scope of the issues relevant

18   to this action.

19       6.    The Responding Party further objects to any of the requests which seek

20   discovery of communications with or the opinions of any expert(s) not designated

21   to testify on behalf of the Responding Party in this action, as such information is

22   not discoverable under applicable law.

23       7.    For purposes of the following responses to requests for production of

24   documents and things, and the objections stated therein, the following terms shall

25   have the following meanings:

26           a.    **"Inadequate Description"** shall signify an objection on the

27   grounds that the Request does not describe the information, documents or

28   matter sought with reasonable particularity (including, without limitation,

4

where the Request taken as a whole, or the terminology used therein, is vague, ambiguous or unintelligible);

b.    **"Irrelevant"** shall signify an objection on the grounds that the Request seeks matter that is irrelevant to the subject matter of this action and not calculated to lead to the discovery of admissible evidence;

b.    **"Overbroad"** shall signify an objection on the grounds that the Request is overbroad in scope, either with reference to time period, subject matter, or otherwise;

c.    **"Attorney-Client-Privilege"** shall signify an objection on the grounds that the Request calls for production of documents and things protected by the attorney-client-privilege;

d.    **"Attorney Work Product"** shall signify an objection on the grounds that the Request calls for production of documents and things protected by the attorney work product doctrine;

e.    **"Confidential Information"** shall signify an objection on the grounds that the Request improperly calls for discovery of confidential business, financial, proprietary, trade secret or other sensitive information or documents, the disclosure of which would be harmful to the Responding Party or a third party;

f.    **"Tax Returns"** shall signify an objection on the grounds that the Request improperly seeks production of documents and things protected by the privilege against disclosure of the contents of income tax returns;

g.    **"Privacy"** shall signify an objection on the grounds that the Request calls for production of documents and things protected against discovery by the Responding Party's right of privacy.

h.    **"Unduly Burdensome"** shall signify an objection on the grounds that the Request improperly seeks production of information, documents and things, or other matter, already been produced to the

5

Propounding Party, or already in its possession, or available to the Propounding Party as readily and at approximately equal expense and trouble as it would be for the Responding Party to obtain and provide them, and/or in the context of this case, and in light of any other objections interposed, would impose an undue burden, expense or effort upon the Responding Party, or unduly intrude into matters protected by the right of privacy;

j.    **"Impermissible Discovery"** shall signify an objection on the grounds that the Request exceeds the scope of permissible discovery as defined by the applicable provisions of the California Code of Civil Procedure; and

k.    **"CC 3294-3295"** shall signify an objection on the grounds that the Request improperly seeks production of documents and things concerning the Responding Party's financial condition, in contravention of (and without the Propounding Party having met the prerequisites of) California Civil Code Sections 3294-3295.

8.    The Responding Party objects to the so-called "Definitions and Instructions" set forth in the Requests, as follows:

a.    Definition and Instruction No. 1 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "representatives and other persons acting on behalf of CARDI B, and the sources within the control of CARDI B"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least seven categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. The Responding Party will take this definition as merely meaning and referring to Defendant BELCALIS ALMANZAR aka CARDI B.

b.    Definition and Instruction No. 2 is vague and ambiguous (in

6

particular, but without limitation, in regard to what is meant by "its affiliates, partners, parents, subsidiaries, past or present agents, past or present attorneys, servants, employees, representatives, or others acting at their direction"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least thirteen categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].   The Responding Party will take this definition as merely meaning and referring to Defendant KSR GROUP, LLC.

   c.      Definition and Instruction No. 3 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "its affiliates, partners, parents, subsidiaries, past or present agents, past or present attorneys, servants, employees, representatives, or others acting at their direction"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least thirteen categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].   The Responding Party will take this definition as merely meaning and referring to Defendant WASHPOPPIN, INC.

   d.      Definition and Instruction No. 6 is confusing and open-ended.

   e.      Definition and Instruction No. 7 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "concerning, regarding, referring, describing, pertaining to, evidencing, constituting, or in any way related to, directly or indirectly" and how those terms are distinguishable, one from the others); compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions

7

between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate interrogatories; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. The Responding Party will interpret this definition as consisting merely of the defined term, "related."

f.      Definition and Instruction No. 8 is compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. The Responding Party will interpret this definition as consisting merely of the terms "writing," "recording," "photograph," "original" and "duplicate," as defined in Federal Rules of Evidence 1001.

g.      Definition and Instruction No. 9 is vague and ambiguous (in particular, but without limitation, in its reference, with regard to "ESI," to numerous technological and computer software-related terms of art, abbreviations and extensions, which presumes a degree of knowledge and expertise that neither the Defendants, nor their counsel, claim to possess); compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definitions of "DOCUMENTS" and "ESI" and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. The Responding Party will interpret this definition as consisting

8

merely to "writings," "recordings," "photographs," "originals" and "duplicates," as defined in Federal Rules of Evidence 1001, that have been stored electronically, e.g., in, on or by means of a computer.

h.      Definition and Instruction No. 10 is vague and ambiguous (in particular, but without limitation, in its reference to numerous technological and computer software-related terms of art, abbreviations and extensions, which presumes a degree of knowledge and expertise that neither the Defendants, nor their counsel, claim to possess); also vague and ambiguous in its reference to things "within the possession, custody or control of sources and persons with YOUR control, including any of YOUR attorneys, agents and other sources within YOUR control;" violative of attorney client privilege and work product doctrines in seeking information  in gross from Defendants' attorneys; compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

i.      Definition and Instruction No. 11 is vague and ambiguous (in particular, but without limitation, in its reference to "upgrades, enhancements, new versions, patches and fixes" of software); also, not an interrogatory-related definition, but a document request, on its face, inappropriate to a set of interrogatories.

j.      Definition and Instruction No. 13 is unduly burdensome and oppressive, in that this would require Defendants to "IDENTIFY" in detail each document they are simultaneously being requested to produce by means of Plaintiff's simultaneous requests for production of documents and things for inspection and copying.   All documents, not privileged or otherwise

9

objectionable, which are produced will speak for themselves and be the best evidence of their own contents.   Further, this definition constitutes an additional, "universal" interrogatory, implicit in each other numbered one to which it pertains, in calling for "any information necessary to allow that DOCUMENT to be the subject of a request for production," i.e. what amounts to a privilege log, even for documents that are produced.  Thus, this definition, in its effect, causes this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

k.     Definition and Instruction No. 18 is vague and ambiguous (in particular, but without limitation, it its failure to sufficiently define what constitutes "any . . . internet website, and any other online account held by YOU"); compound and confusing, in its reference to several different forms of social media, both by name and by vague reference, thus requiring speculation; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  As worded, this definition could be read to call for production of information concerning untold numbers and kinds of internet-accessible files and records concerning each Defendant's banking, financial, health, commercial (e.g. retail transactions), governmental (e.g., taxes) and personal information, *inter alia*.

l.     Definition and Instruction No. 19 is unduly burdensome and harassing in purporting to call for a "privilege" log in the vent information is not produced on grounds of privilege, work product *or otherwise."*  There is no legal requirement for the Responding Party to provide a "privilege log," in response to an interrogatory, identifying with specificity <u>all</u> information not produced, regardless of the basis.  Further, in so far as it purports to call for the Responding Party to state "the specific grounds upon which YOUR

10

objection and privilege claim is based (including each and every fact and legal basis upon which YOU claim such privilege," it constitutes an additional interrogatory implicit in each of the separate numbered interrogatories; and its reference, then, to the "date of creation, author, [and] recipients" of information, as distinguished from documents, is vague, ambiguous, confusing and unintelligible.   Thus, this definition, in its effect, causes this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

9.     Wherever objections have been interposed, the Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to the Request and the stated objections.   Assuming that such "meet and confer" takes place in a timely fashion, and to the extent it is successful in resolving differences, the Responding Party stands ready, willing and able to complete discovery as to the relevant and non-privileged information called for by the Request (subject, of course, to any stipulations entered into as a result of the "meet and confer").

10.     The Responding Party has already delivered to the Propounding Party for consideration a proposed form of Stipulated Protective Order embodying typical terms of such an order that have been previously approved by federal district courts in this District.  In so far as the Responding Party has interposed objections based on grounds of "Confidential Information" or "Privacy," the Responding Party will produce non-privileged documents or information, as the case may be, responsive to these discovery Requests, upon the issuance and filing by the Court of such a protective order either pursuant to the Parties' stipulation to the terms of such an order or upon motion of any of the Parties.

11.     No response or objection (or production of documents or things in

11

1  response to) any of the Requests is intended as, nor shall it be construed as, a waiver

2  by the Responding Party of all or any part of any objection to that or any other

3  Request, or an admission of the existence of any fact set forth in or assumed by that

4  or any other Request, or an admission that such response or objection constitutes

5  admissible evidence.

6        12.   <u>Delineation of the Court's Limitation on Jurisdictional Issues Subject to</u>

7  <u>This Discovery.</u> By its "Order Denying Without Prejudice Defendants' Motion to

8  Dismiss and Granting Plaintiff's Request for Jurisdictional Discovery," dated May

9  3, 2018, Docket No. 36, the Court ordered the parties to engage in, and complete,

10  within 90 days from the date of the Order, good faith "limited jurisdictional discovery

11  *on the issues identified in this order*." The Order specified only the following issues

12  for purposes of such discovery: with regard to personal jurisdiction, "to clarify (1)

13  the extent of Defendants' business and presence in California, and (2) any

14  relationship between the Gangsta Bitch cover and California" (Order, p. 10); and,

15  with regard to subject matter jurisdiction, "to clarify whether the amount-in-

16  controversy has been met" (Order, p. 11).

17        13.   Each of the foregoing items set forth in this Paragraph is incorporated

18  by reference in the responses to specific Requests, below.

19                      **RESPONSES TO SPECIFIC INTERROGATORIES**

20  <u>INTERROGATORY NO. 1:</u>

21        State all dates on which YOU were physically present in the State of California

22  from January 1, 2016 through the present.

23  <u>RESPONSE TO INTERROGATORY NO. 1:</u>

24        The Responding Party objects to this Request, in whole or in part, on the

25  following grounds: Inadequate Description; and incorporates the Introduction,

26  General Objections, and [Responding Party's] Definitions, stated hereinabove

27  (specifically including, without limitation, the Responding Party's Objections to the

28  Propounding Party's Definitions and Instructions, with regard to any of the Defined

1    terms utilized in the Requests).

2        Subject to the foregoing objection(s), but without waiving the same in whole

3    or in part, the Responding Party responds to this Request as follows:

4        The Responding Party offers to meet and confer with the Propounding Party,

5    through counsel, at any mutually convenient time and in accordance with the Local

6    Rules, to attempt in good faith to resolve informally any differences or disputes that

7    may exist between the parties with respect to this Request and the aforestated

8    objections, and insofar as counsel are able to resolve the parties' differences

9    successfully by stipulation, the Responding Party shall be ready, willing and able to

10   provide such other relevant and non-privileged information as is called for by the

11   Request, as interpreted or modified per the parties' stipulation after meeting and

12   conferring, within a reasonable time thereafter.

13   INTERROGATORY NO. 2:

14       List all of YOUR SOCIAL MEDIA ACCOUNTS.

15   RESPONSE TO INTERROGATORY NO. 2:

16       The Responding Party objects to this Request, in whole or in part, on the

17   following grounds: Inadequate Description; Overbroad; Confidential Information;

18   Privacy; Unduly Burdensome; Impermissible Discovery; and incorporates the

19   Introduction, General Objections, and [Responding Party's] Definitions,  stated

20   hereinabove (specifically including, without limitation, the Responding Party's

21   Objections to the Propounding Party's Definitions and Instructions, with regard to

22   any of the Defined terms utilized in the Requests).

23       By way of explanation, for purposes of this jurisdictional discovery, must be

24   limited to those accounts targeted at California or its residents, and having to do with

25   GBMV1.

26       Subject to the foregoing objection(s), but without waiving the same in whole

27   or in part, the Responding Party responds to this Request as follows:

28       The Responding Party offers to meet and confer with the Propounding Party,

13

through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 3:

Describe in detail all marketing strategies YOU used to market GBMV1 to California residents.

RESPONSE TO INTERROGATORY NO. 3:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "marketing strategies."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences

14

successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

<u>INTERROGATORY NO. 4:</u>

Describe in detail all marketing strategies YOU used to market GBMV1.

<u>RESPONSE TO INTERROGATORY NO. 4:</u>

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "marketing strategies;"  its definition and description of "marketing strategies" is irrelevant to jurisdictional issues; and,  for purposes of this jurisdictional discovery, must be limited to such matters as targeted California or its residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and

15

1     conferring, within a reasonable time thereafter.

2     INTERROGATORY NO. 5:

3        IDENTIFY all posts on YOUR SOCIAL MEDIA ACCOUNTS in which YOU

4     promoted an event that CARDI B would be attending in California.

5     RESPONSE TO INTERROGATORY NO. 5:

6        The Responding Party objects to this Request, in whole or in part, on the

7     following grounds: Inadequate Description; Overbroad; Tax Returns; Privacy;

8     Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction,

9     General Objections, and [Responding Party's] Definitions, stated hereinabove

10    (specifically including, without limitation, the Responding Party's Objections to the

11    Propounding Party's Definitions and Instructions, with regard to any of the Defined

12    terms utilized in the Requests).

13       By way of explanation, this Request is vague and ambiguous in its reference

14    to "posts" and "promoted."

15       Subject to the foregoing objection(s), but without waiving the same in whole

16    or in part, the Responding Party responds to this Request as follows:

17       The Responding Party offers to meet and confer with the Propounding Party,

18    through counsel, at any mutually convenient time and in accordance with the Local

19    Rules, to attempt in good faith to resolve informally any differences or disputes that

20    may exist between the parties with respect to this Request and the aforestated

21    objections, and insofar as counsel are able to resolve the parties' differences

22    successfully by stipulation, the Responding Party shall be ready, willing and able to

23    provide such other relevant and non-privileged information as is called for by the

24    Request, as interpreted or modified per the parties' stipulation after meeting and

25    conferring, within a reasonable time thereafter.

26    INTERROGATORY NO. 6:

27       IDENTIFY all geographical places in the State of California YOU visited from

28    January 1, 2016 through the present, and the dates YOU visited them.

16

RESPONSE TO INTERROGATORY NO. 6:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Privacy; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is, as to dates, duplicative of Special Interrogatory No. 1.  By "geographical places" the Responding Party will interpret this as calling for naming of cities.  Additionally, as to KSR and Washpoppin, this is vague and ambiguous as to whom is referred to as "YOUR agent or employee."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 7:

IDENTIFY the total amount of sales of GBMV1.

RESPONSE TO  INTERROGATORY NO. 7:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information;

17

Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," in that it is not clear whether this asks for unit sales, dollar value of sales, sales of different configurations or products including GBMV1, etc.  For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 8:

IDENTIFY the total amount of sales of each single on GBMVl.

RESPONSE TO INTERROGATORY NO. 8:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the

18

Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," in that it is not clear whether this asks for unit sales, or dollar value of sales. For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

<u>INTERROGATORY NO. 9:</u>

IDENTIFY the total amount of profits, royalties and/or other compensation YOU received from sales of GBMVI.

<u>RESPONSE TO INTERROGATORY NO. 9:</u>

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated

19

hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," and in its use of the terms "profits, royalties and/or other compensation." For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 10:

IDENTIFY the total amount of profits, royalties and/or other compensation YOU received from sales of each single on GBMVl.

RESPONSE TO INTERROGATORY NO. 10:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's

20

Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," and in its use of the terms "profits, royalties and/or other compensation." For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 11:

IDENTIFY all revenues from sales of tickets to events at which CARDI B appeared in the State of California from January 1, 2016 through the present, INCLUDING but not limited to the promotional tour for GBMV1 (the "(Underestimated Tour").

RESPONSE TO INTERROGATORY NO. 11:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated

21

hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "revenues." Irrelevant in so far as it refers to events at which the Responding Party merely "appeared" (as opposed to performed, or events which featured the Responding Party as a pre-arranged celebrity guest). For purposes of this jurisdictional discovery, must be limited to events related to GBMV1.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 12:

IDENTIFY all profits that YOU or anyone on YOUR behalf earned from events which CARDI B or YOU appeared and/or attended in order to promote GBMV1.

RESPONSE TO INTERROGATORY NO. 12:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated

22

hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "revenues." Irrelevant in so far as it refers to events at which the Responding Party merely "appeared" (as opposed to performed, or events which featured the Responding Party as a pre-arranged celebrity guest). For purposes of this jurisdictional discovery, must be limited to events taking place in California. Additionally, as to KSR and Washpoppin, vague and ambiguous as to whom is referred to as "YOUR agent or employee."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 13:

IDENTIFY all contracts RELATED TO GBMV1, INCLUDING but not limited to recording, COVER ART, concerts, travel, costume, hair and makeup, non-concert appearances, licensing, and/or merchandising from January 1, 2016 through the present.

RESPONSE TO INTERROGATORY NO. 13:

The Responding Party objects to this Request, in whole or in part, on the

23

following grounds: Inadequate Description; Overbroad; Confidential Information; Privacy; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant, and for purposes of this jurisdictional discovery may only relate to such contracts as were either executed in California, to be performed in California, or entered into with persons known to be residing in, or entities known to be domiciled in, California.  Moreover, under the Court's Order of May 3, 2018, this must exclude contracts with entities that merely engaged in the online promotion, sale, and distribution of sound recordings such as GBMV1, and that may happen to be organized, domiciled or located or doing business in California

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 14:

IDENTIFY the graphic designer(s) and/or photographer(s) who created the COVER ART for GBMVI.

RESPONSE TO INTERROGATORY NO. 14:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant. The identity of the graphic designer and/or photographer is not a jurisdictional issue of fact, and was not among the issues specified by the Court in its Order of May 23, 2018, as being properly the subject of this jurisdictional discovery.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 15:

IDENTIFY all communications with the graphic designer(s) and/or photographer(s) who created the COVER ART for GBMVI.

RESPONSE TO INTERROGATORY NO. 15:

The Responding Party objects to this Request, in whole or in part, on the

25

following grounds: Inadequate Description; Overbroad; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant.  Communications with the graphic designer and/or photographer are not a jurisdictional issue of fact, and were not among the issues specified by the Court in its Order of May 23, 2018, as being properly the subject of this jurisdictional discovery

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.


Dated: June 14, 2018                          Respectfully Submitted,

                                              **ALAN G. DOWLING, P.C.**


                                              By: /s/ Alan G. Dowling
                                                   **Alan G. Dowling**
                                              *Attorney for Defendants*

## PROOF OF SERVICE

STATE OF CALIFORNIA,
COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1043 Pacific St., No. 1, Santa Monica, California 90405.

    On June 18, 2018, I served the foregoing document, described as: **RESPONSE AND OBJECTIONS TO "PLAINTIFF'S FIRST SET OF SPECIAL INTERROGATORIES (JURISDICTIONAL) TO DEFENDANT BELCALIS ALMANZAR AKA CARDI B"** on each of the interested parties in this action, by the following means:

__ **IF PERSONAL SERVICE**: I placed __ the original [or] _X_ a true copy thereof enclosed in a sealed envelope addressed as set forth on the attached Service List, and caused the same to be delivered via messenger by hand to the offices of the addressee. [*For Personal Service* signature must be that of messenger.]

_x_ **IF SERVICE BY MAIL**: I placed __ the original [or] _X_ a true copy thereof enclosed in a sealed envelope addressed as set forth on the attached Service List, and deposited such envelope in the mail at Santa Monica, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Santa Monica, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

__ **IF SERVICE BY FACSIMILE TRANSFER:**  On June 18, 2018, at or about ___ a.m/___ p.m. (i.e., between the hours of 9:00 a.m. and 5:00 p.m.), I transmitted by facsimile transfer ("fax") a copy of the foregoing document, from my fax machine the telephone number of which is (424) 238-5366, to each person ("fax recipient") indicated on the attached Service List on whom the foregoing document was thus served. The transmission was reported as complete and without error, and a copy of the transmission report so indicating was properly issued by the transmitting fax machine and is attached hereto.  Service by fax is permissible in this action in that the parties thus served have agreed thereto and a written confirmation of that agreement has been obtained.  The fax machine telephone number for the fax machine maintained by each fax recipient (and last given by each such person on any document which he or she has filed in this action and served on the party making this service) is as set forth on the attached Service List.  I understand that (subject to the other provisions of C.C.P. § 1013 and C.R.C. Rule 2008) service by fax is complete at the time of transmission, i.e., at the time of receipt of the entire

27

document by the fax recipient's fax machine, and that service by fax that occurs after 5:00 p.m. shall be deemed to has occurred on the next court day.

_ **COURTESY COPY SENT BY FACSIMILE TRANSFER ("FAX"):** Concurrently with service by other means as indicated herein, I have also caused an additional courtesy copy thereof to be transmitted by fax to said counsel, as indicated on the attached Service List.

\_ **COURTESY COPY SENT BY INTERNET ELECTRONIC MAIL TRANSFER ("E-MAIL"):** In addition to the foregoing, I caused a courtesy copy thereof to be attached to an E-mail message, and thus transmitted by E-mail, to the lead opposing counsel indicated below, at the email address customarily used by said counsel heretofore in this action for sending and receiving communications.

Executed on June 18, 2018, at Santa Monica, California.

**X (Federal)** I declare under penalty of perjury under the laws of the United States of America and the State of California that I am employed by the office of a member of the bar of this Court at whose direction the service was made.

**X (California)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

<u>Alan G. Dowling</u>
ALAN G. DOWLING

1

## <u>SERVICE LIST</u>

2

3

<u>Brophy v. Almanzar et al.</u>
USDC, CD Cal, Case No. 8:17-cv-01885-CJC (JPRx)

4

5

<u>Counsel and Party/Parties Represented</u>:

6

7

A. Barry Cappello (CSB No. 037835)
abc@cappellonoel.com

8

Lawrence J. Conlan (CSB No. 221350)
lconlan@cappellonoel.com

9

Wendy D. Welkom (CSB No. 156345)
wwelkom@cappellonoel.com

10

**CAPPELLO & NOËL LLP**

11

831 State Street

12

Santa Barbara, CA 93101-3227
Telephone:  (805)564-2444

13

Facsimile:   (805)965-5950

14

*Attorneys for Plaintiff*

15

<u>*Service mailing address:*</u>

16

17

Lawrence J. Conlan, Esq.
**CAPPELLO & NOËL LLP**

18

831 State Street
Santa Barbara, CA 93101-3227

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Alan G. Dowling**
(California Bar No. 70686)
Email:  agdowling@aol.com
**ALAN G. DOWLING,**
**A PROFESSIONAL CORPORATION**
1043 Pacific Street, No. 1
Santa Monica, California 90405
Telephone: (818) 679-6395
Fax:  (424) 238-5366
*Attorney for Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

KEVIN MICHAEL BROPHY, JR., an
individual,

Plaintiffs,

v.

BELCALIS ALMANZAR aka CARDI B,
an individual; KSR GROUP, LLC, a New
York limited liability company;
WASHPOPPIN, INC., a New York
corporation; and DOES 1-20, inclusive,

Defendants.

**Case No. 8:17-cv-01885-CJC(JPRx)**

Hon. Cormac J. Carney,
U.S. District Judge

**RESPONSE AND OBJECTIONS
TO "PLAINTIFF'S FIRST SET OF
SPECIAL INTERROGATORIES
(JURISDICTIONAL) TO
DEFENDANT KSR GROUP, LLC"**

1

1  PROPOUNDING PARTY:       Plaintiff

2  RESPONDING PARTY:        Defendant KSR GROUP, LLC

3  SET NO.:                 One

4         Defendant KSR GROUP, LLC (hereinafter "Defendant" or "the Responding

5  Party") hereby responds and objects as follows to **PLAINTIFF'S FIRST SET**

6  **OF     SPECIAL     INTERROGATORIES     (JURISDICTIONAL)     TO**

7  **DEFENDANT KSR GROUP, LLC,"** dated May 14, 2018 (the "Requests"),

8  pursuant to Rule 33 of the Federal Rules of Civil Procedure.

9         <u>INTRODUCTION, GENERAL OBJECTIONS AND DEFINITIONS</u>

10        1.     The Responding Party has not fully completed an investigation of all the

11 facts relating to the subject matter of this action, has not completed all discovery in

12 this action, and has not completed preparation for trial.  All of the responses contained

13 herein are based only upon such information and documents as are presently available

14 to and specifically known to the Responding Party, and disclose only those facts and

15 documents that presently are known to and/or are available to the Responding Party.

16 It is anticipated that further independent investigation, discovery, legal research and

17 analysis may supply additional information, which may lead to substantial changes to

18 the responses set forth below.  The following responses are consequently given

19 without prejudice to the right of the Responding Party to introduce evidence of any

20 subsequently discovered facts or documents which the Responding Party may later

21 obtain or recall.

22        2.     The depositions of certain of the witnesses who would or possibly could

23 testify as to the subject matter of the within action have not yet been commenced.  The

24 documents that would or could form the basis of certain responses are still in the

25 process of being discovered, and all such relevant documents may not have yet been

26 produced or examined. Further, the significance of documents in the possession of the

27 Responding Party, or presently in the possession of the Propounding Party or a third

28 party but not yet obtained from or produced by them, may only become apparent upon

RESP & OBJECS TO PLTFS 1ST INTERROGS
TO DEF KSR GROUP, LLC

reviewing them in the context of other documents which have not yet been obtained or in the context of testimony not yet taken shedding light upon their relevance.

3.   The Responding Party accordingly reserves the right to change any and all responses set forth or referred to below, as additional facts may be ascertained, documents discovered, analyses made, legal research completed, and contentions made.  The responses contained below are made in a good faith effort to supply as much factual information and as much specification of the basis for legal contentions as is presently known and available to the Responding Party, but should in no way be construed to the prejudice of the Responding Party in relation to further investigation and/or discovery.

4.   This Responding Party's responses are made without waiver of, but, on the contrary, are intended to preserve and do preserve the following rights:

a.   the right to raise all questions of authenticity, foundation, relevancy, materiality, privilege and admissibility as evidence for any purpose, of the documents or information identified in response to the Requests, which may arise in subsequent proceedings in, or trial of, this or any other action;

b.   the right to object on any ground to the introduction into evidence of, or the use of, said documents or information identified in response to the Requests in any subsequent proceedings in, or trial of, this or any other action;

c.   the right to object on any ground at any time to other document requests or discovery involving said documents or information; and

d.   the right to amend or supplement this response in the event that any document or information is in the Responding Party's possession, custody or control, but is unintentionally omitted from production at this time.  Additionally, inadvertent identification or production of privileged documents or information by the Responding Party is not intended as, and shall not be construed as, a waiver of any applicable privilege.

5.   This Responding Party further specifically objects to each and every

3

discovery Request in the set to which this response is directed, to the extent that it:

      a.     seeks documents or information which are protected by the attorney-client privilege or the attorney work product doctrine, or by the right of privacy provided for in the Constitution of the United States of America or the Constitution of the State of California, or which are by law otherwise privileged or exempt from discovery;

      b.     attempts or purports to seek the disclosure of documents or information to which the Propounding Party has access or which the Propounding Party has already obtained;

      c.     attempts or purports to impose obligations on the Responding Party exceeding those imposed or authorized by the Federal Rules of Civil Procedure and/or the applicable Local Rules of the Court before which this action is pending; or

      d.     seeks information, or documents generated, outside the time period relevant to this action or otherwise beyond the scope of the issues relevant to this action.

      6.     The Responding Party further objects to any of the requests which seek discovery of communications with or the opinions of any expert(s) not designated to testify on behalf of the Responding Party in this action, as such information is not discoverable under applicable law.

      7.     For purposes of the following responses to requests for production of documents and things, and the objections stated therein, the following terms shall have the following meanings:

      a.     **"Inadequate Description"** shall signify an objection on the grounds that the Request does not describe the information, documents or matter sought with reasonable particularity (including, without limitation, where the Request taken as a whole, or the terminology used therein, is vague, ambiguous or unintelligible);

4

b.    **"Irrelevant"** shall signify an objection on the grounds that the Request seeks matter that is irrelevant to the subject matter of this action and not calculated to lead to the discovery of admissible evidence;

b.    **"Overbroad"** shall signify an objection on the grounds that the Request is overbroad in scope, either with reference to time period, subject matter, or otherwise;

c.    **"Attorney-Client-Privilege"** shall signify an objection on the grounds that the Request calls for production of documents and things protected by the attorney-client-privilege;

d.    **"Attorney Work Product"** shall signify an objection on the grounds that the Request calls for production of documents and things protected by the attorney work product doctrine;

e.    **"Confidential Information"** shall signify an objection on the grounds that the Request improperly calls for discovery of confidential business, financial, proprietary, trade secret or other sensitive information or documents, the disclosure of which would be harmful to the Responding Party or a third party;

f.    **"Tax Returns"** shall signify an objection on the grounds that the Request improperly seeks production of documents and things protected by the privilege against disclosure of the contents of income tax returns;

g.    **"Privacy"** shall signify an objection on the grounds that the Request calls for production of documents and things protected against discovery by the Responding Party's right of privacy.

h.    **"Unduly Burdensome"** shall signify an objection on the grounds that the Request improperly seeks production of information, documents and things, or other matter, already been produced to the Propounding Party, or already in its possession, or available to the Propounding Party as readily and at approximately equal expense and trouble

5

as it would be for the Responding Party to obtain and provide them, and/or in the context of this case, and in light of any other objections interposed, would impose an undue burden, expense or effort upon the Responding Party, or unduly intrude into matters protected by the right of privacy;

j.    **"Impermissible Discovery"** shall signify an objection on the grounds that the Request exceeds the scope of permissible discovery as defined by the applicable provisions of the California Code of Civil Procedure; and

k.    **"CC 3294-3295"** shall signify an objection on the grounds that the Request improperly seeks production of documents and things concerning the Responding Party's financial condition, in contravention of (and without the Propounding Party having met the prerequisites of) California Civil Code Sections 3294-3295.

8.    The Responding Party objects to the so-called "Definitions and Instructions" set forth in the Requests, as follows:

a.    Definition and Instruction No. 1 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "representatives and other persons acting on behalf of CARDI B, and the sources within the control of CARDI B"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least seven categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. The Responding Party will take this definition as merely meaning and referring to Defendant BELCALIS ALMANZAR aka CARDI B.

b.    Definition and Instruction No. 2 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "its affiliates, partners, parents, subsidiaries, past or present agents, past or present attorneys,

6

servants, employees, representatives, or others acting at their direction"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least thirteen categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].   The Responding Party will take this definition as merely meaning and referring to Defendant KSR GROUP, LLC.

        c.      Definition and Instruction No. 4 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "its affiliates, partners, parents, subsidiaries, past or present agents, past or present attorneys, servants, employees, representatives, or others acting at their direction"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least thirteen categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].   The Responding Party will take this definition as merely meaning and referring to Defendant WASHPOPPIN, INC.

        d.      Definition and Instruction No. 6 is confusing and open-ended.

        e.      Definition and Instruction No. 7 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "concerning, regarding, referring, describing, pertaining to, evidencing, constituting, or in any way related to, directly or indirectly" and how those terms are distinguishable, one from the others); compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate interrogatories; and, in so

far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  The Responding Party will interpret this definition as consisting merely of the defined term, "related."

f.     Definition and Instruction No. 8 is compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts  [F.R.Civ.P. 33(a)(1)].   The Responding Party will interpret this definition as consisting merely of the terms "writing," "recording," "photograph," "original" and "duplicate," as defined in Federal Rules of Evidence 1001.

g.     Definition and Instruction No. 9 is vague and ambiguous (in particular, but without limitation, in its reference, with regard to "ESI," to numerous technological and computer software-related terms of art, abbreviations and extensions, which presumes a degree of knowledge and expertise that neither the Defendants, nor their counsel, claim to possess); compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definitions of "DOCUMENTS" and "ESI" and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  The Responding Party will interpret this definition as consisting merely to "writings," "recordings," "photographs," "originals" and "duplicates," as defined in Federal Rules of Evidence 1001, that have been

8

stored electronically, e.g., in, on or by means of a computer.

h.     Definition and Instruction No. 10 is vague and ambiguous (in particular, but without limitation, in its reference to numerous technological and computer software-related terms of art, abbreviations and extensions, which presumes a degree of knowledge and expertise that neither the Defendants, nor their counsel, claim to possess); also vague and ambiguous in its reference to things "within the possession, custody or control of sources and persons with YOUR control, including any of YOUR attorneys, agents and other sources within YOUR control;" violative of attorney client privilege and work product doctrines in seeking information  in gross from Defendants' attorneys; compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

i.     Definition and Instruction No. 11 is vague and ambiguous (in particular, but without limitation, in its reference to "upgrades, enhancements, new versions, patches and fixes" of software); also, not an interrogatory-related definition, but a document request, on its face, inappropriate to a set of interrogatories.

j.     Definition and Instruction No. 13 is unduly burdensome and oppressive, in that this would require Defendants to "IDENTIFY" in detail each document they are simultaneously being requested to produce by means of Plaintiff's simultaneous requests for production of documents and things for inspection and copying.   All documents, not privileged or otherwise objectionable, which are produced will speak for themselves and be the best evidence of their own contents.   Further, this definition constitutes an

9

additional, "universal" interrogatory, implicit in each other numbered one to which it pertains, in calling for "any information necessary to allow that DOCUMENT to be the subject of a request for production," i.e. what amounts to a privilege log, even for documents that are produced.  Thus, this definition, in its effect, causes this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

k.      Definition and Instruction No. 18 is vague and ambiguous (in particular, but without limitation, it its failure to sufficiently define what constitutes "any . . . internet website, and any other online account held by YOU"); compound and confusing, in its reference to several different forms of social media, both by name and by vague reference, thus requiring speculation; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  As worded, this definition could be read to call for production of information concerning untold numbers and kinds of internet-accessible files and records concerning each Defendant's banking, financial, health, commercial (e.g. retail transactions), governmental (e.g., taxes) and personal information, *inter alia.*

l.      Definition and Instruction No. 19 is unduly burdensome and harassing in purporting to call for a "privilege" log in the vent information is not produced on grounds of privilege, work product "*or otherwise.*"  There is no legal requirement for the Responding Party to provide a "privilege log," in response to an interrogatory, identifying with specificity all information not produced, regardless of the basis.  Fruther, in so far as it purports to call for the Responding Party to state "the specific grounds upon which YOUR objection and privilege claim is based (including each and every fact and legal basis upon which YOU claim such privilege," it constitutes an additional

10

interrogatory implicit in each of the separate numbered interrogatories; and its reference, then, to the "date of creation, author, [and] recipients" of information, as distinguished from documents, is vague, ambiguous, confusing and unintelligible.   Thus, this definition, in its effect, causes this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

9.   Wherever objections have been interposed, the Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to the Request and the stated objections.  Assuming that such "meet and confer" takes place in a timely fashion, and to the extent it is successful in resolving differences, the Responding Party stands ready, willing and able to complete discovery as to the relevant and non-privileged information called for by the Request (subject, of course, to any stipulations entered into as a result of the "meet and confer").

10.   The Responding Party has already delivered to the Propounding Party for consideration a proposed form of Stipulated Protective Order embodying typical terms of such an order that have been previously approved by federal district courts in this District.  In so far as the Responding Party has interposed objections based on grounds of "Confidential Information" or "Privacy," the Responding Party will produce non-privileged documents or information, as the case may be, responsive to these discovery Requests, upon the issuance and filing by the Court of such a protective order either pursuant to the Parties' stipulation to the terms of such an order or upon motion of any of the Parties.

11.   No response or objection (or production of documents or things in response to) any of the Requests is intended as, nor shall it be construed as, a waiver by the Responding Party of all or any part of any objection to that or any other

11

Request, or an admission of the existence of any fact set forth in or assumed by that or any other Request, or an admission that such response or objection constitutes admissible evidence.

12.     <u>Delineation of the Court's Limitation on Jurisdictional Issues Subject to This Discovery.</u>  By its "Order Denying Without Prejudice Defendants' Motion to Dismiss and Granting Plaintiff's Request for Jurisdictional Discovery," dated May 3, 2018, Docket No. 36, the Court ordered the parties to engage in, and complete, within 90 days from the date of the Order, good faith "limited jurisdictional discovery *on the issues identified in this order*."  The Order specified only the following issues for purposes of such discovery: with regard to personal jurisdiction, "to clarify (1) the extent of Defendants' business and presence in California, and (2) any relationship between the Gangsta Bitch cover and California" (Order, p. 10); and, with regard to subject matter jurisdiction, "to clarify whether the amount-in-controversy has been met" (Order, p. 11).

13.     Each of the foregoing items set forth in this Paragraph is incorporated by reference in the responses to specific Requests, below.

## RESPONSES TO SPECIFIC INTERROGATORIES

INTERROGATORY NO. 1:

State all dates on which YOU were physically present in the State of California from January 1, 2016 through the present.

RESPONSE TO INTERROGATORY NO. 1:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

Subject to the foregoing objection(s), but without waiving the same in whole

12

1   or in part, the Responding Party responds to this Request as follows:

2   　　　　The Responding Party offers to meet and confer with the Propounding Party,

3   through counsel, at any mutually convenient time and in accordance with the Local

4   Rules, to attempt in good faith to resolve informally any differences or disputes that

5   may exist between the parties with respect to this Request and the aforestated

6   objections, and insofar as counsel are able to resolve the parties' differences

7   successfully by stipulation, the Responding Party shall be ready, willing and able to

8   provide such <u>other</u> relevant and non-privileged information as is called for by the

9   Request, as interpreted or modified per the parties' stipulation after meeting and

10   conferring, within a reasonable time thereafter.

11   <u>INTERROGATORY NO. 2:</u>

12   　　　　List all of YOUR SOCIAL MEDIA ACCOUNTS.

13   <u>RESPONSE TO INTERROGATORY NO. 2:</u>

14   　　　　The Responding Party objects to this Request, in whole or in part, on the

15   following grounds: Inadequate Description; Overbroad; Confidential Information;

16   Privacy; Unduly Burdensome; Impermissible Discovery; and incorporates the

17   Introduction, General Objections, and [Responding Party's] Definitions,  stated

18   hereinabove (specifically including, without limitation, the Responding Party's

19   Objections to the Propounding Party's Definitions and Instructions, with regard to

20   any of the Defined terms utilized in the Requests).

21   　　　　By way of explanation, for purposes of this jurisdictional discovery, must be

22   limited to those accounts targeted at California or its residents, and having to do with

23   GBMV1.

24   　　　　Subject to the foregoing objection(s), but without waiving the same in whole

25   or in part, the Responding Party responds to this Request as follows:

26   　　　　The Responding Party offers to meet and confer with the Propounding Party,

27   through counsel, at any mutually convenient time and in accordance with the Local

28   Rules, to attempt in good faith to resolve informally any differences or disputes that

13

may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 3:

Describe in detail all marketing strategies YOU used to market GBMV1 to California residents.

RESPONSE TO INTERROGATORY NO. 3:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "marketing strategies."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the

14

Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 4:

Describe in detail all marketing strategies YOU used to market GBMV1.

RESPONSE TO INTERROGATORY NO. 4:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "marketing strategies;" its definition and description of "marketing strategies" is irrelevant to jurisdictional issues; and,  for purposes of this jurisdictional discovery, must be limited to such matters as targeted California or its residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 5:

1    IDENTIFY all posts on YOUR SOCIAL MEDIA ACCOUNTS in which YOU

2    promoted an event that CARDI B would be attending in California.

3    RESPONSE TO INTERROGATORY NO. 5:

4    The Responding Party objects to this Request, in whole or in part, on the

5    following grounds: Inadequate Description; Overbroad; Tax Returns; Privacy;

6    Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction,

7    General Objections, and [Responding Party's] Definitions,  stated hereinabove

8    (specifically including, without limitation, the Responding Party's Objections to the

9    Propounding Party's Definitions and Instructions, with regard to any of the Defined

10   terms utilized in the Requests).

11   By way of explanation, this Request is vague and ambiguous in its reference

12   to "posts" and "promoted."

13   Subject to the foregoing objection(s), but without waiving the same in whole

14   or in part, the Responding Party responds to this Request as follows:

15   The Responding Party offers to meet and confer with the Propounding Party,

16   through counsel, at any mutually convenient time and in accordance with the Local

17   Rules, to attempt in good faith to resolve informally any differences or disputes that

18   may exist between the parties with respect to this Request and the aforestated

19   objections, and insofar as counsel are able to resolve the parties' differences

20   successfully by stipulation, the Responding Party shall be ready, willing and able to

21   provide such other relevant and non-privileged information as is called for by the

22   Request, as interpreted or modified per the parties' stipulation after meeting and

23   conferring, within a reasonable time thereafter.

24   INTERROGATORY NO. 6:

25   IDENTIFY all geographical places in the State of California YOU visited from

26   January 1, 2016 through the present, and the dates YOU visited them.

27   RESPONSE TO INTERROGATORY NO. 6:

28   The Responding Party objects to this Request, in whole or in part, on the

16

following grounds: Inadequate Description; Overbroad; Privacy; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is, as to dates, duplicative of Special Interrogatory No. 1. By "geographical places" the Responding Party will interpret this as calling for naming of cities. Additionally, as to KSR and Washpoppin, this is vague and ambiguous as to whom is referred to as "YOUR agent or employee."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 7:

IDENTIFY the total amount of sales of GBMV1.

RESPONSE TO INTERROGATORY NO. 7:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated

17

RESP & OBJECS TO PLTFS 1ST INTERROGS
TO DEF KSR GROUP, LLC

hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," in that it is not clear whether this asks for unit sales, dollar value of sales, sales of different configurations or products including GBMV1, etc. For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

<u>INTERROGATORY NO. 8:</u>

IDENTIFY the total amount of sales of each single on GBMVl.

<u>RESPONSE TO INTERROGATORY NO. 8:</u>

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's

18

1  Objections to the Propounding Party's Definitions and Instructions, with regard to
2  any of the Defined terms utilized in the Requests).

3  By way of explanation, this Request is vague and ambiguous in its reference
4  to "sales," in that it is not clear whether this asks for unit sales, or dollar value of
5  sales. For purposes of this jurisdictional discovery, must be limited to sales taking
6  place in, or purchases known to have been made by residents of, California, and
7  income received from California residents.

8  Subject to the foregoing objection(s), but without waiving the same in whole
9  or in part, the Responding Party responds to this Request as follows:

10  The Responding Party offers to meet and confer with the Propounding Party,
11  through counsel, at any mutually convenient time and in accordance with the Local
12  Rules, to attempt in good faith to resolve informally any differences or disputes that
13  may exist between the parties with respect to this Request and the aforestated
14  objections, and insofar as counsel are able to resolve the parties' differences
15  successfully by stipulation, the Responding Party shall be ready, willing and able to
16  provide such <u>other</u> relevant and non-privileged information as is called for by the
17  Request, as interpreted or modified per the parties' stipulation after meeting and
18  conferring, within a reasonable time thereafter.

19  <u>INTERROGATORY NO. 9:</u>

20  IDENTIFY the total amount of profits, royalties and/or other compensation
21  YOU received from sales of GBMVl.

22  <u>RESPONSE TO INTERROGATORY NO. 9:</u>

23  The Responding Party objects to this Request, in whole or in part, on the
24  following grounds: Inadequate Description; Overbroad; Confidential Information;
25  Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the
26  Introduction, General Objections, and [Responding Party's] Definitions,  stated
27  hereinabove (specifically including, without limitation, the Responding Party's
28  Objections to the Propounding Party's Definitions and Instructions, with regard to

19

1   any of the Defined terms utilized in the Requests).

2       By way of explanation, this Request is vague and ambiguous in its reference

3   to "sales," and in its use of the terms "profits, royalties and/or other compensation."

4   For purposes of this jurisdictional discovery, must be limited to sales taking place in,

5   or purchases known to have been made by residents of, California, and income

6   received from California residents.

7       Subject to the foregoing objection(s), but without waiving the same in whole

8   or in part, the Responding Party responds to this Request as follows:

9       The Responding Party offers to meet and confer with the Propounding Party,

10  through counsel, at any mutually convenient time and in accordance with the Local

11  Rules, to attempt in good faith to resolve informally any differences or disputes that

12  may exist between the parties with respect to this Request and the aforestated

13  objections, and insofar as counsel are able to resolve the parties' differences

14  successfully by stipulation, the Responding Party shall be ready, willing and able to

15  provide such <u>other</u> relevant and non-privileged information as is called for by the

16  Request, as interpreted or modified per the parties' stipulation after meeting and

17  conferring, within a reasonable time thereafter.

18  <u>INTERROGATORY NO. 10:</u>

19      IDENTIFY the total amount of profits, royalties and/or other compensation

20  YOU received from sales of each single on GBMVl.

21  <u>RESPONSE TO INTERROGATORY NO. 10:</u>

22      The Responding Party objects to this Request, in whole or in part, on the

23  following grounds: Inadequate Description; Overbroad; Confidential Information;

24  Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the

25  Introduction, General Objections, and [Responding Party's] Definitions,  stated

26  hereinabove (specifically including, without limitation, the Responding Party's

27  Objections to the Propounding Party's Definitions and Instructions, with regard to

28  any of the Defined terms utilized in the Requests).

20

By way of explanation, this Request is vague and ambiguous in its reference to "sales," and in its use of the terms "profits, royalties and/or other compensation." For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 11:

IDENTIFY all revenues from sales of tickets to events at which CARDI B appeared in the State of California from January 1, 2016 through the present, INCLUDING but not limited to the promotional tour for GBMV1 (the "(Underestimated Tour").

RESPONSE TO INTERROGATORY NO. 11:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to

21

any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "revenues." Irrelevant in so far as it refers to events at which the Responding Party merely "appeared" (as opposed to performed, or events which featured the Responding Party as a pre-arranged celebrity guest). For purposes of this jurisdictional discovery, must be limited to events related to GBMV1.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 12:

IDENTIFY all profits that YOU or anyone on YOUR behalf earned from events which CARDI B or YOU appeared and/or attended in order to promote GBMV1.

RESPONSE TO INTERROGATORY NO. 12:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to

22

1   any of the Defined terms utilized in the Requests).

2   By way of explanation, this Request is vague and ambiguous in its reference

3   to "revenues." Irrelevant in so far as it refers to events at which the Responding Party

4   merely "appeared" (as opposed to performed, or events which featured the

5   Responding Party as a pre-arranged celebrity guest). For purposes of this

6   jurisdictional discovery, must be limited to events taking place in California.

7   Additionally, as to KSR and Washpoppin, vague and ambiguous as to whom is

8   referred to as "YOUR agent or employee."

9   Subject to the foregoing objection(s), but without waiving the same in whole

10   or in part, the Responding Party responds to this Request as follows:

11   The Responding Party offers to meet and confer with the Propounding Party,

12   through counsel, at any mutually convenient time and in accordance with the Local

13   Rules, to attempt in good faith to resolve informally any differences or disputes that

14   may exist between the parties with respect to this Request and the aforestated

15   objections, and insofar as counsel are able to resolve the parties' differences

16   successfully by stipulation, the Responding Party shall be ready, willing and able to

17   provide such <u>other</u> relevant and non-privileged information as is called for by the

18   Request, as interpreted or modified per the parties' stipulation after meeting and

19   conferring, within a reasonable time thereafter.

20   <u>INTERROGATORY NO. 13:</u>

21   IDENTIFY all contracts RELATED TO GBMV1, INCLUDING but not

22   limited to recording, COVER ART, concerts, travel, costume, hair and makeup, non-

23   concert appearances, licensing, and/or merchandising from January 1,2016 through

24   the present.

25   <u>RESPONSE TO INTERROGATORY NO. 13:</u>

26   The Responding Party objects to this Request, in whole or in part, on the

27   following grounds: Inadequate Description; Overbroad; Confidential Information;

28   Privacy; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and

incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant, and for purposes of this jurisdictional discovery may only relate to such contracts as were either executed in California, to be performed in California, or entered into with persons known to be residing in, or entities known to be domiciled in, California.  Moreover, under the Court's Order of May 3, 2018, this must exclude contracts with entities that merely engaged in the online promotion, sale, and distribution of sound recordings such as GBMV1, and that may happen to be organized, domiciled or located or doing business in California

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

<u>INTERROGATORY NO. 14:</u>

IDENTIFY the graphic designer(s) and/or photographer(s) who created the COVER ART for GBMVI.

<u>RESPONSE TO INTERROGATORY NO. 14:</u>

The Responding Party objects to this Request, in whole or in part, on the

following grounds: Inadequate Description; Overbroad; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,   stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant.  The identity of the graphic designer and/or photographer is not a jurisdictional issue of fact, and was not among the issues specified by the Court in its Order of May 23, 2018, as being properly the subject of this jurisdictional discovery.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 15:

IDENTIFY all communications with the graphic designer(s) and/or photographer(s) who created the COVER ART for GBMVI.

RESPONSE TO INTERROGATORY NO. 15:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and

[Responding Party's] Definitions,   stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant.  Communications with the graphic designer and/or photographer are not a jurisdictional issue of fact, and were not among the issues specified by the Court in its Order of May 23, 2018, as being properly the subject of this jurisdictional discovery

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

Dated: June 14, 2018                    Respectfully Submitted,

                                        **ALAN G. DOWLING, P.C.**

                                        By:  /s/ Alan G. Dowling
                                           **Alan G. Dowling**
                                           *Attorney for Defendants*

## **PROOF OF SERVICE**

STATE OF CALIFORNIA,
COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1043 Pacific St., No. 1, Santa Monica, California 90405.

     On June 18, 2018, I served the foregoing document, described as: **RESPONSE AND OBJECTIONS TO "PLAINTIFF'S FIRST SET OF SPECIAL INTERROGATORIES (JURISDICTIONAL) TO DEFENDANT KSR GROUP, LLC"** on each of the interested parties in this action, by the following means:

__**IF PERSONAL SERVICE**: I placed ___ the original [or] _X_ a true copy thereof enclosed in a sealed envelope addressed as set forth on the attached Service List, and caused the same to be delivered via messenger by hand to the offices of the addressee. [*For Personal Service* signature must be that of messenger.]

_x_ **IF SERVICE BY MAIL**: I placed ___ the original [or] _X_ a true copy thereof enclosed in a sealed envelope addressed as set forth on the attached Service List, and deposited such envelope in the mail at Santa Monica, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Santa Monica, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_ **IF SERVICE BY FACSIMILE TRANSFER:**  On June 18, 2018, at or about ___ a.m/___ p.m. (i.e., between the hours of 9:00 a.m. and 5:00 p.m.), I transmitted by facsimile transfer ("fax") a copy of the foregoing document, from my fax machine the telephone number of which is (424) 238-5366, to each person ("fax recipient") indicated on the attached Service List on whom the foregoing document was thus served. The transmission was reported as complete and without error, and a copy of the transmission report so indicating was properly issued by the transmitting fax machine and is attached hereto.  Service by fax is permissible in this action in that the parties thus served have agreed thereto and a written confirmation of that agreement has been obtained.  The fax machine telephone number for the fax machine maintained by each fax recipient (and last given by each such person on any document which he or she has filed in this action and served on the party making this service) is as set forth on the attached Service List.  I understand that (subject to the other provisions of C.C.P. § 1013 and C.R.C. Rule 2008) service by fax is complete at the time of transmission, i.e., at the time of receipt of the entire

document by the fax recipient's fax machine, and that service by fax that occurs after 5:00 p.m. shall be deemed to has occurred on the next court day.

\_   **COURTESY COPY SENT BY FACSIMILE TRANSFER ("FAX"):** Concurrently with service by other means as indicated herein, I have also caused an additional courtesy copy thereof to be transmitted by fax to said counsel, as indicated on the attached Service List.

\_\_   **COURTESY COPY SENT BY INTERNET ELECTRONIC MAIL TRANSFER ("E-MAIL"):** In addition to the foregoing, I caused a courtesy copy thereof to be attached to an E-mail message, and thus transmitted by E-mail, to the lead opposing counsel indicated below, at the email address customarily used by said counsel heretofore in this action for sending and receiving communications.

Executed on June 18, 2018, at Santa Monica, California.

\_  **(Federal)** I declare under penalty of perjury under the laws of the United States of America and the State of California that I am employed by the office of a member of the bar of this Court at whose direction the service was made.

 **X** **(California)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

<u>Alan G. Dowling</u>
ALAN G. DOWLING

1

## SERVICE LIST

2

3      Brophy v. Almanzar et al.
       USDC, CD Cal, Case No. 8:17-cv-01885-CJC (JPRx)

4

5      Counsel and Party/Parties Represented:

6

7      A. Barry Cappello (CSB No. 037835)
       abc@cappellonoel.com
8      Lawrence J. Conlan (CSB No. 221350)
       lconlan@cappellonoel.com
9      Wendy D. Welkom (CSB No. 156345)
10     wwelkom@cappellonoel.com
       **CAPPELLO & NOËL LLP**
11     831 State Street
12     Santa Barbara, CA 93101-3227
       Telephone: (805)564-2444
13     Facsimile: (805)965-5950
14     *Attorneys for Plaintiff*

15     *Service mailing address:*

16

17     Lawrence J. Conlan, Esq.
       **CAPPELLO & NOËL LLP**
18     831 State Street
       Santa Barbara, CA 93101-3227
19

20

21

22

23

24

25

26

27

28

29

1    **Alan G. Dowling**
2    (California Bar No. 70686)
     Email:  agdowling@aol.com
3    **ALAN G. DOWLING,**
4    **A PROFESSIONAL CORPORATION**
     1043 Pacific Street, No. 1
5    Santa Monica, California 90405
6    Telephone: (818) 679-6395
     Fax:  (424) 238-5366
7    *Attorney for Defendants*

8

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11

12   KEVIN MICHAEL BROPHY, JR., an        **Case No. 8:17-cv-01885-CJC(JPRx)**
     individual,
13                                        Hon. Cormac J. Carney,
                                          U.S. District Judge
14                   Plaintiffs,
     v.
15                                        **RESPONSE AND OBJECTIONS**
                                          **TO "PLAINTIFF'S FIRST SET OF**
16   BELCALIS ALMANZAR aka CARDI B,       **SPECIAL INTERROGATORIES**
     an individual; KSR GROUP, LLC, a New **(JURISDICTIONAL) TO**
17   York limited liability company;      **DEFENDANT WASHPOPPIN,**
     WASHPOPPIN, INC., a New York         **INC."**
18   corporation; and DOES 1-20, inclusive,
19
                     Defendants.
20

21

22

23

24

25

26

27

28

                                          1

PROPOUNDING PARTY:          Plaintiff

RESPONDING PARTY:          Defendant WASHPOPPIN, INC.

SET NO.:                    One

    Defendant   WASHPOPPIN,   INC.   (hereinafter   "Defendant"   or   "the Responding Party") hereby responds and objects as follows to **"PLAINTIFF'S FIRST SET OF SPECIAL INTERROGATORIES (JURISDICTIONAL) TO DEFENDANT WASHPOPPIN, INC.,"** dated May 14, 2018 (the "Requests"), pursuant to Rule 33 of the Federal Rules of Civil Procedure.

<u>INTRODUCTION, GENERAL OBJECTIONS AND DEFINITIONS</u>

    1.    The Responding Party has not fully completed an investigation of all the facts relating to the subject matter of this action, has not completed all discovery in this action, and has not completed preparation for trial.  All of the responses contained herein are based only upon such information and documents as are presently available to and specifically known to the Responding Party, and disclose only those facts and documents that presently are known to and/or are available to the Responding Party. It is anticipated that further independent investigation, discovery, legal research and analysis may supply additional information, which may lead to substantial changes to the responses set forth below.  The following responses are consequently given without prejudice to the right of the Responding Party to introduce evidence of any subsequently discovered facts or documents which the Responding Party may later obtain or recall.

    2.    The depositions of certain of the witnesses who would or possibly could testify as to the subject matter of the within action have not yet been commenced.  The documents that would or could form the basis of certain responses are still in the process of being discovered, and all such relevant documents may not have yet been produced or examined. Further, the significance of documents in the possession of the Responding Party, or presently in the possession of the Propounding Party or a third party but not yet obtained from or produced by them, may only become apparent upon

reviewing them in the context of other documents which have not yet been obtained or in the context of testimony not yet taken shedding light upon their relevance.

3.     The Responding Party accordingly reserves the right to change any and all responses set forth or referred to below, as additional facts may be ascertained, documents discovered, analyses made, legal research completed, and contentions made.  The responses contained below are made in a good faith effort to supply as much factual information and as much specification of the basis for legal contentions as is presently known and available to the Responding Party, but should in no way be construed to the prejudice of the Responding Party in relation to further investigation and/or discovery.

4.     This Responding Party's responses are made without waiver of, but, on the contrary, are intended to preserve and do preserve the following rights:

a.     the right to raise all questions of authenticity, foundation, relevancy, materiality, privilege and admissibility as evidence for any purpose, of the documents or information identified in response to the Requests, which may arise in subsequent proceedings in, or trial of, this or any other action;

b.     the right to object on any ground to the introduction into evidence of, or the use of, said documents or information identified in response to the Requests in any subsequent proceedings in, or trial of, this or any other action;

c.     the right to object on any ground at any time to other document requests or discovery involving said documents or information; and

d.     the right to amend or supplement this response in the event that any document or information is in the Responding Party's possession, custody or control, but is unintentionally omitted from production at this time.  Additionally, inadvertent identification or production of privileged documents or information by the Responding Party is not intended as, and shall not be construed as, a waiver of any applicable privilege.

5.     This Responding Party further specifically objects to each and every

3

discovery Request in the set to which this response is directed, to the extent that it:

  a.  seeks documents or information which are protected by the attorney-client privilege or the attorney work product doctrine, or by the right of privacy provided for in the Constitution of the United States of America or the Constitution of the State of California, or which are by law otherwise privileged or exempt from discovery;

  b.  attempts or purports to seek the disclosure of documents or information to which the Propounding Party has access or which the Propounding Party has already obtained;

  c.  attempts or purports to impose obligations on the Responding Party exceeding those imposed or authorized by the Federal Rules of Civil Procedure and/or the applicable Local Rules of the Court before which this action is pending; or

  d.  seeks information, or documents generated, outside the time period relevant to this action or otherwise beyond the scope of the issues relevant to this action.

  6.  The Responding Party further objects to any of the requests which seek discovery of communications with or the opinions of any expert(s) not designated to testify on behalf of the Responding Party in this action, as such information is not discoverable under applicable law.

  7.  For purposes of the following responses to requests for production of documents and things, and the objections stated therein, the following terms shall have the following meanings:

  a.  **"Inadequate Description"** shall signify an objection on the grounds that the Request does not describe the information, documents or matter sought with reasonable particularity (including, without limitation, where the Request taken as a whole, or the terminology used therein, is vague, ambiguous or unintelligible);

4

b.      **"Irrelevant"** shall signify an objection on the grounds that the Request seeks matter that is irrelevant to the subject matter of this action and not calculated to lead to the discovery of admissible evidence;

b.      **"Overbroad"** shall signify an objection on the grounds that the Request is overbroad in scope, either with reference to time period, subject matter, or otherwise;

c.      **"Attorney-Client-Privilege"** shall signify an objection on the grounds that the Request calls for production of documents and things protected by the attorney-client-privilege;

d.      **"Attorney Work Product"** shall signify an objection on the grounds that the Request calls for production of documents and things protected by the attorney work product doctrine;

e.      **"Confidential Information"** shall signify an objection on the grounds that the Request improperly calls for discovery of confidential business, financial, proprietary, trade secret or other sensitive information or documents, the disclosure of which would be harmful to the Responding Party or a third party;

f.      **"Tax Returns"** shall signify an objection on the grounds that the Request improperly seeks production of documents and things protected by the privilege against disclosure of the contents of income tax returns;

g.      **"Privacy"** shall signify an objection on the grounds that the Request calls for production of documents and things protected against discovery by the Responding Party's right of privacy.

h.      **"Unduly Burdensome"** shall signify an objection on the grounds that the Request improperly seeks production of information, documents and things, or other matter, already been produced to the Propounding Party, or already in its possession, or available to the Propounding Party as readily and at approximately equal expense and trouble

5

as it would be for the Responding Party to obtain and provide them, and/or in the context of this case, and in light of any other objections interposed, would impose an undue burden, expense or effort upon the Responding Party, or unduly intrude into matters protected by the right of privacy;

j.     **"Impermissible Discovery"** shall signify an objection on the grounds that the Request exceeds the scope of permissible discovery as defined by the applicable provisions of the California Code of Civil Procedure; and

k.     **"CC 3294-3295"** shall signify an objection on the grounds that the Request improperly seeks production of documents and things concerning the Responding Party's financial condition, in contravention of (and without the Propounding Party having met the prerequisites of) California Civil Code Sections 3294-3295.

8.     The Responding Party objects to the so-called "Definitions and Instructions" set forth in the Requests, as follows:

a.     Definition and Instruction No. 1 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "representatives and other persons acting on behalf of CARDI B, and the sources within the control of CARDI B"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least seven categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. The Responding Party will take this definition as merely meaning and referring to Defendant BELCALIS ALMANZAR aka CARDI B.

b.     Definition and Instruction No. 2 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "its affiliates, partners, parents, subsidiaries, past or present agents, past or present attorneys,

6

servants, employees, representatives, or others acting at their direction"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least thirteen categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].   The Responding Party will take this definition as merely meaning and referring to Defendant KSR GROUP, LLC.

        c.     Definition and Instruction No. 3 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "its affiliates, partners, parents, subsidiaries, past or present agents, past or present attorneys, servants, employees, representatives, or others acting at their direction"); compound and confusing, in that it requires the Responding Party to answer each interrogatory with reference to at least thirteen categories of persons, and innumerable unnamed individuals; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].   The Responding Party will take this definition as merely meaning and referring to Defendant WASHPOPPIN, INC.

        d.     Definition and Instruction No. 6 is confusing and open-ended.

        e.     Definition and Instruction No. 7 is vague and ambiguous (in particular, but without limitation, in regard to what is meant by "concerning, regarding, referring, describing, pertaining to, evidencing, constituting, or in any way related to, directly or indirectly" and how those terms are distinguishable, one from the others); compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate interrogatories; and, in so

7

far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  The Responding Party will interpret this definition as consisting merely of the defined term, "related."

f.     Definition and Instruction No. 8 is compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  The Responding Party will interpret this definition as consisting merely of the terms "writing," "recording," "photograph," "original" and "duplicate," as defined in Federal Rules of Evidence 1001.

g.     Definition and Instruction No. 9 is vague and ambiguous (in particular, but without limitation, in its reference, with regard to "ESI," to numerous technological and computer software-related terms of art, abbreviations and extensions, which presumes a degree of knowledge and expertise that neither the Defendants, nor their counsel, claim to possess); compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definitions of "DOCUMENTS" and "ESI" and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].  The Responding Party will interpret this definition as consisting merely to "writings," "recordings," "photographs," "originals" and "duplicates," as defined in Federal Rules of Evidence 1001, that have been

8

stored electronically, e.g., in, on or by means of a computer.

h.     Definition and Instruction No. 10 is vague and ambiguous (in particular, but without limitation, in its reference to numerous technological and computer software-related terms of art, abbreviations and extensions, which presumes a degree of knowledge and expertise that neither the Defendants, nor their counsel, claim to possess); also vague and ambiguous in its reference to things "within the possession, custody or control of sources and persons with YOUR control, including any of YOUR attorneys, agents and other sources within YOUR control;" violative of attorney client privilege and work product doctrines in seeking information  in gross from Defendants' attorneys; compound and confusing, in that it requires the Responding Party to speculate as to the meaning and distinctions between the numerous separate terms included in the definition and to attempt to apply them in responding to each of the separate discovery requests; and, in so far as it is compound, this set of discovery requests  taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

i.     Definition and Instruction No. 11 is vague and ambiguous (in particular, but without limitation, in its reference to "upgrades, enhancements, new versions, patches and fixes" of software); also, not an interrogatory-related definition, but a document request, on its face, inappropriate to a set of interrogatories.

j.     Definition and Instruction No. 13 is unduly burdensome and oppressive, in that this would require Defendants to "IDENTIFY" in detail each document they are simultaneously being requested to produce by means of Plaintiff's simultaneous requests for production of documents and things for inspection and copying.   All documents, not privileged or otherwise objectionable, which are produced will speak for themselves and be the best evidence of their own contents.   Further, this definition constitutes an

9

additional, "universal" interrogatory, implicit in each other numbered one to which it pertains, in calling for "any information necessary to allow that DOCUMENT to be the subject of a request for production," i.e. what amounts to a privilege log, even for documents that are produced. Thus, this definition, in its effect, causes this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

k.    Definition and Instruction No. 18 is vague and ambiguous (in particular, but without limitation, it its failure to sufficiently define what constitutes "any . . . internet website, and any other online account held by YOU"); compound and confusing, in its reference to several different forms of social media, both by name and by vague reference, thus requiring speculation; and, in so far as it is compound, this set of discovery requests taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)]. As worded, this definition could be read to call for production of information concerning untold numbers and kinds of internet-accessible files and records concerning each Defendant's banking, financial, health, commercial (e.g. retail transactions), governmental (e.g., taxes) and personal information, *inter alia*.

l.    Definition and Instruction No. 19 is unduly burdensome and harassing in purporting to call for a "privilege" log in the vent information is not produced on grounds of privilege, work product *"or otherwise."* There is no legal requirement for the Responding Party to provide a "privilege log," in response to an interrogatory, identifying with specificity <u>all</u> information not produced, regardless of the basis. Fruther, in so far as it purports to call for the Responding Party to state "the specific grounds upon which YOUR objection and privilege claim is based (including each and every fact and legal basis upon which YOU claim such privilege," it constitutes an additional

10

interrogatory implicit in each of the separate numbered interrogatories; and its reference, then, to the "date of creation, author, [and] recipients" of information, as distinguished from documents, is vague, ambiguous, confusing and unintelligible.   Thus, this definition, in its effect, causes this set of discovery requests   taken as a whole far exceeds the statutory limit of 25 interrogatories, including subparts [F.R.Civ.P. 33(a)(1)].

9.     Wherever objections have been interposed, the Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to the Request and the stated objections.   Assuming that such "meet and confer" takes place in a timely fashion, and to the extent it is successful in resolving differences, the Responding Party stands ready, willing and able to complete discovery as to the relevant and non-privileged information called for by the Request (subject, of course, to any stipulations entered into as a result of the "meet and confer").

10.     The Responding Party has already delivered to the Propounding Party for consideration a proposed form of Stipulated Protective Order embodying typical terms of such an order that have been previously approved by federal district courts in this District.   In so far as the Responding Party has interposed objections based on grounds of "Confidential Information" or "Privacy," the Responding Party will produce non-privileged documents or information, as the case may be, responsive to these discovery Requests, upon the issuance and filing by the Court of such a protective order either pursuant to the Parties' stipulation to the terms of such an order or upon motion of any of the Parties.

11.     No response or objection (or production of documents or things in response to) any of the Requests is intended as, nor shall it be construed as, a waiver by the Responding Party of all or any part of any objection to that or any other

11

Request, or an admission of the existence of any fact set forth in or assumed by that or any other Request, or an admission that such response or objection constitutes admissible evidence.

12.   Delineation of the Court's Limitation on Jurisdictional Issues Subject to This Discovery.  By its "Order Denying Without Prejudice Defendants' Motion to Dismiss and Granting Plaintiff's Request for Jurisdictional Discovery," dated May 3, 2018, Docket No. 36, the Court ordered the parties to engage in, and complete, within 90 days from the date of the Order, good faith "limited jurisdictional discovery *on the issues identified in this order*."  The Order specified only the following issues for purposes of such discovery: with regard to personal jurisdiction, "to clarify (1) the extent of Defendants' business and presence in California, and (2) any relationship between the Gangsta Bitch cover and California" (Order, p. 10); and, with regard to subject matter jurisdiction, "to clarify whether the amount-in-controversy has been met" (Order, p. 11).

13.   Each of the foregoing items set forth in this Paragraph is incorporated by reference in the responses to specific Requests, below.

**RESPONSES TO SPECIFIC INTERROGATORIES**

INTERROGATORY NO. 1:

State all dates on which YOU were physically present in the State of California from January 1, 2016 through the present.

RESPONSE TO INTERROGATORY NO. 1:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

Subject to the foregoing objection(s), but without waiving the same in whole

12

or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such <u>other</u> relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

<u>INTERROGATORY NO. 2:</u>

List all of YOUR SOCIAL MEDIA ACCOUNTS.

<u>RESPONSE TO INTERROGATORY NO. 2:</u>

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Privacy; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, for purposes of this jurisdictional discovery, must be limited to those accounts targeted at California or its residents, and having to do with GBMV1.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that

13

may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 3:

Describe in detail all marketing strategies YOU used to market GBMV1 to California residents.

RESPONSE TO INTERROGATORY NO. 3:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "marketing strategies."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the

14

Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 4:

Describe in detail all marketing strategies YOU used to market GBMV1.

RESPONSE TO INTERROGATORY NO. 4:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,   stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "marketing strategies;"  its definition and description of "marketing strategies" is irrelevant to jurisdictional issues; and,  for purposes of this jurisdictional discovery, must be limited to such matters as targeted California or its residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 5:

15

1   IDENTIFY all posts on YOUR SOCIAL MEDIA ACCOUNTS in which YOU

2   promoted an event that CARDI B would be attending in California.

3   RESPONSE TO INTERROGATORY NO. 5:

4   The Responding Party objects to this Request, in whole or in part, on the

5   following grounds: Inadequate Description; Overbroad; Tax Returns; Privacy;

6   Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction,

7   General Objections, and [Responding Party's] Definitions,  stated hereinabove

8   (specifically including, without limitation, the Responding Party's Objections to the

9   Propounding Party's Definitions and Instructions, with regard to any of the Defined

10  terms utilized in the Requests).

11  By way of explanation, this Request is vague and ambiguous in its reference

12  to "posts" and "promoted."

13  Subject to the foregoing objection(s), but without waiving the same in whole

14  or in part, the Responding Party responds to this Request as follows:

15  The Responding Party offers to meet and confer with the Propounding Party,

16  through counsel, at any mutually convenient time and in accordance with the Local

17  Rules, to attempt in good faith to resolve informally any differences or disputes that

18  may exist between the parties with respect to this Request and the aforestated

19  objections, and insofar as counsel are able to resolve the parties' differences

20  successfully by stipulation, the Responding Party shall be ready, willing and able to

21  provide such other relevant and non-privileged information as is called for by the

22  Request, as interpreted or modified per the parties' stipulation after meeting and

23  conferring, within a reasonable time thereafter.

24  INTERROGATORY NO. 6:

25  IDENTIFY all geographical places in the State of California YOU visited from

26  January 1, 2016 through the present, and the dates YOU visited them.

27  RESPONSE TO INTERROGATORY NO. 6:

28  The Responding Party objects to this Request, in whole or in part, on the

16

RESP & OBJECS TO PLTFS 1ST INTERROGS
TO DEF WASHPOPPIN, INC.

following grounds: Inadequate Description; Overbroad; Privacy; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is, as to dates, duplicative of Special Interrogatory No. 1. By "geographical places" the Responding Party will interpret this as calling for naming of cities. Additionally, as to KSR and Washpoppin, this is vague and ambiguous as to whom is referred to as "YOUR agent or employee."

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 7:

IDENTIFY the total amount of sales of GBMV1.

RESPONSE TO INTERROGATORY NO. 7:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated

17

hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," in that it is not clear whether this asks for unit sales, dollar value of sales, sales of different configurations or products including GBMV1, etc.  For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 8:

IDENTIFY the total amount of sales of each single on GBMVl.

RESPONSE TO INTERROGATORY NO. 8:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's

18

Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is vague and ambiguous in its reference to "sales," in that it is not clear whether this asks for unit sales, or dollar value of sales. For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 9:

IDENTIFY the total amount of profits, royalties and/or other compensation YOU received from sales of GBMVl.

RESPONSE TO INTERROGATORY NO. 9:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to

19

1  any of the Defined terms utilized in the Requests).

2     By way of explanation, this Request is vague and ambiguous in its reference

3  to "sales," and in its use of the terms "profits, royalties and/or other compensation."

4  For purposes of this jurisdictional discovery, must be limited to sales taking place in,

5  or purchases known to have been made by residents of, California, and income

6  received from California residents.

7     Subject to the foregoing objection(s), but without waiving the same in whole

8  or in part, the Responding Party responds to this Request as follows:

9     The Responding Party offers to meet and confer with the Propounding Party,

10  through counsel, at any mutually convenient time and in accordance with the Local

11  Rules, to attempt in good faith to resolve informally any differences or disputes that

12  may exist between the parties with respect to this Request and the aforestated

13  objections, and insofar as counsel are able to resolve the parties' differences

14  successfully by stipulation, the Responding Party shall be ready, willing and able to

15  provide such <u>other</u> relevant and non-privileged information as is called for by the

16  Request, as interpreted or modified, per the parties' stipulation after meeting and

17  conferring, within a reasonable time thereafter.

18  <u>INTERROGATORY NO. 10:</u>

19     IDENTIFY the total amount of profits, royalties and/or other compensation

20  YOU received from sales of each single on GBMVl.

21  <u>RESPONSE TO INTERROGATORY NO. 10:</u>

22     The Responding Party objects to this Request, in whole or in part, on the

23  following grounds: Inadequate Description; Overbroad; Confidential Information;

24  Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the

25  Introduction, General Objections, and [Responding Party's] Definitions,  stated

26  hereinabove (specifically including, without limitation, the Responding Party's

27  Objections to the Propounding Party's Definitions and Instructions, with regard to

28  any of the Defined terms utilized in the Requests).

20

By way of explanation, this Request is vague and ambiguous in its reference to "sales," and in its use of the terms "profits, royalties and/or other compensation." For purposes of this jurisdictional discovery, must be limited to sales taking place in, or purchases known to have been made by residents of, California, and income received from California residents.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 11:

IDENTIFY all revenues from sales of tickets to events at which CARDI B appeared in the State of California from January 1, 2016 through the present, INCLUDING but not limited to the promotional tour for GBMV1 (the "(Underestimated Tour").

RESPONSE TO INTERROGATORY NO. 11:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Confidential Information; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions, stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to

21

1  any of the Defined terms utilized in the Requests).

2  By way of explanation, this Request is vague and ambiguous in its reference

3  to "revenues." Irrelevant in so far as it refers to events at which the Responding Party

4  merely "appeared" (as opposed to performed, or events which featured the

5  Responding Party as a pre-arranged celebrity guest). For purposes of this

6  jurisdictional discovery, must be limited to events related to GBMV1.

7  Subject to the foregoing objection(s), but without waiving the same in whole

8  or in part, the Responding Party responds to this Request as follows:

9  The Responding Party offers to meet and confer with the Propounding Party,

10  through counsel, at any mutually convenient time and in accordance with the Local

11  Rules, to attempt in good faith to resolve informally any differences or disputes that

12  may exist between the parties with respect to this Request and the aforestated

13  objections, and insofar as counsel are able to resolve the parties' differences

14  successfully by stipulation, the Responding Party shall be ready, willing and able to

15  provide such <u>other</u> relevant and non-privileged information as is called for by the

16  Request, as interpreted or modified per the parties' stipulation after meeting and

17  conferring, within a reasonable time thereafter.

18  <u>INTERROGATORY NO. 12:</u>

19  IDENTIFY all profits that YOU or anyone on YOUR behalf earned from

20  events which CARDI B or YOU appeared and/or attended in order to promote

21  GBMV1.

22  <u>RESPONSE TO INTERROGATORY NO. 12:</u>

23  The Responding Party objects to this Request, in whole or in part, on the

24  following grounds: Inadequate Description; Overbroad; Confidential Information;

25  Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and incorporates the

26  Introduction, General Objections, and [Responding Party's] Definitions, stated

27  hereinabove (specifically including, without limitation, the Responding Party's

28  Objections to the Propounding Party's Definitions and Instructions, with regard to

22

1   any of the Defined terms utilized in the Requests).

2       By way of explanation, this Request is vague and ambiguous in its reference
3   to "revenues." Irrelevant in so far as it refers to events at which the Responding Party
4   merely "appeared" (as opposed to performed, or events which featured the
5   Responding Party as a pre-arranged celebrity guest). For purposes of this
6   jurisdictional discovery, must be limited to events taking place in California.
7   Additionally, as to KSR and Washpoppin, vague and ambiguous as to whom is
8   referred to as "YOUR agent or employee."

9       Subject to the foregoing objection(s), but without waiving the same in whole
10  or in part, the Responding Party responds to this Request as follows:

11      The Responding Party offers to meet and confer with the Propounding Party,
12  through counsel, at any mutually convenient time and in accordance with the Local
13  Rules, to attempt in good faith to resolve informally any differences or disputes that
14  may exist between the parties with respect to this Request and the aforestated
15  objections, and insofar as counsel are able to resolve the parties' differences
16  successfully by stipulation, the Responding Party shall be ready, willing and able to
17  provide such other relevant and non-privileged information as is called for by the
18  Request, as interpreted or modified per the parties' stipulation after meeting and
19  conferring, within a reasonable time thereafter.

20  INTERROGATORY NO. 13:

21      IDENTIFY all contracts RELATED TO GBMV1, INCLUDING but not
22  limited to recording, COVER ART, concerts, travel, costume, hair and makeup, non-
23  concert appearances, licensing, and/or merchandising from January 1,2016 through
24  the present.

25  RESPONSE TO INTERROGATORY NO. 13:

26      The Responding Party objects to this Request, in whole or in part, on the
27  following grounds: Inadequate Description; Overbroad; Confidential Information;
28  Privacy; Unduly Burdensome; Impermissible Discovery; CC 3294-3295; and

23

incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant, and for purposes of this jurisdictional discovery may only relate to such contracts as were either executed in California, to be performed in California, or entered into with persons known to be residing in, or entities known to be domiciled in, California.  Moreover, under the Court's Order of May 3, 2018, this must exclude contracts with entities that merely engaged in the online promotion, sale, and distribution of sound recordings such as GBMV1, and that may happen to be organized, domiciled or located or doing business in California

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 14:

IDENTIFY the graphic designer(s) and/or photographer(s) who created the COVER ART for GBMVI.

RESPONSE TO INTERROGATORY NO. 14:

The Responding Party objects to this Request, in whole or in part, on the

24

following grounds: Inadequate Description; Overbroad; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and [Responding Party's] Definitions,  stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant.  The identity of the graphic designer and/or photographer is not a jurisdictional issue of fact, and was not among the issues specified by the Court in its Order of May 23, 2018, as being properly the subject of this jurisdictional discovery.

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

INTERROGATORY NO. 15:

IDENTIFY all communications with the graphic designer(s) and/or photographer(s) who created the COVER ART for GBMVI.

RESPONSE TO INTERROGATORY NO. 15:

The Responding Party objects to this Request, in whole or in part, on the following grounds: Inadequate Description; Overbroad; Unduly Burdensome; Impermissible Discovery; and incorporates the Introduction, General Objections, and

25

[Responding Party's] Definitions,   stated hereinabove (specifically including, without limitation, the Responding Party's Objections to the Propounding Party's Definitions and Instructions, with regard to any of the Defined terms utilized in the Requests).

By way of explanation, this Request is irrelevant.  Communications with the graphic designer and/or photographer are not a jurisdictional issue of fact, and were not among the issues specified by the Court in its Order of May 23, 2018, as being properly the subject of this jurisdictional discovery

Subject to the foregoing objection(s), but without waiving the same in whole or in part, the Responding Party responds to this Request as follows:

The Responding Party offers to meet and confer with the Propounding Party, through counsel, at any mutually convenient time and in accordance with the Local Rules, to attempt in good faith to resolve informally any differences or disputes that may exist between the parties with respect to this Request and the aforestated objections, and insofar as counsel are able to resolve the parties' differences successfully by stipulation, the Responding Party shall be ready, willing and able to provide such other relevant and non-privileged information as is called for by the Request, as interpreted or modified per the parties' stipulation after meeting and conferring, within a reasonable time thereafter.

Dated: June 14, 2018                    Respectfully Submitted,

                                        **ALAN G. DOWLING, P.C.**

                                        By:  /s/ Alan G. Dowling
                                             **Alan G. Dowling**
                                        *Attorney for Defendants*

26

## PROOF OF SERVICE

STATE OF CALIFORNIA,
COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1043 Pacific St., No. 1, Santa Monica, California 90405.

    On June 18, 2018, I served the foregoing document, described as: **RESPONSE AND OBJECTIONS TO "PLAINTIFF'S FIRST SET OF SPECIAL INTERROGATORIES (JURISDICTIONAL) TO DEFENDANT WASHPOPPIN, INC."** on each of the interested parties in this action, by the following means:

\_\_**IF PERSONAL SERVICE**: I placed \_\_ the original [or] _X_ a true copy thereof enclosed in a sealed envelope addressed as set forth on the attached Service List, and caused the same to be delivered via messenger by hand to the offices of the addressee.  [*For Personal Service* signature must be that of messenger.]

_x_ **IF SERVICE BY MAIL**: I placed \_\_ the original [or] _X_ a true copy thereof enclosed in a sealed envelope addressed as set forth on the attached Service List, and deposited such envelope in the mail at Santa Monica, California.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Santa Monica, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

\_ **IF SERVICE BY FACSIMILE TRANSFER:**  On June 18, 2018, at or about \_\_ a.m/\_\_ p.m. (i.e., between the hours of 9:00 a.m. and 5:00 p.m.), I transmitted by facsimile transfer ("fax") a copy of the foregoing document, from my fax machine the telephone number of which is (424) 238-5366, to each person ("fax recipient") indicated on the attached Service List on whom the foregoing document was thus served. The transmission was reported as complete and without error, and a copy of the transmission report so indicating was properly issued by the transmitting fax machine and is attached hereto.  Service by fax is permissible in this action in that the parties thus served have agreed thereto and a written confirmation of that agreement has been obtained.  The fax machine telephone number for the fax machine maintained by each fax recipient (and last given by each such person on any document which he or she has filed in this action and served on the party making this service) is as set forth on the attached Service List.  I understand that (subject to the other provisions of C.C.P. § 1013 and C.R.C. Rule 2008) service by fax is complete at the time of transmission, i.e., at the time of receipt of the entire

27

document by the fax recipient's fax machine, and that service by fax that occurs after 5:00 p.m. shall be deemed to has occurred on the next court day.

_ **COURTESY COPY SENT BY FACSIMILE TRANSFER ("FAX"):** Concurrently with service by other means as indicated herein, I have also caused an additional courtesy copy thereof to be transmitted by fax to said counsel, as indicated on the attached Service List.

__ **COURTESY COPY SENT BY INTERNET ELECTRONIC MAIL TRANSFER ("E-MAIL"):** In addition to the foregoing, I caused a courtesy copy thereof to be attached to an E-mail message, and thus transmitted by E-mail, to the lead opposing counsel indicated below, at the email address customarily used by said counsel heretofore in this action for sending and receiving communications.

Executed on June 18, 2018, at Santa Monica, California.

_ **(Federal)** I declare under penalty of perjury under the laws of the United States of America and the State of California that I am employed by the office of a member of the bar of this Court at whose direction the service was made.

_X_ **(California)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Alan G. Dowling
ALAN G. DOWLING

1

<u>**SERVICE LIST**</u>

2

3

<u>Brophy v. Almanzar et al.</u>
USDC, CD Cal, Case No. 8:17-cv-01885-CJC (JPRx)

4

5

<u>Counsel and Party/Parties Represented</u>:

6

7

A. Barry Cappello (CSB No. 037835)
abc@cappellonoel.com

8

Lawrence J. Conlan (CSB No. 221350)
lconlan@cappellonoel.com

9

Wendy D. Welkom (CSB No. 156345)

10

wwelkom@cappellonoel.com
**CAPPELLO & NOËL LLP**

11

831 State Street

12

Santa Barbara, CA 93101-3227
Telephone:  (805)564-2444

13

Facsimile:  (805)965-5950

14

*Attorneys for Plaintiff*

15

<u>*Service mailing address:*</u>

16

17

Lawrence J. Conlan, Esq.
**CAPPELLO & NOËL LLP**

18

831 State Street

19

Santa Barbara, CA 93101-3227

20

21

22

23

24

25

26

27

28

RESP & OBJECS TO PLTFS 1ST INTERROGS
TO DEF WASHPOPPIN, INC.

# EXHIBIT R

**Lawrence J. Conlan**

| | |
|---|---|
| **From:** | Alan <agdowling@aol.com> |
| **Sent:** | Wednesday, May 8, 2019 2:13 PM |
| **To:** | Lawrence J. Conlan |
| **Cc:** | Mandy Duong |
| **Subject:** | Re: 17cv01885 CJC Brophy Jt Stip and Jt Request |
| **Attachments:** | 17cv01885 CJC Brophy Jt Stip and Jt Request AGD revis 05 08 19.docx |

Larry-

I've reviewed your proposed Stipulation, and made a number of changes, which are reflected in my revised version attached hereto.  Please look them over and let me know if they are OK with you.  (I will be out of state from June 5 to June 17, traveling to multiple cities, and have taken that into account in suggesting new dates.) If my version is OK, I will go ahead and filed the Stip as revised.  If not, please send me your further revision, or comments (if that's more efficient).

With regard to your suggestion that we stipulate that you may revise the Complaint, I regret that, after considerable thought, I cannot agree to that. You never chose to amend when you might have done so as a matter of right, and have never previously sought leave from the Court to amend, including in your opposition to our original motions.  There is no real question but that, in so far as a motion to dismiss for failure to state a claim attacks the facial sufficiency of the pleadings, you would likely, as a matter of course, be granted leave to amend to correct any facial defects, assuming the motion is granted, if that were the only issue.  However, the issues of lack of subject matter and personal jurisdiction are another thing altogether.  Those are based on the claims as pled in the original Complaint, but that is of no particular moment, since you have previously been given, and will again have, the opportunity to present all of your evidence in opposition to the motion on those grounds.  It is therefore unnecessary to amend the Complaint prior to the renewal of that motion, and would only needlessly further delay the progress of the case.  Should the Court decide to grant the jurisdictional motion once it is renewed, the Court will determine whether and in what respects you should be allowed leave to amend; should the Court deny the motion, it will likely be a moot point.

I will of course be happy to discuss with you a briefing and hearing schedule for the renewed motion to dismiss, so as to accommodate your own calendar, as well.

Do you have any idea when we may expect to receive the completed transcript of the most recent deposition(s)?

Best,

Alan G. Dowling
Alan G. Dowling, A Professional Corporation
1043 Pacific St., No. 1
Santa Monica, CA 90405-1474
Tele: 818 679 6395
Fax:  424 238 5366
Email: agdowling@aol.com
Website:  www.alandowling.com


On May 8, 2019, at 11:15 AM, Lawrence J. Conlan <lconlan@cappellonoel.com> wrote:

1

Dear Alan,

Here is a working draft of a joint stip regarding scheduling.  As I said at Cardi's deposition, we believe that sufficient evidence has been developed to establish personal jurisdiction over defendants in California, and to satisfy the amount in controversy requirement.  I understood you to say at the time that you disagreed, but let me know if you've reconsidered your position.

If not, I suggest we discuss a schedule for me to file an amended complaint and then if you still believe grounds exist to move to dismiss, a briefing schedule for such a motion.  I am available anytime today to discuss.  The deadline to file our report is today.

Larry
<17cv01885 CJC Brophy Jt Stip and Jt Request AGD  revis 01 27  19.docx>

# EXHIBIT S

**Lawrence J. Conlan**

| | |
|---|---|
| **From:** | Lawrence J. Conlan |
| **Sent:** | Thursday, February 14, 2019 1:25 PM |
| **To:** | 'Alan' |
| **Cc:** | Mandy Duong |
| **Subject:** | RE: Brophy v. Belcalis Almanzar aka Cardi B, et al: Case No.: 8:17-cv-01885-CJC(JPRx) |

Dear Alan,

You may or may not know that your client Cardi B inactivated (and possibly deleted) her Instagram account recently.  If the account has been deleted we understand that all "photos, videos, comments, likes and followers" will be permanently deleted.  We also believe that since the litigation has been filed, many of the older posts that we cited in opposing the motion to dismiss have been removed from her Instagram account.  We also understand that the KSR Group LLC website has been altered since the litigation was filed to remove the "client roster" and other information.

We are writing to remind you and your clients of their evidence preservation obligations.  See *Gatto v. United Air Lines, Inc.,* No. 10-cv-1090-ES-SCM, 2013 U.S. Dist. LEXIS 41909 (D.N.J. Mar. 25, 2013) (where the court ordered that the jury would be instructed on the "adverse inference of spoliation" because the plaintiff employee deleted his Facebook account during the pendency of his lawsuit against United Air Lines).

We hope that all of your clients have taken appropriate steps to otherwise preserve their electronic media.  If they have not we will seek all available inferences and sanctions against them.

Thank you,
Larry

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com

---

**From:** Alan <agdowling@aol.com>
**Sent:** Wednesday, February 13, 2019 1:33 PM
**To:** Lawrence J. Conlan <lconlan@cappellonoel.com>
**Cc:** Mandy Duong <mduong@cappellonoel.com>
**Subject:** Re: Brophy v. Belcalis Almanzar aka Cardi B, et al: Case No.: 8:17-cv-01885-CJC(JPRx)

Larry-

I have just been advised that they are actively working to get us deposition dates as soon as possible and that I should be advised of those shortly.  I have also been advised of various categories of documents and information you requested that they say Cardi does not have at all, while they are actively gathering information and any documents responsive to the other categories, where she does have information.  I'll continue to follow up.

I'm not going to get into a tit for tat, or finger pointing, regarding the timing and delays of this particular discovery.  We've all been trying to get it done, and all been patient, but whatever's happened up to now is water under the bridge.  The point is to get it done, and it appears we're finally close to doing that.

I will be sending you objections, in writing, to the depo notices you just sent, for the record and just so there is no assertion later that we waived any such objections.

BTW. I did not mean to imply that you deliberately picked a date that conflicted with my calendar.  We merely failed to communicate on that part of it.

Best,

Alan G. Dowling
Alan G. Dowling, A Professional Corporation
1043 Pacific St., No. 1
Santa Monica, CA 90405-1474
Tele: 818 679 6395
Fax:  424 238 5366
Email: agdowling@aol.com
Website:  www.alandowling.com

On Feb 11, 2019, at 4:39 PM, Lawrence J. Conlan <lconlan@cappellonoel.com> wrote:

Dear Alan,

As you'll recall, before we last stipulated to extend the discovery deadline again, you suggested I wait until after February 4, 2019 to notice her deposition in order to see if Ms. Almanzar would finally supply a date for her deposition, which we've been requesting from you for many months.  Having heard nothing from you about her or your availability between February 4 and February 8, we selected a date and noticed her deposition per FRCP 26 and 30, in New York City, which is within the new discovery deadline.

I was not aware, and don't believe I was ever told, that there were dates in February on which you were not available prior to the new February 25 discovery deadline.  It was only when I received your email below that I learned that the date we noticed may pose a problem.

I note that Ms. Almanzar visited LA again this weekend to attend the Grammy Awards in LA at the Staples Center on February 10.  I also note that she has been in LA or California close to a dozen times since the Court allowed jurisdictional discovery, and that all the while we have been requesting deposition dates for her, but none have ever been proposed, in LA or NY.

We have been trying to work with you cooperatively for a long time get a date for Ms. Almanzar's deposition, as well as the documents we long ago requested, without success.  I have no confidence that without a deposition date pending and a renewed document request pending we will ever receive any new dates from Ms. Almanzar.  For now, I ask that you please secure a date for her deposition in LA on a

date when you and she are available.  Once we have an agreement on that, we can serve an amended notice.

Thanks and call me if you want to discuss.

Larry


Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com


**From:** Alan <agdowling@aol.com>
**Sent:** Friday, February 8, 2019 5:11 PM
**To:** Mandy Duong <mduong@cappellonoel.com>
**Cc:** Lawrence J. Conlan <lconlan@cappellonoel.com>
**Subject:** Re: Brophy v. Belcalis Almanzar aka Cardi B, et al: Case No.: 8:17-cv-01885-CJC(JPRx)

Ms. Duong and Mr. Conlan,

I appreciate that it is your right to notice the depositions described below, and will of course not interfere with your right to proceed via notice instead of stipulation. In that regard. I also sincerely appreciate the patience you've shown as we all waited to see whether Ms. Almanzar would herself indicate available dates and a preferred location, hoping that she might find a convenient time in Los Angeles, as Shaft did.  Unfortunately, we have not yet been able to obtain that information from her, and so you are proceeding via notice.

However, the date you have unilaterally selected and noticed poses a problem.  Had you extended to me, personally, the courtesy of inquiring as to my own availability on the date you have unilaterally selected, before serving a notice, I would have told you immediately that I am otherwise engaged on the date indicated, and the day before (necessary for travel from LA to New York), so February 21 will not work.  These depositions will therefore have to be rescheduled to a date after February 21 in all events.

I am personally available for the depositions to be conducted on Thurs February 28 or Friday March 1, or alternatively any day of the week of Monday March 11-15, or the following week of March 18-22.  I presently have no information regarding Ms. Almanzar's availability.  Obviously, I am willing to submit whatever stipulation for extension we may need to submit to the Court to make that feasible, to circumvent the current jurisdictional discovery deadline.

If you will be so kind as to confirm when, in those rate ranges, you are available and on which particular date you would prefer to proceed, I will advise Ms. Almanzar's transactional counsel accordingly.  In any event, I will advise them immediately that you have served a notice, and advise them of my available date ranges, to see if there is a particular date within those ranges when she is willing to make herself available for deposition in New York, or whether she can somehow arrange to appear voluntarily in Los Angeles instead.

Thanks, and I have every hope that we can cooperate to re-set and proceed with these depositions without having to resort to court proceedings.

Best regards,

Alan G. Dowling
Alan G. Dowling, A Professional Corporation
1043 Pacific St., No. 1
Santa Monica, CA 90405-1474
Tele: 818 679 6395
Fax:  424 238 5366
Email: agdowling@aol.com
Website:  www.alandowling.com


On Feb 8, 2019, at 4:20 PM, Mandy Duong <mduong@cappellonoel.com> wrote:

Dear Mr. Dowling,

Please find attached the Notice of Deposition of Belcalis Almanzar and Person Most Knowledgeable of Washpoppin, Inc. scheduled for **February 21, 2019**. Should you have any questions, please feel free to contact our office.

Thank you.

Mandy Duong
Cappello & Noël LLP
831 State Street
Santa Barbara, CA 93101
Main Phone:  805-564-2444
Fax:  805-965-5950

******************************************************************************************************************
The information contained in this message may be legally privileged and confidential.  It is intended only for the eyes and use of the individual or entity named above.
If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message is strictly prohibited.
If you have received this message in error, please immediately notify the sender  by e-mail mduong@cappellonoel.com Thank you, your cooperation is appreciated.
******************************************************************************************************************


<19.02.08, Brophy, Notice of Deposition of Becalis Alamanzar.pdf><19.02.08, Brophy, Notice of Deposition of PMK of Washpoppin Inc.pdf>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Lawrence J. Conlan, hereby certify that on August 5, 2019, I electronically filed the following document with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record:

- **SUPPLEMENTAL DECLARATION OF LAWRENCE J. CONLAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [F.R.C.P. RULE 12(B)]**

*/s/ Lawrence J. Conlan*
Lawrence J. Conlan

DECLARATION OF LAWRENCE J. CONLAN